**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**EARTHWORKS** *et al.*,

     **Plaintiffs,**

     **v.**                 **Civil Action No. 09-1972 (HHK/JMF)**

**U.S. DEPT. OF THE INTERIOR**
*et al.*,

     **Defendants.**

**MEMORANDUM OPINION**

Currently pending and ready for resolution are 1) Northwest Mining Association's and Alaska Miners Association, Inc.'s Motion to Supplement Administrative Record [#64] and 2) Plaintiffs' Motion to Compel Production of Documents Improperly Withheld from the Administrative Record and Memorandum in Support Thereof [#65].

**INTRODUCTION**

I.    The Mining Law

"The General Mining Law of 1892[1] is the federal statute that governs hardrock mining on federal lands.  Passed in the spirit of Manifest Destiny, the Law was designed to encourage development and settlement of the West.  In fact, as its basic premise, the Law posits that 'all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to

---

[1] 30 U.S.C. §§ 22 *et seq.*  All references to the United States Code, the Code of Federal Regulations and the Federal Register are to the electronic versions that appear in Westlaw and Lexis.

occupation and purchase." Nicholas Rinke, THE CROWN JEWEL DECISION: RECOGNIZING THE MINING LAW'S INHERENT LIMITS, 27 Ecology L. Q. 819, 820-21 (2000) (footnotes omitted).

This generous exploitation of the public domain permits exploration until the explorer, having found the minerals to be mined, perfects a valid mining claim. Mineral Policy Center v. Norton, 292 F. Supp. 2d 30, 46 (D.D.C. 2003).  The explorer who has perfected a mining claim has greater rights that he who does not, and there is, therefore, a consequential difference in government authority over claimed as opposed to unclaimed land.

A statute requires the Department of Interior to take "any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b).  Another statute specifies that it is the policy of the United States to "receive fair market value of the use of public lands and their resources unless otherwise provided for by statute." 43 U.S.C. § 1701(a)(9).

II.      The Kennedy Decision

In regulations promulgated on October 30, 2001, the Department of Interior did not require the payment of fair market value for mining operations on unclaimed land.  Judge Kennedy concluded that the Department of Interior was wrong and therefore remanded that portion of the 2001 regulations to the Department of Interior so that the policy of securing fair market value could be effectuated. Mineral Policy Center, 292 F. Supp. 2d at 51.

III.     The 2003 Regulations[2]

Under the Mining Law, a person who validly asserted a right to mine her claim, has the right to locate and patent a mill site claim in order to mine, smelt, and process the minerals

---

[2] On October 24, 2003, another set of regulations (68 Fed. Reg. 61,046-01) pertaining to this topic was promulgated but they did not address the subject of Judge Kennedy's decision.

extracted from the claim. 30 U.S.C. § 42(a).  According to plaintiffs, a section of the 2003

regulations provided a claimant with the right to locate and claim "as many millsite claims and

acres as the claimants needed for a proposed mining operation, regardless of the number of

associated mining claims to be utilized by that mining operation." Complaint for Declaratory and

Injunctive Relief [#1] ¶ 13.  Again, according to plaintiffs, because the acres of land that make

up the mill site claims are not subject to otherwise applicable environmental regulations, these

regulations "severely limit[] the regulatory authority of the federal land agencies to protect the

environment and non-mining resources of the public lands." Id. ¶ 14.

IV.    The Remand Regulation

      On remand from Judge Kennedy, the Bureau of Land Management ("BLM") issued, on

February 23, 2007, an advance notice of proposed rule making that requested public comments

"regarding whether any miners or mining companies in fact use unclaimed lands for such mining

operations." 73 Fed. Reg. 73,790.  As Judge Kennedy had concluded, certain activities

conducted pursuant to valid mining claims or explicitly protected by the Federal Land Policy and

Management Act or the Mining Law itself (exploration, ingress and egress to a valid claim and

limited utilization of mill sites) are not subject to the requirement that the government secure fair

market value for the use of public lands. Mineral Policy Center, 292 F. Supp 2d at 51.  As BLM

saw it, the question presented was therefore whether mining operations that would be excused

from the fair market value requirement if conducted on validly claimed lands were being

conducted on invalidly claimed or unclaimed lands, triggering an obligation to consider whether

BLM was obliged to secure fair market value for their use.

      According to the BLM, however, the public comments confirmed what BLM suspected:

no mining operations, other than initial exploration, were occurring on invalidly claimed or

unclaimed lands. 73 Fed. Reg. 73,790-92.  It therefore followed that it was unnecessary for BLM to do anything more because, there being no use of invalidly claimed or unclaimed land for mining operations, there was no need to ascertain whether BLM should demand fair market value. Id.

Plaintiffs now challenge both the 2003 regulations and the 2008 determination on remand on several grounds.  In the motion before this Court, they insist that the administrative record pertaining to both is insufficient and that it should first be supplemented by specific records they tender with their motion.  They also demand that "the Federal Defendants conduct a more thorough investigation of their files to ensure that other documents have not been excluded." [#65] at 27.

Intervenor-Defendants ask for the inclusion of nine specific documents. [#64], *passim*.

The question presented is whether the relief sought should be granted as to each set of regulations, the 2003 regulations pertaining to mill sites and the 2008 regulations pertaining to the remand Judge Kennedy ordered.  I begin, however, with an analysis of the controlling legal principles.

## DISCUSSION

I.    Legal Standards

Pursuant to Section 706 of the Administrative Procedure Act ("APA"), "the reviewing court shall . . . review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; Pacific Shores Subdivision California Water Dist. v. United States Army Corps of Eng'rs, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (citing Ctr. For Auto Safety v. Fed. Highway Admin., 956 F.2d 309, 314 (D.C. Cir. 1992)).  The Supreme Court has defined "the whole record" to include "the full administrative record" that was before the decision-makers at the time. Citizens to Preserve

Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), abrogated on other grounds by Califano

v. Sanders, 430 U.S. 99 (1977).

In Pacific Shores, this Court stated the following:

> This Court has interpreted the "whole record" to include "all
> documents and materials that the agency 'directly or indirectly
> considered' . . . [and nothing] more nor less." Maritel, Inc. v.
> Collins, 422 F.Supp.2d 188, 196 (D.D.C. 2006) (quoting Bar MK
> Ranches v. Yuetter, 994 F.2d 735, 739 (10th Cir. 1993)); Fund for
> Animals, 391 F.Supp.2d at 197; Amfac Resorts, LLC v. Dep't of
> Interior, 143 F.Supp.2d 7, 12 (D.D.C. 2001).  In other words, the
> administrative record "should not include materials that were not
> considered by agency decisionmakers." Novartis Pharms. Corp. v.
> Shalala, No. 99-323, 2000 U.S. Dist. LEXIS 6152, at *1, *11-12
> (D.D.C. Apr. 28, 2000) (citing Ammex, Inc. v. United States, 62 F.
> Supp. 2d 1148, 1156 (C.I.T. 1999) ("relevant materials that were
> neither directly nor indirectly considered by agency
> decisionmakers should not be included")).
>
> Limiting review of the administrative record to only what the
> agency decisionmakers directly or indirectly considered is
> important.  A broad application of the phrase "before the agency"
> would undermine the value of judicial review: "[I]nterpreting the
> word 'before' so broadly as to encompass any potentially relevant
> document existing within the agency or in the hands of a third
> party would render judicial review meaningless." Fund for
> Animals v. Williams, 245 F.Supp.2d 49, 57 n.7 (D.D.C. 2003).
> Thus, to ensure fair review of an agency decision, a reviewing
> court "'should have before it neither more nor less information
> than did the agency when it made its decision.'" Fund for Animals,
> 391 F. Supp. 2d at 196 (quoting IMS, P.C. v. Alvarez, 129 F.3d
> 618, 623 (D.C. Cir. 1997)); accord Overton Park, 401 U.S. at 420,
> 91 S.Ct. 814.[3]

---

[2] Accord Franks v. Salazar, 751 F. Supp. 2d 62, 67 (D.D.C. 2010); Marcum v. Salazar, 751 F.
Supp. 2d 74, 78 (D.D.C. 2010); Wildearth Guardians v. United States Forest Service, 713 F.
Supp. 2d 1243, 1254 (D. Colo. 2010).

Finally, "absent clear evidence to the contrary, an agency is entitled to a strong presumption of regularity,[4] that it properly designated the administrative record" and "is not obligated to include every potentially relevant document existing within its agency." Pacific Shores, 448 F. Supp. 2d at 5, 7 (internal citations omitted).  In this Circuit, the presumption of regularity has been overcome in those rare instances when 1) "the agency deliberately or negligently excluded documents that may have been adverse to its decision," 2) "the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors," or 3) "the agency failed to explain administrative action so as to frustrate judicial review." American Wildlands v. Kemphorne, 530 F.3d 991, 1002 (D.C. Cir. 2008) (quoting James Madison Ltd. By Hecht v. Ludwig, 82 F.3d 1085, 1095 (D.C. Cir. 1996)).  Unless a party can "demonstrate unusual circumstances justifying a departure from the general rule" a motion to supplement must be denied. Id.; accord City of Dania Beach v. F.A.A., 628 F.3d 581, 590 (D.C. Cir. 2010).

A.    Supplementation of the Administrative Record[5]

As this Court noted in an earlier opinion, supplementing the administrative record means "adding to the volume of the administrative record with documents the agency considered." Pacific Shores, 448 F. Supp. 2d at 5.  In all instances, the party seeking to supplement the administrative record "must put forth concrete evidence." Id. at 6.  In other words, the party "must identify reasonable, non-speculative grounds for [his] belief that the documents were

---

[4] Accord San Luis Obispo Mothers for Peace v. NRC, 751 F.2d 1287, 1329 (D.C. Cir. 1984); Sara Lee Corp., v. American Bakers Ass'n, 252 F.R.D. 31, 34 (D.D.C. 2008).

[5] Although the intervenor-defendants have captioned their motion as one to supplement the record, because they also argue in favor of this Court's consideration of extra-record evidence, the Court will consider their motion under both standards.

considered by the agency and not included in the record." Id. (internal citation omitted).  Mere speculation will not suffice. Id.  In addition, there must be proof that the documents were before the actual decision makers. Id. (citing Overton Park, 401 U.S. at 420.

      B.      Consideration of Extra-Record Evidence

    Consideration of extra-record evidence means "viewing evidence outside of or in addition to the administrative record that was not necessarily considered by the agency." Pacific Shores, 448 F. Supp. 2d at 5.  As this Court stated in Pacific Shores:

> It would be useful to first clarify what it means to "supplement" the record.  There appears to be some confusion regarding the difference between supplementing the record, i.e. adding to the volume of the administrative record with documents the agency considered, and allowing the review of extra-record evidence, i.e. viewing evidence outside of or in addition to the administrative record that was not necessarily considered by the agency.  It is necessary to clarify the difference between these two concepts . . ..  Defendants appear to have conflated the act of supplementing the record with permitting consideration of extra-record evidence.  For a court to supplement the record, the moving party must rebut the presumption of administrative regularity and show that the documents to be included were before the agency decision maker.  On the other hand, for a court to review extra-record evidence, the moving party must prove applicable one of the eight recognized exceptions to the general prohibition against extra-record review.

Id. at 5-6.

    At the time Pacific Shores was written, the eight exceptions to which the Court referred were the following, as identified in Esch v. Yuetter, 876 F.2d 976 (D.C. Cir. 1989):

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued

> for failure to take action; (7) in cases arising under the National
> Environmental Policy Act; and (8) in cases where relief is at issue,
> especially at the preliminary injunction stage.

Id. at 991.

Since then, there have been three decisions in this Court, two by Chief Judge Lamberth and an intervening one by Judge Huvelle, both indicating that the court of appeals has now narrowed these exceptions.

In The Cape Hatteras Access Preservation Alliance v. United States Department of Interior, 667 F. Supp. 2d 111 (D.D.C. 2009), Chief Judge Lamberth read Esch to apply the traditional rule strictly limiting review to the administrative record with "its maximum force when the substantive soundness of the agency's decision is under scrutiny." Id. at 115 (quoting Esch, 876 F.2d at 991). The Chief Judge also read Esch to countenance the use of extra-record evidence in those cases where, in a procedural context, it might be necessary to enable judicial review to be effective. Cape Hatteras at 115. The Chief Judge then concluded the following: "Read in context, this Court thinks that the Esch exceptions are generally more appropriately applied in actions contesting the procedural validity of agency decisions, but even if they are not so limited, it is clear that they were to be sparingly applied to only those cases where extra-record evidence was necessary to make judicial review effective." Id. (citing Calloway v. Harvey, 590 F. Supp. 2d 29, 38 (D.D.C. 2008); Pacific Shores, 448 F. Supp. 2d at 6).

Finally, the Chief Judge concluded that there were many other cases that suggested that the eight exceptions in Esch were not widely accepted. Cape Hatteras at 115 (citing Axiom Resource Mgmt. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009) ("Esch's vitality even within the D.C. Circuit is questionable in light of more recent opinions by that court which demonstrate a more restrictive approach to extra-record evidence."). He pointed particularly to

IMS, P.C. v. Alvarez, 129 F.3d 618, 624 (D.C. Cir. 1997), in which the court of appeals only identified four instances that permitted the receipt of extra record evidence: 1) when the agency failed to examine all relevant factors; 2) when the agency failed to explain adequately its grounds for decision; 3) when the agency acted in bad faith; or 4) when the agency engaged in improper behavior. Id.

In Oceana Inc. v. Locke, 674 F. Supp. 2d 39 (D.D.C. 2009), Judge Huvelle, noting that she had previously observed that "Esch's discussion of eight exceptions to the general rule regarding consideration of extra-record evidence was *dicta*," concluded that Chief Judge Lamberth's opinion in Cape Hatteras convinced her that Esch must be read narrowly. Id. at 44. She concluded, as had the Chief Judge, that the court of appeals' decision in IMS, P.C. permitted the receipt of extra-record evidence only in the four instances the Chief Judge had elucidated.

To complete the circle, the Chief Judge then applied his ruling in Cape Hatteras to Franks v. Salazar, 751 F. Supp. 2d 62 (D.D.C. 2010).  In Franks, the Chief Judge noted that since he decided Cape Hatteras, the court of appeals had since held that "'[t]he APA limits judicial review to the administrative record 'except when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review.'" Franks, 751 F. Supp. 2d. at 68 (quoting Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 514 (D.C. Cir. 2010) (internal quotations omitted).  Accord Marcum v. Salazar, 751 F. Supp. 2d 74, 79 (D.D.C. 2010).

I find the analyses of the Chief Judge and Judge Huvelle persuasive and will therefore apply them to plaintiffs' and intervenors' claim that they should be permitted to supplement the administrative record with additional evidence.  Thus, insofar as the motions insist that the administrative record is incomplete, movants would have to establish they have rebutted the

presumption that the administrative record is complete by establishing by clear evidence that the documents they tender were in fact considered by the decision makers, whether directly or indirectly, or that the agency has negligently or deliberately excluded documents that may have been adverse to its decision.  In the alternative, they would have to show that there is background information that is needed to establish that the agency did not consider all of the relevant factors or that the agency failed to explain administrative action so as to frustrate judicial review.

In order to supplement the record with additional evidence, movants would have to show once again that the agency failed to examine all relevant factors or adequately explain the grounds for its decision or that it engaged in improper behavior or bad faith.

First, no one is alleging bad faith or improper behavior.  Second, as will quickly become clear, there are no additional factors to which movants point that the Department of Interior should have considered but did not.  The analyses underlying the two rules are strict legal analyses that will rise or fall on the validity of the legal reasoning that led the agency to reach the conclusion it did.  No one is suggesting that there are, for example, scientific analyses that undercut that legal analysis.  Finally, while plaintiffs quarrel with it, the legal reasoning set forth by the agency is unequivocally clear.  Thus, there is no premise sanctioned by the caselaw to grant the motions being made.  Indeed, as will now be shown, the tendered documents are so insignificant that it cannot possibly be said that without them the administrative record is incomplete.  Instead, they add little or nothing to it.  Moreover, it appears to me that the intervenors are attempting to enlarge the scope of the needed judicial review beyond the only two regulations that are at issue between the original parties and, in any event, the documents they offer are equally insignificant. Thus, neither motion ever "breaks from the gate" and both must be denied.

II.     Analysis

    A.     Plaintiffs' Motion to Compel[6]

In their motion, plaintiffs identify six specific documents that they insist should be part of the administrative record. [#65] at 10-15.  They further contend that numerous documents were improperly withheld on privilege grounds. Id. at 15-26.

    1.     Exhibit 1

According to plaintiffs, a change of administrations brought about a change in policy as to mill sites.  In 1997, the Secretary of Interior in the Clinton administration and his Solicitor issued a memorandum that prohibited a mining plan of operation that permitted the operator a greater number of mill sites than the number of associated mining claims. [#1] ¶ 97.  In 2003, however, during the Bush administration, the Deputy Solicitor of the Department of Interior issued a memorandum permitting an operator as many mill site claims as needed, including lands for the dumping of mine waste. Id. ¶ 101.  A new regulation codified this conclusion. Id. (citing 68 Fed. Reg. 61,036-81).  Thus, the Bush administration reached a categorically different result from the Clinton administration.  The 1997 opinion and the 2003 opinion are part of the administrative record and therefore plaintiffs can advance the obvious argument that the agency did not provide a sufficient justification for this reversal of position.

Thus, although it would appear plaintiffs have all they need to make that argument, they insist that the Department of Interior supplement the record by adding a September 28, 2001 letter, identified as plaintiff's Exhibit 1, in which J. Steven Griles, Deputy Secretary of Interior, instructs Nina Hatfield, Acting Director, Bureau of Land Management, that the Bureau of Land

---

[6] Although captioned a motion to compel, the motion is more appropriately characterized as one seeking to supplement the Administrative Record.

Management is not to apply the 1997 Bush era opinion "to grandfathered patent applications and to plans of operation which were submitted before November 7, 1997, or which were approved before November 29, 1999." [#65-2] at 2.

To understand that conclusion, one has to understand that Griles was dealing with the significance of intervening Congressional action.  As explained in Griles' memorandum to Hatfield, in 1997, Secretary Babbitt, who was President Clinton's Secretary of Interior, issued the 1997 Mill Site Opinion indicating that the Department would not approve mill site patent applications in which the applicant indicated its intent to locate mill sites at a ratio greater than five acres per claim. [#65-2] at 2.  The letter further indicated that Babbitt had advised Senator Harry Reid of Nevada, a state with a substantial mining industry, that the Department of Interior did not intend to apply this five acre limitation to mining operations under already approved plans of operation.  Id.

Despite that assurance, Congress passed legislation that prohibited application of the 1997 Mill Site Opinion for "fiscal years 2000 and 2001, to patent applications grandfathered from the patent funding moratorium and plans of operations that were submitted before November 7, 1997, or that BLM approved before November 29, 1999." [#65-2] at 2 (citing Pub. L. No. 106-113, § 337).  After indicating that the Bureau of Land Management had implemented this legislation by "Instruction Memorandum No. 2001-174 (July 13, 2001)," Griles then warned Hatfield that, although the legislative limitation was going to expire, there was "no indication that Congress has altered its view on this issue" and that it would be unfair "to change the Department's administrative application of the Mill Site opinion at this time." Id.  Griles therefore instructed the Bureau of Land Management to refrain from applying the Mill Site Opinion to those applications specified in the legislation, i.e, the "grandfathered patent

12

applications and to plans of operation which were submitted before November 7, 1997 or which were approved before November 29, 1999, consistent with the policy described in the July 13, 2001 Instruction Memorandum." Id.  Finally, Griles asked the Solicitor to review the 1997 Babbitt opinion and warned that no one should construe his memorandum as approval of the conclusions reached in the Mill Site Opinion. Id.

Quarreling over whether this document should be part of the administrative record is an awful waste of time.  Inclusion or exclusion of it neither advances nor retards the analysis of the revocation of the 1997 opinion and its replacement by the 2003 opinion one whit.  The document does not speak to validity of the conclusions reached in the 1997 opinion nor does it explain why the Department of Interior abandoned relying on it.  The document speaks only to whether a Congressional prohibition should be applied despite its expiration.  The only light it casts on the 2003 opinion is that it marks the inception of the process that will ultimately lead to the promulgation of the 2003 opinion that plaintiffs seeks to have this Court review and set aside.  It is irrational to suggest that without it the court cannot review the 2003 opinion, that plaintiffs will not be able to make as completely and fulsomely any legal argument they wish or that its exclusion renders the administrative record incomplete.

There is an abstract argument, one supposes, that when an agency reverses a policy, the policy being reversed is before the agency and thus considered by it.  But the 1997 opinion is in the record; not every piece of paper that refers to that opinion, even if it starts the process of its revision, must be part of the administrative record when the document speaks not to how or why the policy should be modified but to Congressional legislation imposing a limitation on the application of the process being revised.

2.    Exhibit 2

13

Plaintiffs identify Exhibit 2 as "the Crown Jewel Mine Decision," a mine-specific decision issued in 1999, which "implemented the [Department of Interior / Bureau of Land Management's and Department of Agriculture / United States Forest Services'] Millsite policies to deny a proposed mining operation in Washington State–policies that were reversed by the challenged 2003 Millsite Rule." [#65] at 11.  According to plaintiffs, there are no documents relating to the Crown Jewel Mine decision in the Administrative Record even though it is specifically discussed in the text of the 2003 Mill Site Rule. Id.

Section 42 of the General Mining Law, captioned "Patents for nonmineral lands: application, survey, notice, acreage limitation, payment" provides the following:

> (a) Vein or lode and mill site owners eligible
> Where nonmineral land not contiguous to the vein or lode is used or occupied by the proprietor of such vein or lode for mining or milling purposes, such nonadjacent surface ground may be embraced and included in an application for a patent for such vein or lode, and the same may be patented therewith . . . but no location made on and after May 10, 1872, of such nonadjacent land shall exceed five acres . . ..
>
> (b) Placer claim owners eligible
> Where nonmineral land is needed by the proprietor of a placer claim for mining, milling, processing, beneficiation, or other operations in connection with such claim, and is used or occupied by the proprietor for such purposes, such land may be included in an application for a patent for such claim, and may be patented therewith subject to the same requirements as to survey and notice as are applicable to placers. No location made of such nonmineral land shall exceed five acres . . ..

30 U.S.C. §§ 42 et seq.

As discussed above, in 1997, during the Clinton Administration, the Department of Interior issued an opinion,[7] part of the administrative record, that concluded that "an applicant may patent only up to 5 mill site acres per mining claim." 68 Fed. Reg. 61,054.  The rule therefore limited "the amount of mill site acreage claimants could locate per mining claim." Id. The Bush Administration reversed this policy in a new regulation, 43 C.F.R. § 3832.32, by answering the question "How much land may I include in my mill site?" with the following:

> The maximum size of an individual mill site is 5 acres.  You may locate more than one mill site per mining claim if you use each site for at least one of the purposes described in § 3832.34 of this part. You may locate only that amount of mill site acreage that is reasonably necessary to be used or occupied for efficient and reasonably compact mining or milling operations.

43 C.F.R. § 3832.32.

In the explanation that accompanies this regulation, the Bush Administration Department of Interior explains why it reversed the 1997 opinion that led to the 1999 rule that the 2003 rule superseded.  According to the Department of Interior, the 1997 opinion was inconsistent with the manner in which the Department of Interior, through the Bureau of Land Management, had applied the statutory 5 acre mill provision throughout its history. 68 Fed. Reg. 61,054-55.

On March 25, 1999, the Office of the Solicitor, Department of Interior, applied the 1997 opinion to a proposed plan of operation of the Crown Jewel Mine in Okanogan County, Washington, and it is the Solicitor's letter[8] that disapproved the application that plaintiffs insist should be part of the administrative record, despite the defendants' refusal to include it.

---

[7] It was entitled "Limitations on Patenting Millsites Under the Mining Law of 1872." 68 Fed. Reg. 61,054.

[8] [#65-4].

15

Significantly, the letter never became effective because Congress passed legislation in 1999 that stated that, notwithstanding the Solicitor's opinion of November 7, 1997, "the Department of Interior and the Department of Agriculture shall not limit the number or acreage of millsites based on the ratio between the number or acreage of millsites and the number or acreage of associated lode or placer claims with respect to the Crown Jewel project, Okanogan County, Washington for any fiscal year." Emergency Supplemental Appropriations Act, Pub. L. No. 106-31, § 3006, 113 Stat. 57 (1999). The very next section of the law specifically required the Secretary of Interior to "approve the plan of operations and reinstate the record of decision for the Crown Jewel project." Id.

Congress, now speaking more generically, "grandfathered" and thereby rendered invulnerable all applications for mining and mill site claims that had been filed by September 30, 1994. Department of the Interior and Related Agencies Appropriations Act, 2001, Pub. L. No. 106-291, §§ 311 (a) & (b), 144 Stat. 922 (2000).  By the day of the enactment of that legislation, October 11, 2000, a presidential election was a few weeks away.  Then, as recounted above, the Bush Administration Secretary of Interior precluded any reliance on the 1997 opinion and ultimately promulgated the 2003 opinion that is one of the subjects of this lawsuit.

The March 25, 1999 letter at issue is therefore the deadest of dead letters.  It is undisputed that it spoke to a single application for a particular mine, applied the 1997 opinion without further elucidation of its rationale and was rendered ineffective by prompt Congressional action that specifically nullified it by name.  Thus, the letter evidences what everyone already knows; the Department of Interior applied the 1997 opinion once and Congress outlawed its doing so.  The opinion was never applied to any other mining claim until it was superseded by the 2003 regulations.

16

Given its history, the fight over the inclusion of the March 25, 1999 letter is truly a "rage over a lost penny."  While the letter does discuss other legal issues–whether the applicant could put some surface facilities on land it did not intend to mine, whether a land exchange was possible, and whether it was equitable for the Department of Interior to apply the 1997 opinion to applications made prior to its promulgation–their resolution has nothing whatsoever to do with the question presented by this lawsuit: was the 2003 opinion an arbitrary and capricious action or otherwise in violation of the statutes upon which plaintiffs rely?  Since the March 25, 1999 letter adds nothing to the legal analysis that underlies the 1997 opinion, it does not advance the resolution of those issues a single inch.  It certainly cannot be said that without this document the administrative record is incomplete.

> 3.    Exhibit 3

Exhibit 3 is a January 18, 2001, Memorandum from Secretary Babbitt entitled "Use of Mining Claims for Purposes Ancillary to Mineral Extraction." [#65] at 12.  According to plaintiffs, this document belongs in the Administrative Record because it was one of the key agency decisions relied upon by this Court in its Mineral Policy Center decision, which prompted the issuance of the 2008 Mining Claim Rule that plaintiffs challenge herein. Id. at 12-13.

Defendants argue that, although the Mineral Policy Center decision did contain a discussion of this document, it was in a "general legal background" section and not in that section of the opinion the defined the parameters of the remand. Federal Defendants' Consolidated Opposition to Plaintiffs' Motion to Compel Production of Documents and Northwest Mining Association's and Alaska Miners Association's Motion to Supplement Administrative Record [#72] at 26.  Defendants also contend that it would be inappropriate to

17

make this document part of the Administrative Record because the date of the document is

January 18, 2001, three years prior to the Depart of Interior's initiation of the rulemaking that

resulted in the 2008 Mining Claim Rule. Id. at 26-27.

Defendants' argument that the memorandum should not be made part of the

Administrative Record because it predates the initiation of the rulemaking process that resulted

in the issuance of the 2008 Mining Claim Rule is not persuasive.  The issue is not the date of a

particular document but rather, whether, irrespective of its date, the administrative record is

complete without it.  More persuasive is defendants' argument regarding the insignificance of

the Ancillary Use Memorandum to the Court's ultimate conclusion that this case should be

remanded and to what the Department of Interior did to comply with that remand order.

In the memorandum at issue, the Department of Interior, under the Clinton

Administration, addressed, in what might have been one of its final actions,[9] the use of mining

claims for purposes ancillary to mineral extraction.  The Yarnell Mining Company, located in

Arizona, proposed that it be permitted to use some of its 32 unpatented mining claims not to

mine but to locate sites for "heap leach wads, waste rock dumps, and other facilities to support

development of nearby mining claims." [#65-4] at 1.  These uses are called "'ancillary

operations'; i.e., operations intended to support mineral extraction from other mining claims or

other lands, and not looking to extract minerals from these particular claims." Id.

The Solicitor concluded that the request required him to consider the following legal

issues: (1) whether the Mining law treats mining claims  and mill sites differently; (2) whether a

mining claim might be invalid if used solely for ancillary operations; and (3) whether the

---

[9] The Solicitor's Memorandum is dated January 18, 2001. [#65-4].  President Bush was sworn in
on January 21, 2001.

Secretary of Interior could, in his discretion, permit use of public lands as to which invalid mining claims or mill site claims had been made. [#65-4], *passim*.

None of these issues were before the Court in Mineral Policy Center because this 2001 opinion was not challenged in that lawsuit.  The Court concluded that the only claim with merit was plaintiffs' contention that the Bureau of Land Management was required to obtain fair market value for all operations on unclaimed or inadequately claimed lands. Mineral Policy Center, 292 F. Supp. 2d at 50.  Ironically, given plaintiffs' claim of the significance of this document, the January 21, 2001 opinion specifically states that whether the Secretary must recover the fair market value for uses of public lands for purposes ancillary to mining when those uses will not take place on valid mining claims or mill sites is an issue better "left for more careful examination in a future opinion." [#65-4] at 17.

Understandably, Judge Kennedy therefore referred to the 2001 Ancillary Use Memorandum only to explain the Solicitor's view on how the law distinguished  between "claimed" versus "unclaimed" lands.  The Solicitor had to explain how, under the Mining Law Act of 1872, rights attach only to valid mining claims and valid mill sites and not to invalid or unclaimed ones, thereby affecting the dramatic difference in how the Secretary considers proposed operations on those two types of lands.  If there is a valid mining or mill site claim, the Secretary must respect the rights the claimant may assert.  If there is not a valid claim, there are no rights the Secretary must respect and he may, in his discretion, permit the use, provided he complies with other pertinent legal requirements. [#65-4] at 12-17.  See Mineral Policy Center, 292 F. Supp. 2d at 48.  As just noted, he left for another day whether the Secretary had to secure the fair market value of this discretionary use of public lands.

19

Judge Kennedy therefore referred to this memorandum solely to explicate the difference in how the law, as interpreted by the Solicitor, drew this most fundamental distinction between the rights pertaining to valid claims and the Secretary's power over lands as to which invalid claims were made.  He then remanded the case for the Secretary to advise the court whether the Department of Interior was securing fair market value for the uses of lands.  The memorandum, which specifically declines to speak to the very question Judge Kennedy posed, is so peripheral to the validity of the answer ultimately given by the Department of Interior that no reasonable person could possibly say that without it the administrative record is incomplete.

    4.  Exhibits 4 & 5 & Other Department of Agriculture / United States Forest Service Documents

Exhibit 4 is a September 22, 2003, Information Memorandum from Department of Agriculture Undersecretary, Marky Rey, to Chief of the Forest Service, Dale Bosworth. [#65] at 14.  Exhibit 5 consists of three letters: 1) a July 3, 2008, letter from United States Forest Service Regional Forester Rick D. Cables to Colorado Rep. John T. Salazar; 2) a July 9, 2008, letter from Department of Interior / Bureau of Land Management Colorado State Director Sally Wisely to Congressmen Salazar and Udall; and 3) another copy of Rey's September 22, 2003, letter.  According to plaintiffs, in addition to these documents, they have obtained numerous Department of Agriculture / United States Forest Service documents that discuss the Department of Agriculture's and United States Forest Service's interpretation and implementation of the 1997 Mill Site Memorandum, the 2001 Ancillary Use Memorandum and the Crown Jewel Mine decision, which should be included in the Administrative Record. [#65] at 13-15.  Plaintiffs argue that the Administrative Record should contain such documents because "[i]ssues surrounding how DOA and USFS have interpreted the relevant provisions of the Mining Law,

such as the Millsite provision and issues regarding the lack of a statutory right to conduct mining operations on lands not covered by valid claims pursuant to Mineral Policy Center, are part of this lawsuit." Id. at 12-13.

Actually, the exhibits speak to a much narrower issue: the scope of the United States Department of Agriculture's regulatory authority over mining operations on lands that are "reserved from the public domain and open to mineral entry." [#65-5] at 2. Notwithstanding (*inter alia*) the Clinton Administration's 1997 Mill Site Opinion at issue in this case, "the Forest Service is not required to inquire into claim validity before processing and approving proposed plans of operations." [#65-5] at 3. It followed that the Department of Agriculture, through the Forest Service, would not inquire into the validity of the mining claim but would insist upon its right to approve the miner's operating plan to insure that the activities proposed were "required for and reasonably incidental to prospecting, mining, or processing operations," and that the "operations minimize[d] adverse environmental effects to the extent feasible." Id.

In the next exhibit, the first of the three letters is a letter to a member of Congress from the Forest Service advising him that, consistent with its policy, it will not be making a validity determination as to a particular mine (the Lucky Jack Mine project). [#65-6] at 2-3. The second letter, from the State Director of the Bureau of Land Management for Colorado, informs two representatives that because the Lucky Jack Mine project is on Forest Service land, it will determine, subject to review by the Bureau of Land Management, whether to inquire into the validity of the claim. Id. at 4. The last letter, a memorandum from the Undersecretary for National Resources and Environment to the Chief of the Forest Service, confirms that the "Forest Service is not required to inquire into claim validity before processing and approving proposed plans of operations." Id. at 5-6.

21

These documents have nothing to do with issues presented by this case.  In their

complaint, plaintiffs, who denominate the U.S. Department of Agriculture and the U.S. Forest

Service as defendants, state that the Secretary of Agriculture "is the agency official responsible

for all DOA and USFS activities, including DOA/USFS' reliance on the Challenged Rules and

the management and regulation of mining on lands administered by DOA/USFS," and that

"DOA/USFS have historically relied upon, and currently rely upon, DOI/BLM's interpretation

of the Mining Law (including the Challenged Rules) in DOA/ USFS' management of mining

operations on the public lands." [#1] ¶¶ 67, 68.  The "Challenged Rules" are, of course, those

identified in paragraphs 1-3 of the Complaint–the 2008 rule, issued upon remand, and the 2003

mill site rule.

        In their Request for Relief, plaintiffs ask the Court to "[e]nter an order declaring that the

2008 Mining Claim Rule and DOI/BLM and DOA/USFS policies and decisions implementing

that Rule violate the Mining Law, FLPMA, and related requirements of federal law." [#1] at 47.

Thus, as the complaint indicates, the administrative record and the history of this litigation show

no one is claiming that the Department of Agriculture or the United States Forest Service

reached any independent conclusions as to how the pertinent laws, including the Mining Law of

1872, should be interpreted in determining how many acres a mill site operator could locate per

claim or how to comply with Judge Kennedy's remand order.  Since neither of these agencies

did so, the claim as to them is derivative of the central claim made against the Department of

Interior, as it promulgated the 2003 mill site regulations and the 2008 response to the remand.

The relief sought against them is therefore equally derivative; plaintiffs demand that the

Department of Agriculture and the United States Forest Service stop relying on the regulations

that the Department of Interior issued. [#1] ¶ 3.  Whether or not these exhibits are in the

administrative record cannot possibly have any bearing on the validity of what the Department
of Interior did.  They will not be made a part of the Administrative Record.

     5.     The Attorney-Client and Work Product Privileges

     According to plaintiffs, the defendants have improperly withheld over 300 documents on
the grounds of attorney-client and attorney work product privilege. [#65] at 15.  After reviewing
the two privilege logs, captioned "FMV - Privileged" and "Mill Site - Privileged," provided by
the defendants, the Court notes the following deficiencies in their submissions.

     First, the defendants failed to properly invoke the deliberative process privilege.  In this
Circuit, that "requires a formal claim of privilege by the head of the department with control
over the information" and "must include a description of the documents involved, a statement by
the department head that she has reviewed the documents involved, and an assessment of the
consequences of disclosure of the information." Northrop Corp. v. McDonnell Douglas Corp.
751 F.2d 395, 405 n.11 (D.C. Cir. 1984) (internal citations omitted).  Here, the defendants
submitted a declaration by Mitchell Leverette, Division Chief for the Washington Office, Solid
Minerals Division, Bureau of Land Management.  The only certification Mr. Leverette makes is
that "each indexed document is a true and correct copy of documents comprising the official
record." [#65-7].  There is no indication whatsoever that he has personally reviewed the
documents and that, based on his assessment, they are protected by the deliberative process
privilege and should not be disclosed to the public.

     Second, the defendants failed to provide any index identifying the titles of the individuals
identified in the privilege log.  Without such an index, the Court cannot ascertain whether any of
the claimed privileges are appropriate.

Third, while the defendants claim in their opposition to plaintiffs' motion to have

invoked only the attorney-client and deliberative process privileges, in the actual privilege log

itself, they claimed the attorney-client, deliberative process, *and* work product privileges.

Compare [#72] at 30 with Federal Defendants' Corrected Notice of Filing Index to

Administrative Record [#55].

Although the Court could simply order defendants to resubmit their privilege logs with

the necessary corrections, it has been this Court's experience that privilege logs are notoriously

useless documents. Lurensky v. Wellinghoff, 271 F.R.D. 345, 355 (D.D.C. 2010).  The Court

will therefore order that the defendants cure the defects described above and submit the

documents to the Court for *in camera* review along with a proper declaration from the head of

the Bureau of Land Management and an index that provides the titles of the individuals

identified in the privilege log.

B.      Intervenor-Defendants' Motion to Supplement

The United States Forest Service has taken the positions that (1) the public has the right

to enter National Forest Lands to prospect, locate and develop mineral resources; (2) it has the

right to approve and regulate all activities related to prospecting, locating and developing

mineral resources and (3) the United States Forest Service is not required to insist that a

prospector have a valid claim as a condition of her entry upon National Forest Lands to prospect,

locate and develop mineral resources. [#64-2] at 1-3.  The United States Forest Service also has

concluded that if the activities are reasonably incidental to mining, they are subject to one set of

regulations, *i.e.*, 36 C.F.R. § 228 Subpart A and to federal environmental laws while if they are

not, they are not subject to those regulations. [#64-4].  It therefore follows that the United States

Forest Service will not require a prospector to establish the validity of her claim as a condition of

her entry onto National Forest Lands but reserves the right to approve the plan of operations for activities that are "required for and reasonably incidental to prospecting, mining, or processing operations. " Id.  As will be shown in greater detail in a moment, intervenors tender for inclusion documents that pertain only to these topics.

Plaintiffs' attack on the 2003 regulations is, according to the complaint, on particularly "those portions of the October 24, 2003 Final Rule related to Millsites or Millsite Claims (hereinafter, '2003 Millsite Rule')" [#1] ¶ 3.  Their other attack is, of course, related to the "Mining Claim Rule," *i.e.*, the Department of Interior's response to Judge Kennedy's remand order. Id. ¶ 2.  Plaintiffs only seek to "declare invalid and enjoin the DOA's and USFS's adoption of, and reliance upon, the two above-mentioned DOI/BLM Rules (and the policies contained therein) [ i.e. the Millsite regulation and the response to the remand] in DOA/USFS'[s] review, management, and regulation of mining operations on federal public lands administered by DOA/USFS." Id. ¶ 4.

Judge Kennedy denied these intervenors intervention as of right, concluding that their representation by the existing parties was adequate. Memorandum Opinion and Order [#41] at 3. He did, however, grant them permissive intervention because they had an interest "in keeping the agencies' rules in place." Id.  The rules to which the judge was referring are the Mining Claim rule and the Mill Site rule.  These intervenors have no right to demand that the lawsuit be expanded to uphold the validity of rules other than those that are in dispute.

Furthermore, as should also be self-evident, it is impossible as a simple matter of logic for the persons in the Department of Interior who promulgated the two disputed rules to have considered in any way the rules of other agencies on entirely different topics.  It is also true that the Department of Interior and the United States Forest Service rules that concern

25

intervenors–the refusal to consider the validity of a mining claim as a condition of approving a mining plan for lands within its jurisdiction and the assertion of the agencies' right to approve a mining operation plan on lands open to public entry under the Mining law–will rise or fall irrespective of the validity of the two rules that are actually in dispute.  There is nothing in Judge Kennedy's order permitting their intervention that could authorize them to clutter the existing record with documents that pertain to concerns that have nothing to do with the validity of the regulations that are in dispute.  Indeed, the only claim they can possibly assert and still remain within the intervention granted them is so hypothetical–if the Mill Site and Mining Claim rules fall, the Department of Interior may consider other rules–that in my view it does not even present a case or controversy within this Court's jurisdiction.  See Los Angeles v. Lyons, 461 U.S. 95 (1977).

I will now turn to an analysis of the documents intervenors tender.

      1.     Exhibits A and B

The intervenor-defendants identify Exhibit A as a "Memorandum to Kathleen McAllister, Appeal Deciding Officer from Cindy S. Swanson, Appeal Reviewing Officer, regarding the disposition of Cottonwood Resource Council, et al., App. No. 02-01-00-0004 (December 7, 2001)" and Exhibit B as a "Letter to Roger Flynn and Jeffrey C. Parsons, Attorneys for Cottonwood Resource Council and Northern Plains Resource Council, from Kathleen McAllister, Appeal Deciding Officer, regarding the disposition of Cottonwood Resources Council, et al., App. No. 02-01-00-0004 (December 13, 2001)." [#64] at 1-2.  The intervenor-defendants indicate that they pertain to a Forest Service case, Cottonwood Resource Council, et al., App. No. 02-01-00-0004 (Forest Serv. Dec. 21, 2001), which was approvingly "cited and discussed in the Record at FMV000272-FMV000273 in the Department of Interior's

26

2005 opinion 'Legal Requirements for Determine [sic] mining Claim Validity Before Approving a Mining Plan of Operations.'" [#64] at 4-5; Administrative Record ("AR") at FMV000274 ("M-37012").  But, merely because the Solicitor's November 14, 2005, letter references the Cottonwood case does not mean that the individuals responsible for the 2008 Mining Claim Rule considered it at all during their rulemaking deliberations.  The Cottonwood case is one of thirteen cited in that letter, yet the intervenor-defendants do not argue that documents relating to all of those cases were considered by the decision makers and therefore should be included in the Administrative Record.

Exhibit A, a letter from the Appeal Reviewing Officer to the Appeal Deciding Officer in the Cottonwood case, provides, *inter alia*, a review of the Forest Service's authority to regulate mining activities pursuant to the 1872 Mining Law, and includes references to the 1955 Surface Resources Act, Forest Service Regulation 36 CFR § 228.3(a), and section 2817.03 of the Forest Service Manual. [#64-2] at 2-8.  Although it does provide a useful history of the Forest Service's regulatory authority, that history is brief.  Furthermore, it does not explain the Forest Service's policies, it merely summarizes them. Exhibit A's generality and lack of detail, not only fails to explain the Department of Agriculture's / United States Forest Services' policies, it fails to provide any additional explanation as to the Department of Interior's decision to enact the 2008 Mining Claim Rule and therefore will not be considered.

Exhibit B is a letter from the Appeal Deciding Officer in the Cottonwood case affirming the decision rendered by the Appeal Reviewing Officer in Exhibit A.  It, too, will not be considered as extra-record evidence because, like Exhibit A, it neither contains any discussion of the Forest Services' authority to determine the validity of mining claims or mill sites, nor does it further illuminate the Department of Interior's rationale in enacting the challenged decision.

27

2.    <u>Exhibit C</u>

Exhibit C is identified by the intervenor-defendants as a "Letter to Kathleen Clark, Director of the Department of the Interior, from Dale Bosworth, Chief, Forest Service, regarding clarification or revision of a Solicitors Opinion regarding ancillary uses associated with mining activities under the 1872 Mining Law (July 9, 2004)." [#64] at 2.  They argue that Exhibit C was "expressly referenced in the Administrative Record at FMV00268 in a Memorandum titled 'Recession of 2001 Ancillary Use Opinion.'" <u>Id.</u> at 6.  That one document in the Administrative Record references another one does not mean that the court must consider both in its review of the plaintiffs' claims.  Additionally, in a November 14, 2005 memorandum already in the Administrative Record,[10] the Department of Interior states that, in light of the 2003 Mill Site Opinion, the 2001 Ancillary Use Opinion is withdrawn in its entirety.  Thus, Exhibit C does not provide anything further than that already contained in the Administrative Record.

3.    <u>Exhibits D Through I</u>

As to the remaining documents, the intervenor-defendants make only the following argument:

> Exhibits D through I include the policy positions, directives, and a handbook developed by the U.S. Forest Service and were widely circulated among the Federal Defendants including the BLM during the promulgation of the Challenged Rules.  These Omitted Documents illuminate that the U.S. Forest Service has independent authority to consider the reasonableness of mining operations on lands open to mineral entry, an issue that is critical to rebut the allegations made in the Complaint.

[#64] at 7.

Once again, the intervenor-defendants' argument is without merit.  To state simply that a

---

[10] AR at FMV000268.

28

document was widely circulated at a particular time is pure speculation and is not the concrete

evidence necessary to justify supplementing the Administrative Record.  In addition, the

intervenor-defendants' bare assertion that "the Omitted Documents are necessary for a full and

complete understanding of the issues before the Court" does not make it so.[#64] at 7.

Finally, the Court notes that the intervenor-defendants' stated purpose in seeking to

supplement the Administrative Record is to support their contention that the "Omitted

Documents illuminate that the U.S. Forest Service has independent authority to consider the

reasonableness of mining operations on lands open to mineral entry, an issue that is critical to

rebut the allegations made in the Complaint." [#64] at 7.  As has previously been explained,

whether or not the Department of Agriculture / United States Forest Service has independent

authority to consider the reasonableness of mining operations on lands open to mineral entry is

not before this Court.  Thus, Exhibits D through I, each of which deals with the policies of the

Department of Agriculture / United States Forest Service other than its reliance upon the rules

that are in dispute cannot be added to the administrative record.[11]

---

[11] Exhibit D is an "Informational Memorandum to Dale Bosworth, Chief, Forest Service from
Mark Rey, Under Secretary National Resources and Environment, regarding USDA Policy on
Mining of Public Domain Mineral Estate (September 22, 2003); Exhibit D is a two-page letter
that states that "the Forest Service is not required to inquire into claim validity before processing
and approving proposed plans of operations"; Exhibit E is a "Letter to Regional Foresters from
Tom L. Thompson, Deputy Chief for National Forest System, regarding Informational
Memorandum from Under Secretary Mark Rey that clarifies and affirms long-standing USDA
policy regarding regulation of mining operations on National Forest System lands open to
mineral entry (October 19, 2003)"; Exhibit F is the "United States Department of Agriculture
Forest Service, Surface Use Determination Report for the Lodestar Mining and Exploration
Proposal Sweet Grass County, Montana"; Exhibit G is the "United States Forest Service Mineral
and Geology Handbook, Chapter 10 - Surface Use Determination (effective date August 31,
2006)"; Exhibit H is a "Forest Service Manual Missoula, Montana, Title 2800 - Minerals and
Geology (effective date, June 10, 1992)"; and Exhibit I is a "Memorandum to Regional Forester,
Lakewood, Colorado, from Lawrence M. Jakub, Regional Attorney, Office of the General
Council, regarding Gilt Edge Expansion - Minerals (October 25, 1990)." [#64] at 2.

An Order accompanies this Memorandum Opinion.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE