Edward S. Scheideman, DC Bar # 475128
DLA Piper US, LLP
500 8th Street, NW
Washington, DC 20004
(202) 799-4534, Fax: (202) 799-5534
edward.scheideman@dlapiper.com

Roger Flynn, *Pro Hac Vice*
Jeffrey C. Parsons, *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738, Fax (303) 823-5732
wmap@igc.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EARTHWORKS; ) | |
| HIGH COUNTRY CONSERVATION ADVOCATES; ) | |
| GREAT BASIN RESOURCE WATCH; ) | |
| SAVE THE SCENIC SANTA RITAS; and ) | |
| WESTERN SHOSHONE DEFENSE PROJECT, ) | Civ No. 09-CV-1972-FJS |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | PLAINTIFFS' |
| ) | MOTION FOR |
| DEPARTMENT OF THE INTERIOR, ) | SUMMARY JUDGMENT |
| U.S. DEPARTMENT OF AGRICULTURE, ) | and |
| U.S. BUREAU OF LAND MANAGEMENT, and ) | MEMORANDUM |
| U.S. FOREST SERVICE, ) | IN SUPPORT |
| ) | |
| Defendants, ) | Oral Argument Requested |
| ) | |
| BARRICK NORTH AMERICAN HOLDING CORP., ) | |
| ABX FINANCECO INC, NATIONAL MINING ASSOC., ) | |
| ROUND MOUNTAIN GOLD CORP., ALASKA ) | |
| MINERS ASSOC., AMERICAN EXPLORATION & ) | |
| MINING ASSOC., and STATE OF ALASKA ) | |
| ) | |
| Intervenor-Defendants, ) | |
| ) | |
| STATE OF NEVADA, ) | |
| ) | |
| Amicus. ) | |

i

## TABLE OF CONTENTS

I.    **INTRODUCTION AND SUMMARY** ................................................................ 1

II.    **STANDARD OF REVIEW** ............................................................................ 4

III.   **PLAINTIFFS HAVE STANDING** ............................................................. 4

IV.  **FACTUAL BACKGROUND AND STATEMENT** .......................................... 6

      A.    **The 2008 Mining Claim Rule** ......................................................... 6

      B.    **The 2003 Millsite Rule** ................................................................. 9

      C.    **Environmental Impacts of the 2008 Mining Claim Rule and the 2003 Millsite Rule** .................................................................. 12

V.   **ARGUMENT** ........................................................................................ 13

      A.    **The 2008 Mining Claim Rule Violates FLMPA and the Mining Law** .................................................................... 13

            *1.*    *Statutory Background: FLPMA* ...................................... 13

            *2.*    *Statutory Background: the 1872 Mining Law and the requirement for claim validity as a prerequisite for rights to use and occupy public lands* ........................... 15

            *3.*    *By failing to distinguish between operations proposed on valid and perfected claims versus operations proposed on claims without the requisite discovery of a valuable mineral deposit, the 2008 Mining Claim Rule grants rights to claimants where none exist, and fails to meet FLPMA's requirements* ................... 17

      B.    **The 2003 Millsite Rule Violates the Mining Law and FLPMA** .......... 21

            *1.*    *The millsite provision of the Mining Law* ....................................... 21

            *2.*    *The 2003 Millsite Rule erroneously interprets the Mining Law* .... 22

      C.    **The 2008 and 2003 Rules Violate NEPA** ................................................. 28

            *1.*    *NEPA Statutory Background* ....................................... 28

            *2.*    *The "Categorical Exclusion" for the 2008 Rule violates NEPA* .................................................. 32

            *3.*    *The EA for the 2003 Rule violates NEPA* ....................................... 33

**D.** **The 2003 Rule Violates the Public Notice and Comment Requirements of the APA** ........................................................ 39

**CONCLUSION** ......................................................................................... 40

## EXHIBIT LIST

1.  Declaration of Bonnie Gestring, Earthworks.

2.  Declaration of John Hadder, Great Basin Resource Watch and Earthworks.

3.  Declaration of Allison Melton, High Country Conservation Advocates.

4.  Declaration of Sue Navy, High Country Conservation Advocates.

5.  Declaration of Gayle Hartmann, Save the Scenic Santa Ritas.

6.  Declaration of Larson Bill, Western Shoshone Defense Project.

7.  "*One Third of the Nation's' Land*: *A Report to the President and the Congress by the Public Land Law Review Commission*" (1970)(Excerpts).

8.  Office of Technology Assessment, "*Management of Fuel and Non-Fuel Minerals in Federal Land,*" (1979)(Excerpts).

## TABLE OF AUTHORITIES

***Federal Caselaw***

American Bird Conservancy v. F.C.C.,
516 F.3d 1027 (D.C. Cir. 2008) ................................................................. 35

Am. Colloid Co. v. Babbitt,
145 F.3d 1152 (10th Cir.1998) ................................................................... 17

Andrus v. Charlestone Stone Prods. Co.,
436 U.S. 604 (1978) ................................................................................... 23

Baltimore Gas & Elec. Co. v. NRDC,
462 U.S. 87 (1983) ..................................................................................... 29

Best v. Humboldt Placer Mining Co.,
371 U.S. 334 (1963) ................................................................................... 16

Brady Campaign to Prevent Gun Violence v. Salazar,
612 F.Supp.2d 1 (D.D.C. 2009) ............................................ 30, 32, 33, 34, 35

iii

California v. Norton,
311 F.3d 1162 (9th Cir. 2002) ............................................................................ 34

California ex rel. Lockyer v. U.S. Dept. of Agric.,
575 F.3d 999 (9th Cir. 2009) ........................................................................ 32, 33

Cameron v. United States,
252 U.S. 450 (1920) ............................................................................................. 20

Center for Food Safety v. Salazar,
898 F.Supp.2d 130 (D.D.C. 2012) ......................................................................... 5

Chevron U.S.A., Inc. v. Natural Resources Defense Council,
467 U.S. 837 (1984) ......................................................................................... 4, 22

Cole v. Ralph,
252 U.S. 286 (1920) ....................................................................................... 16, 17

Delaware Riverkeeper Network v. F.E.R.C.,
753 F.3d 1304 (D.C. Cir. 2014) ...................................................................... 29, 35

Environmental Integrity Project v. EPA,
425 F.3d 992 (D.C. Cir. 2005) ........................................................................ 39, 40

Freeman v. U.S. Dept. of Interior,
37 F.Supp.3d 313 (D.D.C. 2014) .......................................................................... 17

Friends of the Earth v. Laidlaw Envtl. Servs., Inc.,
528 U.S. 167 (2000) ............................................................................................... 5

Friends of the Earth, Inc. v. U.S. Army Corps of Engineers,
109 F.Supp.2d 30 (D.D.C. 2000) .......................................................................... 33

Grand Canyon Trust v. F.A.A.,
290 F.3d 339 (D.C. Cir. 2002) ........................................................................ 29, 35

Ickes v. Underwood,
141 F.2d 546 (D.C.Cir.1944) ............................................................................... 17

International Union, United Mine Workers of America v. Mine Safety and Health Admin.,
407 F.3d 1250 (D.D.C. 2005) ............................................................................... 39

Kooritsky v. Reich,
17 F.3d 1509 (D.C. Cir. 1994) ............................................................................. 40

Louisiana Pub. Service Comm. v. FERC,
184 F.3d 892 (D.C. Cir. 1999) ............................................................................... 4

Lujan v. NWF,
497 U.S. 871 (1990) ............................................................................................... 24

Marsh v. ONRC,
490 U.S. 360 (1989) ............................................................................................... 28

Martini v. FNMA,
178 F.3d 1336 (D.C. Cir. 1999) ............................................................................ 22

Mineral Policy Center v. Norton,
292 F.Supp.2d 30 (D.D.C. 2003) .................................................................... *passim*

Motor Vehicle Mfrs. Assn. v. State Farm Mut. Automobile Ins. Co.,
463 U.S. 29 (1983) ................................................................................................. 21

Mt. Emmons Min. Co. v. Babbitt,
117 F.3d 1167 (10th Cir. 1997) ............................................................................ 15

Mount Royal Joint Venture v. Kempthorne,
477 F.3d 745 (D.C. Cir. 2007) .............................................................................. 24

Nat'l Labor Relations Bd. v. Brown,
380 U.S. 278 (1965) ................................................................................................. 4

Payne v. United States,
31 Fed.Cl. 709 (1994) ........................................................................................... 17

Public Employees for Environmental Responsibility v. U.S. Fish and Wildlife Service,
177 F.Supp.3d 146 (D.D.C. 2016) ........................................................................ 37

Reed v. Salazar,
744 F.Supp.2d 98 (D.D.C. 2010) ...................................................................... 5, 34

Robertson v. Methow Valley Citizens Council,
490 U.S. 332 (1989) ......................................................................................... 28, 29

Sierra Club v. Bosworth,
510 F.3d 1016 (9th Cir. 2007) ............................................................................... 33

Skaw v. United States,
13 Cl.Ct. 7 (1987) ................................................................................................. 17

Small Refiner Lead Phase-Down Task Force v. EPA,
705 F.2d 546 (D.C. Cir. 1983) .............................................................................. 40

Summers v. Earth Island Institute,
555 U.S. 488 (2009) ................................................................................................. 5

v

U.S. v. Coleman,
390 U.S. 599 (1968) ............................................................................... 16

U.S. v. Locke,
471 U.S. 84 (1985) ................................................................................. 16

U.S. v. Sweet,
245 U.S. 563 (1918) ............................................................................... 27

U.S. v. Union Pacific R. Co.,
353 U.S. 112 (1957) ............................................................................... 23

Waskey v. Hammer,
223 U.S. 85 (1912) ................................................................................. 17

Watt v. Western Nuclear, Inc.,
462 U.S. 36 (1983) ................................................................................. 27

Wilderness Society v. Morton,
479 F.2d 842 (D.C. Cir. 1973) ......................................................... 24, 28

Young v. General Services Admin.,
99 F.Supp.2d 59 (D.D.C. 2000) ............................................................. 29

***Federal Statutes***

Administrative Procedures Act ("APA"),
5 U.S.C. §§ 553, 701-706 ............................................................... *passim*

5 U.S.C. § 553(b) ................................................................................... 39

5 U.S.C. § 553(c) ................................................................................... 39

5 U.S.C. § 706(2) ..................................................................................... 4

30 U.S.C. § 21 ....................................................................................... 27

Mining law of 1872,
30 U.S.C. §§ 22-47 ........................................................................ *passim*

30 U.S.C. § 22 ................................................................................. 16, 27

30 U.S.C. § 23 ....................................................................................... 17

30 U.S.C. § 26 ....................................................................................... 16

30 U.S.C. §§ 28, 28f (2003) ................................................................... 16

30 U.S.C. § 42 ..................................................................................... *passim*

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ................................................................... *passim*

42 U.S.C. § 4332(2)(C) ............................................................................... 29

43 U.S.C. § 201 ........................................................................................... 27

Federal Land Policy Management Act of 1976 ("FLPMA"),
43 U.S.C. § 1701 *et seq.* ...................................................................... *passim*

43 U.S.C. § 1701(a)(9) ......................................................................... 14, 19

43 U.S.C. § 1702(c) .................................................................................... 13

43 U.S.C. § 1732(a) .................................................................................... 13

43 U.S.C. § 1732(b) .................................................................................... 14

43 U.S.C. § 1740 .......................................................................................... 6

43 U.S.C. §§ 1761-1771 ............................................................................ 25

The Federal Register Act,
44 U.S.C. §§ 1501–1511 ............................................................................ 40

Pub. L. 88-606, §2, 78 Stat. 982 ............................................................... 24

Pub. L. No. 106-113, § 337 ........................................................................ 10

Act of July 1, 1862, 12 Stat. 489, ch. 120, § 3 ......................................... 27

Act of July 2, 1862, ch. 130, § 1, 12 Stat. 503 ......................................... 27

Act of July 2, 1864, ch. 217, § 3, 13 Stat. 365 ......................................... 27

Act of June 21, 1866, 14 Stat. 66, ch. 127, § 1 ........................................ 27

Act of July 4, 1866, ch. 166, § 5, 14 Stat. 86 ........................................... 27

Act of Feb. 1, 1905, c.288, §1, 33 Stat. 628 ............................................. 15

***Federal Regulatory Material***

45 Fed.Reg. 78902 (November 26, 1980) .................................................... 6

"Forty Most Asked Questions Concerning CEQ's NEPA Regulations,"
46 Fed. Reg. 18026 (March 23, 1981) ....................................................... 39

"Location, Recording, and Maintenance of Mining Claims or Sites,"
64 Fed.Reg. 47023-47046 (August 27, 1999)........................................... 10, 11, 23, 36, 37, 40

65 Fed.Reg. 69998-70132 (November 3, 2000) ....................................................... 6

66 Fed.Reg. 16162-16171 (March 23, 2001) .......................................................... 6

66 Fed.Reg. 54834-54862 (October 30, 2001) ....................................................... 6

"Locating, Recording, and Maintaining Mining Claims or Sites,"
68 Fed.Reg. 61046-61081 (Oct. 24, 2003) .................................................... *passim*

72 Fed.Reg. 8139-8142 (Feb. 23, 2007) ................................................................ 8

"Mining Claims Under the General Mining Laws,"
73 Fed.Reg. 73789-73794 (Dec. 4, 2008)..................................................... *passim*

82 Fed.Reg. 3388, 3472 (January 11, 2017) ....................................................... 13

1 C.F.R. § 18.12(a)........................................................................................... 40

36 C.F.R. Part 251 subpart B ........................................................................... 13

40 C.F.R. § 1500.1(a)....................................................................................... 28

40 C.F.R. § 1500.1(b) .................................................................................. 29, 38

40 C.F.R. § 1500.2(d) ...................................................................................... 38

40 C.F.R. § 1501.4 .................................................................................. 29, 30, 39

40 C.F.R. § 1502.1 ......................................................................................... 29

40 C.F.R. § 1502.4(b) ..................................................................................... 29

40 C.F.R. § 1506.6(a) ..................................................................................... 39

40 C.F.R. § 1508.4 .................................................................................... 30, 35

40 C.F.R. § 1508.7 ......................................................................................... 30

40 C.F.R. § 1508.8 .................................................................................... 30, 32

40 C.F.R. § 1508.9 .................................................................................... 30, 39

40 C.F.R. § 1508.13 ........................................................................................ 30

40 C.F.R. § 1508.18(a) .................................................................................... 29

43 C.F.R. § 46.205(c) ............................................................................ 30, 33

43 C.F.R. § 46.215 ......................................................................... 30, 32, 33, 34

43 CFR § 3800.6 ................................................................................... 8, 9

43 CFR § 3832.32 ................................................................................ 10, 11

*Federal Administrative and Executive Decisions*

Great Basin Mine Watch,
146 IBLA 248 (1998), 1998 WL1060687 .......................................... 17

"Limitations on Patenting Millsites Under the Mining Law of 1872,"
M-36988 (November 12, 1997) ................... 8, 9, 10, 11, 14, 23, 25, 26, 28, 35, 36, 37, 38, 40

"Use of Mining Claims for Purposes Ancillary to Mineral Extraction,"
M-37004 (Jan. 18, 2001) .............................................. 7, 8, 12, 14, 20, 22

"Mill Site Location and Patenting Under the 1872 Mining Law,"
M-37010 (October 8, 2003) ........................... 11, 23, 26, 28, 35, 36, 37, 39

"Rescission of 2001 Ancillary Use Opinion,"
M-37011 (Nov. 14, 2005) ................................................................. 7

"Legal Requirements for Determining Mining Claim Validity Before
Approving a Mining Plan of Operations,"
M-37012 (Nov. 14, 2005) ................................................................. 8

U.S. Forest Service Manual section 2811.33 ......................................... 15

U.S. Forest Service Manual section 2819 ............................................. 15

BLM H-1790-1 - National Environmental Policy Act Handbook ........................................ 38

*Secondary Authority*

Twitty, "Amendments to the Mining Laws,"
8 *Ariz. L. Rev.* 63 (1966) ................................................................. 25

Parr & Kimball, "Acquisition of Non-Mineral Land for Mine Related Purposes,"
23 *Rocky Mtn. Min. L. Inst.* 595 (1977) ........................................... 25

*One Third of the Nation's Land:  A Report to the President and to the Congress by the
Public Land Law Review Commission* (June 1970) ............................. 24, 25

Office of Technology Assessment, *Management of Fuel and Nonfuel Minerals in
Federal Land*, at 127 (April 1979) ................................................... 26

## I.      **INTRODUCTION AND SUMMARY**

Pursuant to this Court's Order (Dkt. 112) and Fed.R.Civ.Pro. 56, Plaintiffs Earthworks, High Country Conservation Advocates (formerly known as High Country Citizens' Alliance), Great Basin Resource Watch, Save the Scenic Santa Ritas, and the Western Shoshone Defense Project, submit this Motion for Summary Judgment and Memorandum in Support.  This case challenges two Department of the Interior ("DOI")/Bureau of Land Management ("BLM") regulations and their implementation in the review, management, and regulation of mining operations on federal public lands in the western states: (1) DOI/BLM's Interim Final Rule titled "Mining Claims Under the General Mining Laws," 73 Fed.Reg. 73789-73794 (Dec. 4, 2008) ("2008 Mining Claim Rule" or "2008 Rule") issued in response to <u>Mineral Policy Center v. Norton</u>, 292 F.Supp.2d 30 (D.D.C. 2003)(<u>MPC</u>); and (2) DOI/BLM's Final Rule titled "Locating, Recording, and Maintaining Mining Claims or Sites," 68 Fed.Reg. 61046-61081 (Oct. 24, 2003), particularly those portions of the Final Rule related to Millsites, or Millsite Claims ("2003 Millsite Rule").  Plaintiffs also challenge the U.S. Department of Agriculture's ("DOA"), and its U.S. Forest Service's ("USFS"), adoption of, and reliance upon, the two above-mentioned DOI/BLM Rules (and the policies contained therein) in DOA/USFS' review, management, and regulation of mining operations on federal public lands administered by DOA/USFS.

The 2008 Mining Claim Rule and the 2003 Millsite Rule do not comply with the statutes under which they were promulgated, specifically the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et. seq.*, the General Mining Law of 1872 ("The Mining Law") 30 U.S.C.  §§ 22-47; and the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706.  Any reliance by the Defendants on these Rules and the policies contained therein in the management, review, approval, or regulation of mining operations on public lands also violates these statutes.

The 2008 Mining Claim Rule fails to correctly respond to, contradicts, and essentially ignores the Order issued by Judge Kennedy in <u>MPC</u>.  That Order established the proper scope of DOI/BLM's authority, pursuant to FLPMA and the Mining Law, over mining operations proposed on lands not covered by "valid and perfected claims." 292 F.Supp.2d at 46-48.  The

1    Order partially remanded DOI/BLM's mining regulations challenged in that case (43 C.F.R.

2    Subpart 3809), finding that DOI/BLM had improperly interpreted FLPMA and the Mining Law

3    regarding mining operations proposed on lands not covered by valid claims.  The Order required

4    DOI/BLM to publish regulations governing mining operations proposed on lands not covered by

5    valid mining or millsite claims and further directed DOI/BLM to issue regulations requiring such

6    mining operations on federal land to pay Fair Market Value ("FMV") for the use of such lands.

7    Id. at 49-51.  More specifically, the Order stated:

8    
9    
10   
11   
12   
13   

> Operations neither conducted pursuant to valid mining claims nor otherwise explicitly
> protected by FLPMA or the Mining Law (i.e., exploration activities, ingress and egress,
> and limited utilization of mill sites) must be evaluated in light of Congress's expressed
> policy goal for the United States to "receive fair market value of the use of the public
> lands and their resources." 43 U.S.C. § 1701(a)(9). Because, in promulgating 65 Fed.Reg.
> 70,013, Interior was not cognizant of its statutory obligation to attempt to "receive fair
> market value of the use of public lands and their resources," and did not balance its
> competing priorities with that obligation in mind, the court finds that the regulations must
> be remanded to Interior, so that Congress's policy goal, as set forth in § 1701(a)(9), may
> be given proper effect.

14   292 F.Supp.2d at 51.

15   The 2008 Rule failed to comply with that Order.  Instead, the 2008 Rule states that

16   DOI/BLM will not require the payment of FMV, relying on the same legal interpretations–

17   rejected by MPC – that FLPMA and the Mining Law preclude the agencies from applying the

18   "wide discretion in deciding whether to approve or disapprove of a miner's proposed plan of

19   operations" on lands not covered by valid claims, MPC, 292 F.Supp.2d at 48, and preclude the

20   agencies from requiring the payment of FMV.  See 73 Fed.Reg. 73791-92.

21   Thus, under the 2008 Rule, DOI/BLM will not inquire into whether claims proposed for

22   mining operations are valid, but rather will simply assume that claimants have statutory rights to

23   permanently use and occupy public land, without requiring any evidence that such rights exist.

24   This has real ramifications across the West, as it eliminates the federal land agencies' discretion

25   under FLPMA to either restrict (or deny) mining projects on federal public land to protect public

26   resources or charge FMV for the use of federal public land not covered by valid and perfected

27   claims, as required by MPC's remand Order.  In practice and in formal agency policies,

28   DOA/USFS have adopted these DOI/BLM positions.

2

In promulgating the 2008 Rule, DOI/BLM also failed to comply with the strict procedural requirements of NEPA by failing to conduct the environmental analysis required by NEPA, and failing to provide any public review of the environmental impacts that will occur on public land as a result of the 2008 Rule.  Instead, DOI/BLM determined that the 2008 Rule was "categorically excluded from environmental review under" NEPA. 73 Fed.Reg. 73792.  Such an exclusion from NEPA's environmental and public review processes unlawfully ignores the very real environmental impacts that the 2008 Rule (and DOI/BLM's and DOA/USFS' implementation thereof) will have on public land across the West.

Regarding the 2003 Millsite Rule, DOI/BLM illegally reversed and overturned their previous position regarding the Mining Law's limitations on the number and allowable acreages of millsite claims proposed to be utilized by mining operations.  A millsite claimant has "the right to locate up to five acres of nonmineral land for mill site use in association with **each** valid mining claim. 30 U.S.C. §42." MPC, 292 F.Supp. 2d at 47 (emphasis added).

Prior to the 2003 Rule, DOI/BLM interpreted §42 of the Mining Law in accordance with MPC.  In the 2003 Rule, however, DOI/BLM reversed itself – without adequate legal support as shown below – and stated that a claimant had a statutory right to locate/claim as many millsite claims and acres as the claimant needed for mining operations.  This policy reversal effectively eliminated any limitations on the allowable acreage and number of millsites under §42. *See* 68 Fed.Reg. 61054-61055. Thus, by greatly expanding the number and acreage of millsite claims that can be claimed and developed at a mine site in excess of what the Mining Law allows, the 2003 Millsite Rule illegally creates statutory rights against the United States where none exist, and severely limits the regulatory authority of the federal land agencies to protect the environment and balance non-mining resources of the public lands.

In promulgating the 2003 Millsite Rule, DOI/BLM also failed to comply with NEPA, as the agencies failed to conduct the proper environmental analysis, and failed to provide for any public review of the environmental impacts that will occur on public land as a result of the 2003 Rule.  Instead, DOI/BLM claimed that it "conducted an environmental assessment and have concluded that this rule would not have a significant impact on the quality of the human

environment under [NEPA], and therefore an Environmental Impact Statement is not required." 68 Fed.Reg. 61063.  First, this so-called "environmental assessment" was never submitted for public review, as required by NEPA.  Second, the EA ignores the very real environmental impacts that the 2003 Millsite Rule (and DOI/BLM's and DOA/USFS' implementation thereof) will have on public land across the West, in violation of NEPA.

The implementation of the 2008 Mining Claim Rule and the 2003 Millsite Rule will have direct, significant, and adverse impacts on Plaintiffs and their members and the environment in the western public land states.  By interpreting FLPMA and the Mining Law to grant statutory rights to mining claimants where none exist, and eliminating critical federal discretionary authority over proposed mining operations, the agencies have violated their statutory duties to protect public land and the environment from degradation and pollution caused by mining operations and to obtain FMV for the use of that public land.

## II.   STANDARD OF REVIEW

Pursuant to the APA, a federal court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] … (D) without observance of procedures required by law." 5 U.S.C. § 706(2).  "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 n.9 (1984). "[C]ourts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy behind a statute." Nat'l Labor Relations Bd. v. Brown, 380 U.S. 278, 290 (1965).  "For the agency to reverse its position in the face of precedent it has not persuasively distinguished is quintessentially arbitrary and capricious." Louisiana Pub. Service Comm. v. FERC, 184 F.3d 892, 897 (D.C. Cir. 1999).

## III.   PLAINTIFFS HAVE STANDING

Plaintiffs have standing to sue, because members have suffered, and will continue to

suffer, injuries in fact that are fairly traceable to, and would thus be redressed by invalidation of, the challenged rules and the associated reliance on them by DOI/BLM and DOA/USFS in regulating mining operations on public lands in the West. *See* Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S. 167, 181 (2000). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." Id. at 183.

Standing is thus conferred by the substantive on-the-ground impacts to public lands subject to the regulations that Plaintiffs' members regularly use and enjoy as well as the agencies' failure to comply with the procedural public review requirements of NEPA and the public notice and comment mandates of the APA. "[A] person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy." Summers v. Earth Island Institute, 555 U.S. 488, 496 (2009)(emphasis in original). *See also* Reed v. Salazar, 744 F.Supp.2d 98, 113 (D.D.C. 2010)(environmental plaintiffs have standing for NEPA claim related to challenge of agency decision with environmental consequences).

All of Plaintiff groups are non-profit organizations working to protect public lands and waters from the adverse impacts of hardrock mining on a local, regional, and West-wide basis, and particularly mines operating on public land pursuant to the 1872 Mining Law and FLPMA. Two of the groups, Earthworks (formerly Mineral Policy Center) and GBRW (formerly Great Basin Mine Watch) were plaintiffs in MPC. Members of Plaintiffs reside in the western U.S. and regularly use and enjoy the public lands that will be affected by the challenged rules, including public lands at/near specific mine sites whose review, approval and management are subject to the challenged rules. *See* Exhibits 1-6 (Declarations of Plaintiffs' members who use, and specifically intend to continue using in the future, public lands affected by specific mine sites and operations governed by the challenged rules for recreational, aesthetic, and other purposes). The Declarations show that these injuries were actual and imminent in 2009 when the Complaint was filed, and remain so today. *See* Center for Food Safety v. Salazar, 898 F.Supp.2d 130, 140-41 (D.D.C. 2012) (groups had standing to challenge public land rule based on

1   declarations attesting to use of public lands that would be governed by the rule).

2          The challenged regulatory regime fails to adequately consider and protect the interests of

3   Plaintiffs and their members and violates Congress' mandate that the public lands be managed on

4   the basis of environmental and cultural resource protection, multiple use, sustained yield, fair

5   economic return, and in the public's best interest.  The Rules provide mining claimants with

6   statutory and property rights in excess of those authorized by the Mining Law (e.g., for millsite

7   claims and acres in excess of that allowed by 30 U.S.C. §42, and for rights on lands not covered

8   by valid claims) and injure Plaintiffs and their members by providing incentives and rights to

9   develop environmentally damaging mining operations that otherwise may or would not occur in

10  the same way (or not at all) if the law was properly applied.  The 2008 Rule removes federal

11  discretionary authority to protect the non-mining public resources threatened by operations on

12  public lands not covered by valid claims, thereby increasing environmentally damaging mining

13  development.  In addition, by not requiring operators to pay FMV for operations on public lands

14  not covered by valid claims, the Rule provides an illegal financial subsidy that facilitates mining

15  development on public lands.

16  **IV.   FACTUAL BACKGROUND AND STATEMENT**

17  **A.   The 2008 Mining Claim Rule**

18         In 1976 Congress passed FLPMA to provide DOI/BLM with a framework for managing

19  federal public lands under its jurisdiction.  The statute directs the Secretary of the Interior to

20  promulgate rules and regulations to carry out the purposes of FLPMA and of other laws

21  applicable to the public lands.  43 U.S.C. §1740.  In 1980, DOI/BLM first issued regulations to

22  govern its management of hardrock mining. 45 Fed.Reg. 78902.  After a lengthy review process,

23  DOI/BLM revised these regulations on November 21, 2000. 65 Fed.Reg. 69998-70132. The

24  2000 Regulations were challenged in lawsuits brought by the National Mining Association,

25  among others, and Mineral Policy Center ("MPC") and Great Basin Mine Watch ("GBMW").

26         In 2001, DOI/BLM suspended the 2000 Regulations and initiated another round of public

27  comment. 66 Fed.Reg. 16162-16171 (March 23, 2001).  On October 30, 2001, DOI/BLM

28  published their revised regulations. 66 Fed.Reg. 54834-54862.  Shortly thereafter, MPC and

GBMW filed an amended complaint in this Court challenging the 2001 Regulations.  Upon cross-motions for summary judgment, Judge Kennedy issued his Order, granting in part and denying in part Plaintiffs' summary judgment motion. <u>MPC</u>, 292 F.Supp.2d 30 (D.D.C. 2003). That Order, in relevant part, established the proper scope of the federal government's authority, pursuant to FLPMA and the Mining Law, over mining operations proposed on lands not covered by "valid and perfected claims." <u>Id</u>. at 46-48.  The Order partially remanded the 2001 Regulations, finding that the agency had improperly interpreted FLPMA and the Mining Law regarding mining operations proposed on lands not covered by valid claims.  The Order required DOI/BLM to publish regulations governing mining operations  proposed on lands not covered by valid claims and directed DOI/BLM to require such mining operations to pay Fair Market Value ("FMV") for the use of such lands. <u>Id</u>. at 49-51.

The Solicitor and the Secretary of Interior subsequently issued two Memoranda regarding the issues raised by <u>MPC</u>.  On November 14, 2005, DOI issued M-37011, entitled "Rescission of 2001 Ancillary Use Opinion," (ARFMV000268-69) which rescinded the "Ancillary Use Memorandum" issued by Interior Secretary Babbitt on January 18, 2001 (ARFMV012828-43).[1] In M-37011, DOI noted that the USFS had requested DOI to interpret the Mining Law and the previous Memoranda as to how they should be applied on USFS land.  ARFMV000268.

Secretary Babbitt's Ancillary Use Memorandum had recognized that the statutory rights to develop mining and millsite claims contained in the Mining Law did not apply to operations proposed on lands not covered by valid claims.  Judge Kennedy specifically relied upon the Ancillary Use Memo as correctly interpreting the Mining Law and FLPMA. <u>MPC</u>, 292 F.Supp. 2d at 48.  In particular, both <u>MPC</u> and that Memo held that the agencies have broad discretion over mining to protect public resources, and can deny projects proposed on lands not covered by valid and perfected claims: "Before an operator perfects her claim, because there are no rights under the Mining Law that must be respected, BLM has wide discretion in deciding whether to approve or disapprove of a miner's proposed plan of operations." <u>MPC</u> at 48.  "When reviewing

---

[1] "AR" is the Administrative Record submitted by the Federal Defendants.  "ARFMV" is the Record related to the 2008 Rule, and "ARMIL" is the Record for the 2003 Millsite Rule.

1    a proposed plan of operations involving mining claims or mill sites that are not valid (or when

2    unclaimed public lands are involved) … the Secretary has broader discretion, because there are

3    no rights under the Mining Law that must be respected." Id., *quoting* Ancillary Use Memo at 11.

4           The second DOI Memorandum, issued the same day, was entitled "Legal Requirements

5    for Determining Mining Claim Validity Before Approving a Mining Plan of Operations," M-

6    37012.  This Memo reversed the legal findings contained in <u>MPC</u> and the Ancillary Use Memo

7    and asserted that the federal agencies would not inquire into the validity of mining or millsite

8    claims unless the lands covered by the claims had previously been withdrawn from new mineral

9    claiming.  By doing so, DOI/BLM removed the "broad discretion" over operations proposed on

10   claims that have not been shown to be valid, thereby restricting DOI/BLM's authority over

11   mining to only prevent "unnecessary or undue degradation" ("UUD").  *See* <u>MPC</u> at 47-48

12   (discussing difference between limited oversight under UUD standard versus broad discretionary

13   authority over mining projects under FLPMA's other mandates to protect public resources).

14          These 2005 Memoranda, and the 2008 Rule which was based on them, assert that claim

15   validity is irrelevant to the agencies' authority over mining (outside of the limited class of lands

16   withdrawn from the Mining Law such as National Parks).  Rather, agencies will not inquire into

17   claim validity when reviewing mining proposals on lands open to claiming, and agencies will

18   thus not have any discretion over mining operations to meet FLPMA's environmental and public

19   interest protection mandates, even on lands where there is no evidence that the claims are valid.

20          In 2007, DOI/BLM  initially proposed the revised regulations as ordered by <u>MPC</u>.

21   DOI/BLM published an "Advanced Notice of Proposed Rulemaking," which proposed the

22   language and policies that would eventually be promulgated as the final 2008 Mining Claim

23   Rule. 72 Fed.Reg. 8139-8142 (Feb. 23, 2007).  Plaintiff groups submitted comments, detailing

24   why the proposed Rule failed to comply with <u>MPC</u>, and violated FLPMA and the Mining Law.

25          In December 2008, DOI/BLM published the "Interim Final Rule."  73 Fed.Reg. 73789-

26   73794 (Dec. 4, 2008) ("2008 Mining Claim Rule").  As part of this promulgation, DOI/BLM

27   revised its regulation at 43 CFR §3800.6, rejecting any inquiry into whether FMV shall be

28   charged for the use of lands not covered by valid claims: "Other than the [claim] processing,

locating, and maintenance fees, you are not required to pay any other fees to the BLM to use the surface of public lands for mining purposes."  Although DOI/BLM solicited further public comments on this Rule, it became immediately effective and has not been revised.

Regarding compliance with NEPA (or the lack thereof), the 2008 Rule states that:

> The BLM has determined that this interim final rule, which makes it clear that the BLM will not charge fair market value or any additional fee for mining or related use of public lands except as otherwise provided by statute or regulation, is a regulation of an administrative, financial, legal, technical, or procedural nature. Therefore, it is categorically excluded from environmental review under Section 102(2)(C) of the National Environmental Policy Act, pursuant to 516 Departmental Manual (DM), Chapter 2, Appendix 1. In addition, the interim final rule does not meet any of the 10 criteria for exceptions to categorical exclusions listed in 516 DM, Chapter 2, Appendix 2.

73 Fed.Reg. 73792.  Thus, in relying on this Categorical Exclusion in promulgating the 2008 Mining Claim Rule, DOI/BLM never conducted any of the required environmental and other reviews, and never provided public notice and the opportunity to comment under NEPA.

**B.**     **The 2003 Millsite Rule**

DOI is the primary federal agency charged with interpreting the provisions of 1872 Mining Law.  Beginning in 1993, DOI began a comprehensive review of patent applications under the Mining Law.  As a result of this review, the Department's Solicitor, with concurrence by Interior Secretary Babbitt, issued DOI's interpretation of the millsite provision of the Mining Law, 30 U.S.C. §42. Memorandum M-36988, "Limitations on Patenting Millsites Under the Mining Law of 1872," November 12, 1997 ("1997 Millsite Opinion").  ARMIL012018-033. The 1997 Opinion stated in relevant part:

> The Mining Law of 1872 provides that only one millsite of no more than five acres may be patented in association with each mining claim. … In addition, the Bureau [BLM] should not approve plans of operation which rely on a greater number of millsites than the number of associated [mining] claims being developed unless the use of additional lands is obtained through other means.

1997 Opinion, at 2. ARMIL012019.

DOI/BLM's interpretation of §42 has important ramifications across the West.  This is because facilities such as large waste dumps and toxic reagent chemical processing "heaps," often cover thousands of acres beyond that required for the open pit mine itself.  These are activities conducted on non-mineral millsite claims.  If the majority of these millsite claims at a

modern mine were considered invalid because they exceed the strict limits in §42, then under the interpretation set forth in the 1997 Opinion, the agencies would have much greater discretion over how to manage these mines and protect other, non-mineral public land resources such as wildlife, hunting and fishing uses, water quality, historic and cultural sites, and recreation.

As a result, the 1997 Opinion generated controversy regarding its application to mining in the West.  Congress struck a balance by prohibiting application of the 1997 Opinion for fiscal years 2000 and 2001, to existing patent applications and to mining plans submitted before November 7, 1997, or that BLM approved before November 29, 1999. Pub. L. No. 106-113, § 337.  Congress did not, however, prohibit application of the 1997 Opinion to operations that were not grandfathered and took no legal position regarding the 1997 Opinion.

In 1999, DOI proposed a set of regulations streamlining and affirming DOI policy on numerous issues related to mining and millsite claims.  "Location, Recording, and Maintenance of Mining Claims or Sites," 64 Fed.Reg. 47023-47046 (August 27, 1999) (the "1999 Proposed Rule").  Regarding the number of millsites that may be associated with proposed mining operations, DOI stated:

> In accordance with the Mining Law, this rule proposes to make clear that you may not locate more than an aggregate of 5 acres of mill site land for each associated placer or lode mining claim.  The provision allowing a maximum of 5 acres of mill site land for each lode or placer mining claim held is contained in 30 U.S.C. 42, and derives from the Lode Law of 1866 (14 Stat. 251).  This requirement was recently reviewed and Solicitor's opinion M-36988 reaffirmed it on November 7, 1997.

64 Fed.Reg. 47028.  The 1999 Proposed Rule proposed to codify these millsite requirements at 43 CFR § 3832.32, which would state:

> A mill site must not exceed 5 acres in size.  You may locate more than one mill site, so long as you do not locate more than an aggregate of 5 acres of mill site land for each 20-acre parcel of patented or unpatented place or lode mining claims associated with that mill site land, regardless of the number of lode or placer claims located in the 20-acre parcel.

64 Fed.Reg. 47037.  The 1999 Proposed Rule "reaffirmed" and "made clear" existing DOI/BLM legal interpretation and policy regarding the Mining Law's millsite provision, 30 U.S.C. §42, as contained in the 1997 Opinion. 64 Fed.Reg. 47028.  "[T]his rule does not substantially change BLM's overall management objectives or environmental compliance requirements." Id. 47030.

After the change in administrations in 2001, and without any prior public notice, the new Deputy Solicitor of the Interior Department, Roderick Walston, issued a Memorandum which reversed the legal findings contained in the 1997 Opinion and the 1999 Proposed Rule. *See* M-37010, "Mill Site Location and Patenting Under the 1872 Mining Law (co-signed by Interior Secretary Gale Norton on October 8, 2003)(the "2003 Millsite Opinion"). ARMIL012034-77. The 2003 Opinion disregarded the strict limits in §42 and found that a claimant may locate as many millsite claims and acres as needed to use in support of a proposed mining operation, such as for the dumping of mine waste and for chemical processing/leaching facilities.

Roughly two weeks later, and without prior public notice that the agency was reversing its millsite policy, DOI issued a new regulation, the 2003 Millsite Rule, which codified the 2003 Opinion's new interpretation of the Mining Law.  68 Fed.Reg. 61046-61081 (Oct. 24, 2003). The 2003 Millsite Rule stated that as long as a proposed mill site was used for mining purposes, "[y]ou may locate more than one mill site per mining claim." Codified at 43 C.F.R. §3832.32.  In other words, mining companies were now free to use as much land as they needed for waste dumping, etc., pursuant to a statutory right – eliminating the federal agencies' discretion over these permanent uses of public lands and foreclosing any recovery of FMV for that use.

Unlike the 1999 Proposed Rule, which proposed to codify the then-existing millsite policy contained in the 1997 Opinion, the 2003 Millsite Rule reversed DOI/BLM's millsite policy. There was no language in the 1999 Proposed Rule stating, or even implying, that the then-current millsite policy was being considered for reversal. 64 Fed.Reg. 47023-47046.

In issuing the 2003 Millsite Rule, DOI/BLM claimed that it "conducted an environmental assessment and have concluded that this rule would not have a significant impact on the quality of the human environment under [NEPA], and therefore an Environmental Impact Statement is not required." 68 Fed.Reg. 61063 (preamble to 2003 Millsite Rule).  Yet this "environmental assessment" was never submitted for public review, as required by NEPA.  This avoidance of NEPA's full environmental and public review ignores the very real environmental impacts that the Rule, and the agencies' implementation thereof, will have on public land in the West.

11

**C.     Environmental Impacts of the 2008 Mining Claim Rule and the 2003 Millsite Rule**

The Rules will result in significant impacts to environmental, public health, and other resources in the West.  As noted above, the agencies have "broad discretion" to regulate or even deny mining proposed on lands not covered by valid mining and millsite claims. MPC at 47-48; Ancillary Use Memo at ARFMV012838.  Under the 2008 Rule, however, the agencies will not even inquire as to whether proposed operations are on valid claims.  Instead, they will assume, without any evidence, that all claims are valid and that the claimants have statutory rights to permanently use and occupy those public lands.  Similarly, the 2003 Rule, by granting unlimited acreages for waste dumping and other uses on millsite claims (subject only to the proviso that the uses be related to mining), de-facto declares, without evidence, all millsite claims valid – again establishing statutory rights where none exist.  Together, this eliminates the agencies' discretion under FLPMA to deny or restrict mining that threatens other valuable public resources, with the associated increase in the size and number of mining operations and related environmental impacts.  In addition, by considering all these claims, both mining and millsite, valid, the agencies will not require the operators to pay FMV for the use of lands not covered by valid mining or millsite claims, providing a large financial subsidy to those operations at taxpayer cost.

The environmental and other impacts that will result from the challenged Rules are significant.  As Judge Kennedy stated in MPC:

> Mining activity emits vast quantities of toxic chemicals, including mercury, hydrogen, cyanide gas, arsenic, and heavy metals.  The emission of such chemicals affects water quality, vegetation, wildlife, soil, air purity, and cultural resources.  The emissions are such that the hardrock/metal mining industry was recently ranked the nation's leading emitter of toxic pollution.

292 F.Supp.2d at 33.  These impacts have not changed.  In the federal government's most recently-reported "Toxic Release Inventory" (the same toxic pollution "ranking" noted by Judge Kennedy), the metal mining industry again ranked as the nation's leading emitter of toxic pollution. *See* Declaration of John Hadder (discussing the 2015 EPA Toxic Release Inventory figures for mining), Exhibit 2, ¶¶5-7.  For example, according to EPA, in 2015, the metal mining industry accounted for the top five toxic chemical releasing facilities in both Nevada and Arizona, including mines situated in whole or part on public land. Id. at ¶¶ 8-9.  Most recently, a

proposed EPA rule detailed a number of the significant environmental impacts caused by hardrock mining. 82 Fed.Reg. 3388 (January 11, 2017):

> surface mines generate dust, large piles of waste rock, and large, usually permanent holes in the earth's surface.  The corresponding amount of waste rock and tailings being mined and deposited is increasing as a result of these large-scale mining operations. …  Such large scale operations cause a significant increase in exposure of ore constituents to precipitation, resulting in the leaching of hazardous substances to ground and surface waters, and to the wind, resulting in air emissions.

82 Fed.Reg. 3472. *See* Hadder Declaration, ¶¶10-15 (discussing various EPA and other reports).

DOI/BLM's and DOA/USFS' reliance on, and implementation of, the challenged Rules in the agencies' review, approval, and continued regulation of the various specific mines noted in Plaintiffs' Declarations alone will result in severe disturbance of tens of thousands of acres of public land, will cause substantial adverse impacts to public lands, water quality, air quality, wildlife, scenic views, and cultural resources, and will negatively impact local and regional tourism-based economies. *See* Exhibits 1-6.

## V.   **ARGUMENT**

### A.   **The 2008 Mining Claim Rule Violates FLPMA and the Mining Law**

*1.    Statutory Background: FLPMA.*

FLPMA requires that the Secretary "manage the public lands under the principles of multiple use and sustained yield …." 43 U.S.C. §1732(a).  The "multiple use" mandate requires the BLM to ensure that activities authorized by the BLM "best meet the present and future needs of the American people."  43 U.S.C. §1702(c).  It also requires "management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources…."  43 U.S.C §1702(c).  FLPMA further requires the BLM to consider in its decisionmaking a broad range of resource values, "including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific, and historical values."  43 U.S.C §1702(c).  In addition to FLPMA, regulations and statutes governing DOA/USFS management of public lands have similar requirements. *See* 36 C.F.R. Part 251 subpart B, and authorities cited therein.

FLPMA also states that "Congress declares that it is the policy of the United States that

… (9) the United States receive fair market value of the use of the public lands and their resources unless otherwise provided for by statute." 43 U.S.C. §1701(a)(9).  Lastly, "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §1732(b).

Under the 2008 Rule, however, DOI/BLM has exempted mining from all of the above FLPMA requirements, except for the provision requiring the DOI/BLM to prevent unnecessary or undue degradation.  The 2008 Rule thus ignores the holding in <u>MPC</u> that the agencies have "wide discretion in deciding whether to approve or disapprove of a miner's proposed plan of operations" on lands not covered by valid claims, <u>MPC</u>, 292 F.Supp.2d at 48.  Under the 2008 Rule, DOI/BLM will not inquire into whether claims proposed for use are valid, will not apply its FLPMA-mandated discretion over operations proposed on lands not covered by valid claims, and will not require payment of FMV.

That is why the mining industry intervenors joined this case – to avoid the discretion over their operations embodied in FLPMA.  Proper application of FLPMA will not result in the cessation of mining on public lands.  Rather, as correctly stated in <u>MPC,</u> the Ancillary Use Memo, and the 1997 Millsite Opinion, the agencies can still approve mining operations on lands not covered by valid mining or millsite claims via other means. *See* <u>MPC</u> at 47-48; Ancillary Use Memo at ARFMV012838-40; 1997 Opinion at ARMIL012019 ("use of additional lands" not covered by valid claims can be "obtained through other means.").  These "other means" are primarily "special use" or similar permits issued pursuant to FLPMA.

The big difference for the mining companies, however, is that issuance of these permits is entirely discretionary under FLPMA.  In other words, if waste dumps and other permanent uses are proposed on claims that are not valid (i.e., if a mining claim does not contain the required discovery of a valuable mineral deposit, or if the millsite claims are in excess of what is allowed under §42), then the agencies can impose reasonable conditions or deny the permit application if these uses may interfere with other important public resources.

The same holds true on lands administered by DOA/USFS, which have not promulgated regulations implementing the claim validity, millsite, and other provisions of the Mining Law.

Rather, DOA/USFS considers DOI/BLM's legal interpretations of the Mining Law as binding upon DOA/USFS' management of mining operations.  In transferring the National Forests from DOI to DOA in 1905, Congress mandated that DOI retain primary responsibility for the administration of the Mining Law on all public lands, including DOA/USFS lands. Act of Feb. 1, 1905, c.288, §1, 33 Stat. 628.  "The mill site regulation would affect lands open to the operation of the Mining Law that are administered by the BLM and Forest Service."  ARMIL007589.[2]

2.   *Statutory Background: the 1872 Mining Law and the requirement for claim validity as a prerequisite for rights to use and occupy public lands.*

Judge Kennedy correctly outlined the structure of the Mining Law:

In practice, the Mining Law gives citizens three primary rights: (1) the right to explore for valuable mineral deposits, 30 U.S.C. § 22; (2) the right to possess, occupy, and extract minerals from the lands in which valuable mineral deposits are found, 30 U.S.C. § 26; and (3) the right to patent lands in which valuable mineral deposits are found, 30 U.S.C. § 29.   In addition to these primary rights, the Mining Law, in tandem with FLPMA, vests individuals with the following subordinate rights: (1) the right to ingress and egress to and from valid mining claims, 43 U.S.C. § 1732(b); and (2) the right to locate up to five acres of nonmineral land for mill site use in association with each valid mining claim, 30 U.S.C. §42.

MPC, 292 F.Supp.2d at 47.  The 2008 Rule, and this case, focuses on "the right to possess, occupy, and extract minerals from the lands in which valuable mineral deposits are found" as neither Rule applies to exploration activities on public lands.[3]

Critical to this case, the Mining Law grants no statutory rights to use or develop lands not covered by valid mining or millsite claims, except for a limited right to initially explore for valuable minerals.  "The latter two primary rights (possession and patent) and both subordinate

---

[2] *See also* USFS Manual for Minerals and Geology: "The mining laws are comprised of two parts: a. The statutes themselves, which are general in nature; and b. The decisions of the courts and of the Department of the Interior, which interpret and apply the statutes to specific cases." FSM 2819 (2) https://www.fs.fed.us/dirindexhome/fsm/2800/2810.doc (viewed 2-17-17); FSM 2819.2 ("To that Department [Interior], Congress has given adjudicative powers in matters relating to all the land laws, including the mining laws."); FSM 2811.33 (adopting 2003 Rule).

[3] The third right under the Mining Law, to patent (or privatize) valid claims, while related to claim validity, is not directly at issue in this case due to the current (since 1994) congressional moratorium against any new patents.  *See* Mt. Emmons Min. Co. v. Babbitt, 117 F.3d 1167 (10th Cir. 1997)(regarding patent applications that had been grandfathered in from the moratorium).

1   rights (ingress/egress and mill site use) are premised upon the perfection of a valid mining claim,

2   which … requires the making of a 'discovery,' as well as posting, recordation, payment of

3   annual fees, and compliance with other applicable statutory and regulatory requirements. 30

4   U.S.C.A. §§28, 28f (2003); *[U.S. v.] Locke,* 471 U.S. at 86." MPC, at 47.

5        Thus, while giving a limited right to initially explore for minerals on public lands, the

6   Mining Law specifically restricts the right of long-term occupation and development on mining

7   claims to those claims where there has been a discovery of a valuable mineral deposit. 30 U.S.C.

8   §§22, 26.  "All **valuable mineral deposits** in lands belonging to the United States … shall be

9   free and open to exploration and purchase, **and the lands in which they are found to**

10  **occupation and purchase**." 30 U.S.C. §22 (emphasis added).[4]

11        Mining claims on federal land are "valid against the United States if there has been a

12  discovery of [a valuable] mineral within the limits of the claim, if the lands are still mineral, and

13  if other statutory requirements have been met."  Best v. Humboldt Placer Mining Co., 371 U.S.

14  334, 336 (1963).  Importantly, however, a mining claim location, or staking of the claim, does

15  not give the presumption of a discovery or any rights.  "[L]ocation is the act or series of acts

16  whereby the boundaries of the claim are marked, etc., but it confers no right in the absence of

17  discovery, both being essential to a valid claim." Cole v. Ralph, 252 U.S. 286, 296 (1920).

18        To satisfy the discovery requirement necessary for a valid mining claim, the mere

19  physical presence of a mineral is insufficient.  Instead, "the discovered deposits must be of such

20  a character that 'a person of ordinary prudence would be justified in the further expenditure of

21  his labor and means, with a reasonable prospect of success, in developing a valuable mine." U.S.

22  v. Coleman, 390 U.S. 599, 602 (1968).  An important recent decision from this District

23  highlights this fundamental rule, that except for limited rights to explore for minerals, absent the

24  discovery of a valuable mineral deposit on a mining claim, the claim is not valid, and the

25  claimant holds no rights under the Mining Law to use or occupy the claim:

26        Thus, although a claimant may explore for mineral deposits before perfecting a mining
          claim, without a discovery, the claimant has no right to the property against the United

27

28  _____

[4] For millsites, the law creates the "subordinate right … to locate up to five acres of nonmineral
land for mill site use in association with each valid mining claim, 30 U.S.C. §42." MPC, at 47.

16

States or an intervenor. 30 U.S.C. § 23 (mining claim perfected when there is a "discovery of the vein or lode"); *see also Cole v. Ralph,* 252 U.S. 286, 295–96 (1920); *Waskey v. Hammer,* 223 U.S. 85, 90 (1912) (noting that discovery is "a prerequisite to the location of the claim"); *Am. Colloid Co. v. Babbitt,* 145 F.3d 1152, 1156 (10th Cir.1998) ("Before one may obtain any rights in a mining claim, one must 'locate' a valuable deposit of a mineral."); *Mineral Policy Ctr. v. Norton,* 292 F.Supp.2d 30, 48 (D.D.C.2003) ("'A mining claim does not create any rights against the United States and is not valid unless and until all requirements of the mining laws have been satisfied.'" (quoting *Skaw v. United States,*13 Cl.Ct. 7, 28 (1987))).

Freeman v. U.S. Dept. of Interior, 37 F.Supp.3d 313, 319-20 (D.D.C. 2014).  As such:

> [U]npatented claims amount to a potential property interest, since it is the discovery of a valuable mineral deposit and satisfaction of statutory and regulatory requirements that bestows possessory rights. *See Ickes v. Underwood,* 141 F.2d 546, 548–49 (D.C.Cir.1944) (until there has been a determination that there has been a valuable discovery, claimants had only a gratuity from the United States); *Payne v. United States,* 31 Fed.Cl. 709, 711 (1994) (rejecting plaintiff's argument that in the absence of a challenge to validity, the court must take at face value their assertion that claims are supported by an adequate mineral discovery).

Id. at 321.  Thus, use and occupancy of mining claims for ancillary development activities (e.g., processing facilities, waste disposal) on lands not covered by valid claims, like all other uses of public land, are not governed by the Mining Law.  Rather, these uses are governed by the full range of public land statutes applicable to the appropriate agency (i.e., such as FLPMA's discretionary authorities).  "Before an operator perfects her claim, because there are no rights under the Mining Law that must be respected, BLM has wide discretion in deciding whether to approve or disapprove of a miner's proposed plan of operations." MPC, 292 F.Supp.2d at 48.  As held by the Interior Board of Land Appeals (internal DOI adjudicative panel): "Rights to mine under the general mining laws are derivative of a discovery of a valuable mineral deposit and, absent such a discovery, denial of a plan of operations is entirely appropriate." Great Basin Mine Watch, 146 IBLA 248, 256 (1998), 1998 WL1060687, *8.

3.   *By failing to distinguish between operations proposed on valid and perfected claims versus operations proposed on claims without the requisite discovery of a valuable mineral deposit, the 2008 Mining Claim Rule grants rights to claimants where none exist, and fails to meet FLPMA's requirements.*

The 2008 Mining Claim Rule completely ignores the controlling caselaw noted above, which holds that absent a valid and perfected mining claim, the claimant holds no statutory right to occupy and use public land.  Instead, the 2008 Rule is premised on the mistaken position that

the mere filing of a mining claim, without any evidence whatsoever that the claim is valid, creates rights against the United States, eliminates the agencies' discretionary authorities under FLPMA to regulate mining not covered by rights under the Mining Law, and immunizes the claimant from having to pay FMV for the use of such claims. Such an interpretation deliberately and substantially limits DOI/BLM's ability to consider, let alone investigate, the validity of any claim on public lands proposed for disturbance or use as part of a proposed mining operation.

The 2008 rule ignores and misinterprets MPC, which held that DOI/BLM did not properly apply its full discretionary land management authorities, including requiring FMV payments for the use of federal lands, when the lands are either not covered by valid and perfected claims under the 1872 Mining Law. 292 F.Supp.2d at 46-48.

Instead, the 2008 Rule focuses only on the situation where mining is proposed on "invalidly claimed" or "unclaimed lands." 73 Fed.Reg. 73791.  Yet that was **not** the focus of plaintiffs' claims in MPC, nor was it the focus of the Court's remand in that case.  MPC recognized DOI/BLM's duty to apply its broader, multiple use authority under FLPMA when mineral development operations are proposed on lands not subject to valid and perfected claims:

> While a claimant can explore for valuable mineral deposits before perfecting a valid mining claim, without such a claim, she has no property rights against the United States (although she may establish rights against other potential claimants), and her use of the land may be circumscribed beyond the UUD standard because it is not explicitly protected by the Mining Law.

292 F.Supp.2d at 47.  As a result: "Before an operator perfects her claim, because there are no rights under the Mining Law that must be respected, BLM has wide discretion in deciding whether to approve or disapprove of a miner's proposed plan of operations."  Id. at 48.

Instead of recognizing DOI/BLM's obligations under FLPMA in regulating the use of lands not subject to valid claims, the 2008 Rule states that the agencies should not inquire into claim validity and are precluded from charging FMV for the use of claimed lands, regardless of whether or not the claims are valid under the law.  In support, the BLM states:

> [b]ecause Congress authorizes mining claimants to locate mining claims under the Mining Law and maintain them by making annual payments to the BLM while the validity of the claims is unknown or undetermined, the BLM has concluded that it may not apply FLPMA's fair market value policy to approved mining operations that occur on mining claims of unknown validity.

18

73 Fed.Reg. 73789, 73792.

    In other words, despite the agency having no idea if a claim is valid (i.e., "of unknown validity"), it will treat that claim as essentially valid under the Mining Law and immune from FLPMA's FMV and other requirements. Yet the agency admits "that no mining operations amounting to more than initial exploration activities occur on unclaimed lands under the Mining Law." Id. at 73790. As a result, DOI/BLM failed to implement FLPMA's broad multiple use land management authority, violated the APA requirement that agencies make reasonable determinations based on substantial evidence in the administrative record, and failed to comply with the court's Order in MPC.

    DOI/BLM contend that this comports with federal law because FLPMA "establishes a goal of receiving fair market value of the use of use of public lands 'unless otherwise provided by statute'" and that the Mining Law is "that statute" which precludes the application of FLPMA's discretionary and FMV requirements. 73 FR 73789, 73792 (quoting FLPMA § 1701(a)(9)). The 2008 Rule states that:

> [t]he Mining Law has authorized public land use for mineral exploration and development without any requirement to pay fair market value for that use. Therefore, based on the express terms of FLPMA's policy statement, that use is exempt from FLPMA's fair market use policy....

Id. This, however, fails to recognize that the MPC specifically rejected this precise argument:

> The court finds more merit in plaintiffs' view. The court concludes that, for the reasons set forth above, if there is no valid claim and the claimant is doing more than engaging in initial exploration activities on lands open to location, the claimant's activity is not explicitly protected by the Mining Law or FLPMA. Thus, the activity does not fall within the carve-out provision set forth in § 1701(a)(9). Interior and NMA's arguments to the contrary are without merit.

292 F.Supp.2d 30, 50. The Rule's reliance on the fact that FMV is not charged for "exploration," and equates the "rights" to initially explore with the rights to permanently use and occupy public lands, shows the agencies' mistaken view of the law. Plaintiffs have never argued, in either MPC or this case, that FMV must be charged for initial exploration activities.

    The 2008 Rule asserts that the agencies can avoid applying the FMV and other FLPMA requirements because "Mineral Policy Center did not address the use of lands on which mining claims of unknown validity exist." 73 Fed.Reg. 73791. This shows a fundamental error in

DOI/BLM's view of the law.  DOI/BLM argue that because they purposely never inquire into claim validity (except in areas closed off from the Mining Law), then all of these claims are of "unknown validity" and thus immune from FLPMA's FMV and other requirements.

This circular logic defeats the whole purpose behind the requirement that only operations proposed on "valid and perfected claims" have rights under the Mining Law.  By refusing to inquire into claim validity, DOI/BLM erroneously assume that the mere filing of a claim translates into statutory rights to permanently use and occupy public land – directly contradicting over a hundred years of Mining Law precedent as detailed above.  DOI/BLM cannot bypass the "valuable mineral" discovery requirement by simply refusing to inquire as to whether the claims are valid.  As the Supreme Court explained almost a century ago, "no right arises from an invalid claim of any kind ... otherwise they work an unlawful private appropriation in derogation of the rights of the public."  Cameron v. United States, 252 U.S. 450, 460 (1920).  MPC correctly held that operations not conducted on valid claims have no rights under the Mining Law free from FLPMA's other requirements. 292 F.Supp.2d at 47.

Judge Kennedy specifically relied on Interior Secretary Babbitt's Ancillary Use Memorandum, which said the same thing:

> When reviewing a proposed plan of operations involving mining claims or mill sites that are not valid (or when unclaimed public lands are involved), however, the Secretary has broader discretion, because there are no rights under the Mining Law that must be respected.

Id. at 48, quoting Ancillary Use Memo at 11 (ARFMV012838).

Despite MPC's direct reliance on that Memo, the Federal Defendants in this case tried to exclude it from the administrative record, asserting that they never considered either directly or indirectly the Memo and its statements regarding mining and claim validity. See Fed. Def. Response to Plaintiffs' Objections to the Magistrate's recommendations, Dkt. 82, at 17-20.  This Court rejected the agencies' attempt to exclude the Memo (Dkt. 108).

Yet the government's argument raises an important question of whether the agency considered "all relevant factors" in issuing the 2008 Rule.  By asserting they did not review the Memo, DOI/BLM admit that they ignored the critical distinction under FLPMA and the Mining

Law – that operations on "valid and perfected claims" are regulated much differently than operations that have not complied with that fundamental condition of the Mining Law.

Such a failure represents the type of arbitrary and capricious action that should be set aside under the APA:  "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' In reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Motor Vehicle Mfrs. Assn. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983) (citations omitted).  The agency's decision will also be overturned if it "failed to consider an important aspect of the problem." Id.

Overall, instead of recognizing the critical distinction between valid and invalid claims, and ensuring appropriate measures to ensure DOI/BLM uses the proper regulatory authority, the 2008 Rule states that the agencies need not even inquire into the validity of mining claims before approving operations on public lands.  As discussed above, such a position openly ignores the Mining Law's hallmark "valuable mineral" requirement and improperly renders FLPMA's discretionary authority and FMV requirements meaningless.

**B.**     **The 2003 Millsite Rule Violates the Mining Law and FLPMA**

*1.     The millsite provision of the Mining Law.*

As stated by Judge Kennedy, a millsite claimant has "the right to locate up to five acres of nonmineral land for mill site use in association with **each** valid mining claim. 30 U.S.C. §42." MPC, 292 F.Supp. 2d at 47 (emphasis added).  The Mining Law's millsite provision states:

> (a) Vein or lode and mill site owners eligible
> Where nonmineral land not contiguous to the vein or lode is used or occupied by the proprietor of such vein or lode for mining or milling purposes, such nonadjacent surface ground may be embraced and included in an application for a patent for such vein or lode, and the same may be patented therewith,...; **but no location made on and after May 10, 1872, of such nonadjacent land shall exceed five acres**....

30 U.S.C. §42 (emphasis added).  A similar provision applies to millsite use associated with placer mining claims. §42(b).

As stated in §42, millsite claims cover the "nonmineral land" at a mine site (i.e., away from the lode or placer deposits/claims that contain the valuable minerals to be excavated) that are used for ancillary activities such as milling/processing, waste dumps, leaching facilities, etc. The 2001 Ancillary Use Memo summarized the use of millsites, both as intended in 1872, and as how modern mining has evolved to now require the use of vast acreages to handle the ancillary facilities (something which did not occur in 1872):

> In the long-ago era when the Mining Law was enacted, individual mining operations were usually extracting minerals from high-grade underground deposits that did not require extensive surface areas for ancillary operations. The mill site limitation in the Mining Law thus reflected contemporary mining practices. For many years thereafter, the five-acres-per-mining-claim limit on mill sites continued to be viewed as more than adequate.

> As rich deposits have been depleted, mining techniques and practices have evolved to require larger and larger amounts of land. Large modern mines may be open-pit operations encompassing a large, low-grade ore body that can produce enormous quantities of waste rock and tailings which must be put somewhere.

ARFMV012832-33 (citations omitted). The Memo quoted the American Mining Congress's (the forerunner to Defendant-Intervenor National Mining Association), The Mining Law and Public Lands, which stated that: "A mine having 500 acres of mining claims may, for example, require 5000 acres for surface plant facilities and waste disposal areas. **It is obvious that such activities may not be acquired through five-acre millsites**." ARFMV012833 (emphasis added). Yet the 2008 Rule says the opposite, allowing such activities through largely unlimited use of millsites.

2.    *The 2003 Millsite Rule erroneously interprets the Mining Law.*

The 2003 Millsite Rule reversed DOI's previous (1997 and 1999) interpretation of §42. 68 Fed.Reg. 61054-55. The new Rule relied almost exclusively on a new Opinion written by Deputy Solicitor Walston, issued roughly two weeks earlier, ARMIL012034-77. Yet the critical inquiry in this case is what was Congress' intent in enacting the millsite provision in 1872. "[I]f a regulation unreasonably interprets a statute or is inconsistent with the statute under which it is promulgated, the regulation may not be sustained." MPC, 292 F.Supp.2d at 37. "In discerning congressional intent, we owe no deference to the agency's views." Martini v. FNMA, 178 F.3d 1336, 1342 (D.C. Cir. 1999)(citing Chevron 467 U.S. at 843).

1    Importantly, in discerning congressional intent, the court's review focuses on the

2    situation in 1872, and cannot be based on the needs of modern mining operations for unlimited

3    acreages for ancillary millsite uses.  *See* Andrus v. Charlestone Stone Prods. Co., 436 U.S. 604,

4    611 (1978) (determination of what constituted a "valuable mineral" based on intent of the "1872

5    Congress").   In interpreting the Mining Law, the Supreme Court has held that grants from the

6    United States to private parties, such as §42's allowance for millsite claims, must be construed in

7    favor of the government:  "It has long been established that, when grants to federal land are at

8    issue, any doubts 'are resolved for the Government, not against it.'"  Id. at 617, *quoting* U.S. v.

9    Union Pacific R. Co., 353 U.S. 112, 116 (1957).

10    Thus, the question is whether the 1872 Congress intended to give millsite claimants

11    unlimited amounts of "nonmineral" public land for milling purposes, or did the strict 5-acre

12    provision in §42 limit the amount of nonmineral public land that a mining claimant could claim

13    as a millsite.  The 1997 Opinion (and Proposed Rule in 1999) recognized that, while a claimant

14    could file as many mining claims as needed to cover the valuable minerals in the ore body, the

15    amount of nonmineral land allocated for milling was not unlimited.  This was because, as noted

16    above, based on the prevailing situation in the mining regions in the West, more than 5 acres per

17    mining claim was not needed to support extraction of minerals from such mining claims.

18    In contrast, the 2003 Opinion and Rule assert that because a claimant could file as many

19    mining claims on lands containing "valuable minerals" as needed, the same must hold true for

20    millsites covering "nonmineral" land.  ARMIL012036.  The 2003 Rule states that this

21    interpretation is "Consistent with Congress's goal in the Mining Law to promote mineral

22    development on the public lands," and that "Interior consistently followed this practice and

23    interpretation for at least 50 years immediately preceeding the 1997 Opinion." 68 Fed.Reg.

24    61054.  As noted above, however, what Interior allowed in 2003, 1997, or 50 years prior to that

25    is not determinative.  It is what Congress believed in 1872.

26    Both the 1997 and 2003 Opinions debate the merits of various and somewhat conflicting

27    DOI rulings and policies over the years as to the proper interpretation of §42.  The 2003 Opinion,

28    however, ignores a leading source of authority governing public land and mining law, the 1970

Public Land Law Review Commission Report ("PLLRC Report").  That Report, entitled *One Third of the Nation's Land:  A Report to the President and to the Congress by the Public Land Law Review Commission* (June 1970), was commissioned by Congress in 1964 because "it is necessary to have a comprehensive review of those laws and the rules and regulations promulgated thereunder and to determine whether and to what extent revisions thereof are necessary." Pub. L. 88-606, §2, 78 Stat. 982.  The Commission was comprised of the leading Senators and Members of Congress from the Western states, as well as Presidential appointees.

The Supreme Court and the D.C. Circuit have recognized the PLLRC Report as a definitive source of authority on the interpretation of public land and mining laws – especially those that have not changed since their enactment (such as the Mining Law). *See* Lujan v. NWF, 497 U.S. 871, 876-77 (1990); Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 754, n. 10 (D.C. Cir. 2007); Wilderness Society v. Morton, 479 F.2d 842, 881 (D.C. Cir. 1973).

Chapter Seven of the PLLRC Report was devoted to "Mineral Resources," detailing the current state of the law, as well as making recommendations to Congress to modernize mining laws to fit modern mining methods.  This chapter is attached as Exhibit 7, and the full report can be found at https://ir.library.oregonstate.edu/xmlui/handle/1957/11183 (viewed 2-13-17).  The Minerals Chapter was based on a report directed by the Commission and prepared by experts and lawyers from the mining industry. *See* Twitty, Sievwright & Mills, "Nonfuel Mineral Resources of the Public Lands: A Study Prepared for the Public Land Law Review Commission."

The PLLRC Report directly analyzed the millsite provision, and confirmed that it did **not** allow for the expansive interpretation asserted by the 2003 Rule.  Specifically, the Report expressed serious concern about how the Mining Law presented "weaknesses from the standpoint of the using [mining] industry in that there is … (3) inadequate provision for the acquisition of land for related purposes such as locating a mill." Report at 124.  This is the exact opposite of what the 2003 Opinion/Rule asserts (i.e., that §42 affords a mining company as much land as it reasonably needs for processing, dumping, etc. and that the law needed no change).

In order to remedy this problem, the PLLRC Report recommended that the current millsite provision, §42, be abolished or substantively revised.  In its place:

1
2
3

> Development and production rights . . . should embrace use of enough land to
> meet all reasonable requirements for a mineral operation, such as settling ponds,
> mills, tailings deposits, etc.  **Present law allows only 5 acres for each millsite in
> addition to the actual claim acreages, and this clearly has been inadequate in
> many cases.**

4  Report at 128.  This conclusion, and recommendation, mirrored the findings of the industry

5  lawyers that prepared the minerals Study that was essentially adopted by the PLLR Commission:

6
7
8

> One subject extremely important to the mining industry ... is suggested
> amendments to the public land laws ... to assure the operator of a mining property
> that he may acquire adequate surface rights for mine, mill and related facilities,
> for dumps and tailings . . . .  **Existing laws, such as 30 U.S.C. § 42 providing for
> mill sites, are inadequate.**

9  Twitty, "Amendments to the Mining Laws," 8 *Ariz. L. Rev.* 63, 73 n.15 (1966) (emphasis added).

10        Further highlighting the current law and its problems for the modern mining industry, the

11  PLLRC Report included a full-page diagram explaining how "Present" law only allowed one 5

12  acre millsite for each lode claim – the same interpretation as the 1997 Opinion.  Report at 131.

13  The diagram depicted how large scale modern mining, covering multiple mining claims to

14  profitably extract low grade deposits, was expressly limited by the millsite provision, stating

15  that: **"Separate millsites are limited to 5 acres for each mining claim."** Id.   The same

16  diagram then offered the recommended solution: expand the number and acreage of allowable

17  millsite lands so the operator could obtain the "right to use sufficient surface for mining,

18  including millsite and tailings area."  Id.

19        Despite the PLLRC's recommendations, Congress did not amend the millsite provision,

20  and mining industry lawyers and Congressional analysts continued to note the problem:

21
22

> Theoretically, one five-acre millsite can be acquired for each valid mining claim. . . .[I]f
> some 2,000 to 2,500 acres are needed for tailings ponds, dumps, and other mine-related
> uses, the five acres permitted for each valid lode mining claim would be insufficient.

23  Parr & Kimball, "Acquisition of Non-Mineral Land for Mine Related Purposes," 23 *Rocky Mtn.*

24  *Min. L. Inst.* 595, 641-42 (1977).[5]

25

26

27
28

---

[5] Congress did, however, allow companies to use lands above the strict millsite limits, albeit
pursuant to the discretionary permits, easements, and special use authorities under FLPMA Title
V, 43 U.S.C. §§1761-1771.  *See* MPC at 47-48; Ancillary Use Memo, ARFMV012829.

1    In 1979, the Congressional Office of Technology Assessment (OTA), a non-partisan

2 research arm of Congress, confirmed that §42 only allows that "a separate millsite may be

3 located for each lode or placer claim" (i.e., same as the 1997 Opinion).  OTA further noted that:

> These limitations were probably not too restrictive in 1872 when mining operations
> were small, involved high-grade deposits, and were not faced with substantial
> competition for the use of nonmineral land. Today, however, the typical mine
> encompasses a large, low-grade ore body that is often mined in an environment of intense
> competition for the surface use of land. Such a mine produces enormous quantities of
> waste rock and tailings that must be disposed of. If it is an open pit mine, it will have
> deep slanting pit walls. There will be crushing and processing plants and other customary
> facilities.
> …
> [I]t is highly doubtful that [millsites] could satisfy all the demands for surface space.
> **There could be at most as many millsites as there are mining claims**, and each
> millsite would be at most one-fourth the size of the typical 20-acre claim, so that the
> millsites, in the aggregate, would be one-fourth the size of the ore body encompassed by
> the claims. Yet the ore body is itself likely to be smaller than the area required either for
> pit slopes or disposal of waste rock or tailings.
>
> **Because the Mining Law does not adequately provide for land needed for surface
> facilities and uses**, the miner must seek to obtain such land independently through
> purchases and exchanges.

15 Office of Technology Assessment, *Management of Fuel and Nonfuel Minerals in Federal Land*,

16 at 127 (April 1979)(emphasis added)(Exhibit 8).

17    The 1997 Opinion correctly recognized this.  Yet instead of seeking congressional action

18 to change §42 as recommended by the PLLRC and other analysis to fit the needs of modern

19 mining operations, DOI in 2003 simply reversed its 1997 interpretation – not to match the plain

20 language of the law, but to unilaterally eliminate discretion under FLPMA in deciding whether to

21 allow thousands of acres of public lands to be permanently used for waste dumps, tailings

22 impoundments, and other large ancillary facilities.  Thus, by erroneously interpreting §42, DOI

23 violates (by eliminating) its duties under FLPMA's public resource protection mandates.

24    The other overarching assertion in the 2003 Opinion is that Congress must have allowed

25 unlimited lands for millsite activities on non-mineral land in 1872 (limited primarily only by the

26 requirement that the uses of millsite claims be reasonably related to mining/processing) because

27 the general aim of the law was to "promote mining." ARMIL012036.  Yet this ignores what was

28 happening in the West at the time.  While it is true that the Mining Law promoted mining, it was

not the only law promoting development and settlement of the West at the time, particularly uses of lands that did not contain valuable minerals (i.e., "non-mineral" land for millsites).

Unlike mineral land, public land that was not mineral in character had many other equally important, and congressionally-encouraged, uses.  Therefore, limiting a claimant to five acres of non-mineral land is consistent with Congressional intent at the time for efficiently and fairly disposing of non-mineral land.  Although a congressional purpose of the Mining Law was to encourage mining, Congress focused this goal on *mineral* land.  30 U.S.C. §21 ("In all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law."  Act of July 4, 1866, ch. 166, § 5, 14 Stat. 86. *See also* 30 U.S.C. §22 (only lands containing "valuable mineral deposits" were "free and open to exploration and purchase, and the lands in which they are found to occupation and purchase.").

Congress clearly recognized the importance of other uses for *non-mineral* land as evidence by other land disposal legislation at the time:

> For example, mineral land was exempted from the homestead laws, Act of June 21, 1866, 14 Stat. 66, ch. 127, § 1, 43 U.S.C. § 201, from statutes granting lands to railroads, Act of July 1, 1862, 12 Stat. 489, ch. 120, § 3; Act of July 2, 1864, ch. 217, § 3, 13 Stat. 365, and from a statute granting land to states for agricultural colleges, Act of July 2, 1862, ch. 130, § 1, 12 Stat. 503. If land was classified as mineral land, it could not be conveyed under these statutes.

Watt v. Western Nuclear, Inc., 462 U.S. 36, 47, n. 8 (1983)(other citations omitted).

Although mining activities were given precedence over other uses of land, this hierarchy only applied to **mineral** land. *See* Watt, 462 U.S. at 47-48.  Land that was not mineral in character was open for other equally important uses. Id.

> Under the old system of land classification, the disposition of land owned by the United States depended upon whether it was classified as mineral land or non-mineral land, and title to the entire land was disposed of on the basis of the classification. This system of land classification encouraged particular uses of entire tracts of land depending upon their classification as mineral or non-mineral. With respect to land deemed mineral in character, the mining laws provided incentives for the discovery and exploitation of minerals, but the land could not be disposed of under the major land-grant statutes. **With respect to land deemed non-mineral in character, the land-grant statutes provided incentives for parties who wished to use the land for the purposes specified in those statutes.**

Id. (emphasis added).  *See also* U.S. v. Sweet, 245 U.S. 563, 567 (1918)(noting distinction

between purposes of uses for mineral lands and non-mineral lands).  In other words, Congress at the time recognized that other equally-important users of public land, such as farmers, ranchers, timber companies, etc., had rights to use non-mineral land, and that allowing mining companies to claim and acquire essentially unlimited lands for millsite use (as asserted by the 2003 Opinion/Rule) does not square with the prevailing intent of Congress in the 1870s.

Therefore, the 1997 Opinion correctly recognized the focus of public land and mining law in 1872 as limiting non-mineral land for millsites, compared to the 2003 Opinion/Rule's allowance for essentially unlimited use of non-mineral land for millsites.  As such, the 2003 Rule is not consistent with the 1872 Mining Law and thus cannot withstand judicial review.

Although allowing mining companies to claim as many millsites as they need for waste dumping and other ancillary uses (to the significant detriment to the environment and other users of public land), as allowed by the 2003 Rule, benefits the mining industry, it cannot override the language of the statute and congressional intent.  As the D.C. Circuit held in upholding the statutory limitations on right-of-way grants to companies on public lands:

> Congress, by enacting Section 28, allowed pipeline companies to use a certain amount of land to construct their pipelines. **These companies have now come into court, accompanied by the executive agency authorized to administer the statute, and have said, "This is not enough land; give us more."** We have no more power to grant their request, of course, than we have the power to increase congressional appropriations to needy recipients.

Wilderness Society v. Morton, 479 F.2d 842, 891 (D.C. Cir. 1973)(En Banc)(emphasis added).

## C.     The 2008 and 2003 Rules Violate NEPA

*1.     NEPA Statutory Background.*

NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  NEPA "prevent[s] or eliminate[s] damage to the environment and biosphere by focusing government and public attention on the environmental effects of proposed agency action."  Marsh v. ONRC, 490 U.S. 360, 371 (1989).   Requiring all federal agencies to analyze the environmental consequences of proposed actions, NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).

"The agency must comply with principles of reasoned decisionmaking, NEPA's policy of public scrutiny, and the Council on Environmental Quality's regulations." Delaware Riverkeeper Network v. F.E.R.C., 753 F.3d 1304, 1313 (D.C. Cir. 2014).  "[T]he court owes no deference to the [agency's] interpretation of NEPA or the CEQ [NEPA] regulations because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to the [one agency] alone." Grand Canyon Trust v. F.A.A., 290 F.3d 339, 342 (D.C. Cir. 2002).[6]

"NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §1500.1(b).  NEPA "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97 (1983).

NEPA has "'twin-aims': (1) to ensure that the agency takes a 'hard look' at the environmental consequences of its proposed action and (2) to make information on the environmental consequences available to the public, which may then offer its insight to assist the agency's decision-making through the comment process." Young v. General Services Admin., 99 F.Supp.2d 59, 67 (D.D.C. 2000). *See also* Robertson, 490 U.S. at 349 (same).

To fulfill these goals, NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C); 40 C.F.R. §1501.4.  "Major federal actions" include the issuance of "new or revised agency rules, regulations, plans, policies, or procedures." 40 C.F.R. §1508.18(a).  *See also* 40 C.F.R. §1502.4(b).  Overall, the agency must "provide [a] full and fair discussion of significant impacts" associated with a federal action such as the issuance of the challenged Rules and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. §1502.1.

If an agency is not certain as to whether its action may significantly affect the environment, it must prepare an environmental assessment ("EA"). Id. §1501.4(b).  An EA must

---

[6] The CEQ's NEPA regulations are promulgated at 40 C.F.R. §§1500-1508.

provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact.  40 C.F.R. §1508.9.  If the agency determines, based on the EA, that no EIS is needed because its action will not have a significant effect on the human environment, it may then prepare a "finding of no significant impact" (FONSI).  Id. §§1501.4(e), 1508.13.

"[A]n agency need not prepare an EIS or even an EA if it finds that its proposed action is subject to a 'categorical exclusion.'" Brady Campaign to Prevent Gun Violence v. Salazar, 612 F.Supp.2d 1, 14 (D.D.C. 2009).  A "categorical exclusion," or "CE", is defined as:

> a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

40 C.F.R. §1508.4.  A "cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions." Id. §1508.7. The term "effects" not only includes direct effects (those "caused by the action and occur at the same time and place"), but also indirect effects (those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable"). Id. §1508.8.  The type of resources whose "effects" must be analyzed include:

> ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.

Id.

"When an agency finds that its proposed action falls within a categorical exclusion, the agency must then determine whether there are any 'extraordinary circumstances' that nevertheless require the agency to perform an environmental evaluation. 43 C.F.R. §46.215." Brady, 612 F.Supp.2d at 14-15.   BLM's NEPA regulations list these circumstances where it must prepare an EA or EIS.  "Section 46.215 lists the extraordinary circumstances under which actions otherwise covered by a categorical exclusion require analysis under NEPA." 43 C.F.R. §46.205(c).

As noted above and detailed in Plaintiffs' standing declarations, mining operations across

the West covered by both Rules result in significant environmental damage.  As stated by the Defendant-Intervenors, the implementation of the Rules will result in increased mining and its resultant impacts, for if Plaintiffs are successful in overturning either Rule (or if the Rules interpreted the laws differently in the first place), some mining projects would not occur, or be subject to substantial agency discretion.  Defendant-Intervener Barrick owns and operates gold mines, including the Round Mountain Mine, which is of concern to Plaintiffs. Brief for Barrick at 2 (Dkt. 10).  Barrick asserts that invalidating the 2008 Rule would impair its ability to operate mines, and discusses three specific projects. Id. at 7.  Barrick states that "the impact of the new regulations on Barrick would be new and unworkable limitations on the ability to rationally and economically design, construct, operate, and reclaim mines, which could in turn preclude the expansion of existing mines or construction of new mines." Id. at 14.

The National Mining Association acknowledged the same: "Plaintiffs' interpretation would impermissibly restrict, and in many instances could eliminate altogether, the ability of citizens (including NMA's members) to explore for and develop valuable minerals on public lands."  NMA Intervention Motion at 4 (Dkt. 11).  The Northwest Mining Assoc. and Alaska Miners Assoc. asserted that if Plaintiffs were successful in overturning the Rules, it "would significantly chill investment in exploration and mining and make development of future mines much more difficult if not impossible." Motion/Memo to Intervene, Dkt. 21 at 10 of 92.  Alaska asserted that if mining becomes more costly (e.g., by requiring payment of FMV), it could cause existing mining projects to be shut down and future projects to be abandoned, adversely affecting local economies. Brief for State of Alaska at 3 (Dkt. 35)(pointing to specific mining projects on USFS land in Alaska which would be in danger of closing if the 2008 Rule is repealed.).  While these claims may be exaggerated, they demonstrate that both Rules have significant impact on the environment.

Nevertheless, in promulgating the 2008 Rule, DOI/BLM did not prepare an EA or EIS, and instead issued a CE which prevented any public review under NEPA. 73 Fed.Reg. 73792-93. For the 2003 Rule, BLM issued a short EA and FONSI, also without any public review. ARMIL007585-93.  Each of these actions violates NEPA.

2.    The "Categorical Exclusion" for the 2008 Rule violates NEPA.

DOI asserted that the 2008 Rule was categorically excluded from NEPA review, and so, did not conduct an EA or an EIS. 73 Fed.Reg. 73792–93.  BLM stated that the 2008 Rule "is a regulation of an administrative, financial, legal, technical, or procedural nature.  Therefore, it is categorically excluded from environmental review under [NEPA]." Id. at 73792.  "In addition, the [2008 Rule] does not meet any of the 10 criteria for exceptions to categorical exclusions listed in 516 DM 2, Appendix 2." (later codified at 43 C.F.R. §46.215). 73 Fed.Reg. 73792.  This is the sum total of the NEPA review for the 2008 Rule.  DOI/BLM never conducted any environmental review, explained why the CE applied, nor why none of the Extraordinary Circumstances were potentially affected.

Such an end-run around NEPA, via a scant invocation of a CE, cannot stand. "Categorical exclusions are reserved for a category of agency actions that 'do not individually or cumulatively have a significant effect." Brady, 612 F. Supp. 2d at 23–24.  In providing scant justification for invoking the CE, DOI/BLM apparently believe that because the 2008 Rule itself does not directly authorize any mining projects, it is of a purely procedural or legal nature. 73 Fed.Reg. 73792.  The D.C. District in Brady criticized this notion as a "significant misunderstanding of the obligations imposed by NEPA." 612 F.Supp.2d at 16.  In Brady, DOI invoked this same Categorical Exclusion for a regulation allowing firearms on federal lands. Id. at 15.  BLM argued that it was "strictly [a] legal amendment" that changed the applicable rules, and "[did] not authorize any actual impacts on the environment." Id.

The court disagreed: "This burden [of NEPA] is greater than simply examining whether environmental impacts are authorized by the Final Rule—the DOI was required to consider all direct, indirect, and cumulative impacts that were foreseeable as a result of the Final Rule." Id. citing 40 C.F.R. §1508.8.  It was thus not merely "legal." Id. at 23.  The Ninth Circuit rejected an agency's reliance on a similar "procedural" CE in California ex rel. Lockyer v. U.S. Dept. of Agric., 575 F.3d 999, 1013 (9th Cir. 2009).  Since a change in land management regulations would result in actual environmental effects, the rule could not be classified as merely procedural. Id. at 1014.  Lockyer further noted that an agency could not invoke a "procedural"

1   CE when the rule would have "substantive effects on land management." Id. at 1017.

2          The question is therefore not whether the rulemaking directly imposes physical effects on

3   the environment, but whether such effects are foreseeable as a result of the rulemaking.

4          The DOI made the same error in this case that the defendants made in *Friends of the
       Earth, Inc.* and *Sierra Club.* Rather than performing an evaluation to ascertain the extent

5      of any foreseeable environmental impacts, the DOI simply assumed there were none
       because the Final Rule did not authorize any impacts. …

6
       Defendants' failure to apply the correct standard by which to consider environmental
7      impacts—by examining what the Final Rule authorized as opposed to the foreseeable
       consequences that would occur as a result of the Final Rule—is sufficient by itself to
8      render the DOI's decision to invoke a categorical exclusion arbitrary and capricious.

9   Brady, 612 F.Supp.2d 1, 17, *citing* Friends of the Earth, Inc. v. U.S. Army Corps of Engineers,

10  109 F.Supp.2d 30 (D.D.C. 2000) and Sierra Club v. Bosworth, 510 F.3d 1016 (9th Cir. 2007).  As

11  noted above, Plaintiffs, the mining industry intervenors, and the State of Alaska all agree that the

12  result of the rulemakings as interpreted by this Court will have significant and far-reaching

13  environmental and economic effects in the West.  As such, the 2008 Rule does not fit the relied-

14  upon Category and thus violates NEPA.

15         Even if the proper category was invoked, the presence of any Extraordinary

16  Circumstances invalidates use of a CE. "Any action that is normally categorically excluded must

17  be evaluated to determine whether it meets any of the extraordinary circumstances in section

18  46.215; if it does, further analysis and environmental documents must be prepared for the

19  action." 43 C.F.R. §46.205(c)(1)(DOI NEPA regulations).  "Extraordinary circumstances …

20  exist for individual actions within categorical exclusions that may meet any of the criteria listed

21  in paragraphs (a) through (l)." 43 C.F.R. §46.215 (in the 2008 Rule, these were listed under

22  DOI's NEPA Manual).  These circumstances include whether the implementation of the Rule

23  may: (a) Have significant impacts on public health or safety; (b) Have significant impacts on

24  such natural resources and unique geographic characteristics as historic or cultural resources;

25  park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural

26  landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11990);

27  floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant

28  or critical areas.; (c) Have highly controversial environmental effects or involve unresolved

1  conflicts concerning alternative uses of available resources; (d) Have highly uncertain and

2  potentially significant environmental effects or involve unique or unknown environmental risks;

3  (e) Establish a precedent for future action or represent a decision in principle about future actions

4  with potentially significant environmental effects; (f) Have a direct relationship to other actions

5  with individually insignificant but cumulatively significant environmental effects; (g) Have

6  significant impacts on properties listed, or eligible for listing, on the National Register of

7  Historic Places as determined by the bureau; and (h) Have significant impacts on species listed,

8  or proposed to be listed, on the List of Endangered or Threatened Species or have significant

9  impacts on designated Critical Habitat for these species. 43 C.F.R. §46.215.

10       Extraordinary Circumstances foreclose invocation of a CE even when the effects of the

11  rule "**may** meet **any** of the criteria listed." §46.215 (emphasis added).  An "[a]gency's failure to

12  consider reasonably foreseeable impacts of agency action is sufficient to render the agency's

13  invocation of a categorical exclusion arbitrary and capricious." Reed v. Salazar, 744 F.Supp.2d

14  98, 116 (D.D.C. 2010)(paraphrasing Brady, 612 F.Supp.2d at 17, as support for invalidating

15  DOI's use of a CE).  *See also* California v. Norton, 311 F.3d 1162, 1176 (9th Cir. 2002)(where

16  "there is substantial evidence in the record that exceptions to the categorical exclusion are

17  applicable" there is a "heightened" need for adequate justification), *quoted in* Reed at 116.

18       The 2008 Rule merely stated that none of the listed criteria applied.  Yet this was based

19  on the erroneous view that the Rule would not have any effect on how BLM reviewed and

20  approved (or disapproved) mining operations across the West because it was a purely

21  "procedural" or "legal" rule.  As noted above, in Plaintiffs' declarations, and as stated by the

22  mining industry intervenors and Alaska, the 2008 Rule will undoubtedly have on-the-ground

23  effects.  This is because, as especially noted by the intervenors, the Rule allows mining projects

24  to be approved that otherwise may or would not occur, or would occur in a different manner, if

25  DOI/BLM required evidence of claim validity, applied its FLPMA discretion to operations

26  proposed on lands not shown to be covered by valid claims, and/or required payment of Fair

27  Market Value (as ordered in MPC).

28

1       That was the holding in <u>Brady</u>, where DOI "reached their determination that the Final

2  Rule was strictly a legal amendment with no environmental impacts only after failing to

3  adequately evaluate all reasonably foreseeable environmental impacts." 612 F.Supp.2d at 23.

4  "The Court further holds, for precisely the same reasons, that DOI also improperly determined

5  that there were no 'extraordinary circumstances in which a normally excluded action may have a

6  significant effect,' thus requiring preparation of at least and EA. 40 C.F.R. §1508.4." <u>Id</u>. at 24.

7  *3.      The EA for the 2003 Rule violates NEPA.*

8       In attempting to comply with NEPA in issuing the 2003 Rule, DOI/BLM prepared a short

9  EA and a one-page FONSI (i.e., decision not to prepare an EIS) just two days after the 2003

10 Millsite Opinion was issued.  AR MIL007585-93.  The D.C. Circuit's "long established

11 standard" for reviewing an agency's decision not to prepare an EIS is:

12      First, the agency [has] accurately identified the relevant environmental concern. Second,
        once the agency has identified the problem it must have taken a "hard look" at
13      the problem in preparing the EA. Third, if a finding of no significant impact is made, the
        agency must be able to make a convincing case for its finding.
14

15 <u>Grand Canyon Trust v. F.A.A.</u>, 290 F.3d 339, 340-41 (D.C. Cir. 2002) (citation omitted).  "But if

16 *any* significant environmental impacts might result from the proposed action, then an EIS must

17 be prepared *before* the action is taken." <u>American Bird Conservancy v. F.C.C.</u>, 516 F.3d 1027,

18 1034 (D.C. Cir. 2008)(emphasis in original).

19      Like it did for the 2008 Rule, the agency did not consider the environmental impacts of

20 mining operations that would be approved under the 2003 Rule's reversal of the 1997 Millsite

21 Opinion.  "We have determined that the proposed action would not cause any significant

22 impacts." ARMIL007589.  Yet "simple, conclusory statements of 'no impact' are not enough to

23 fulfill an agency's duty under NEPA." <u>Delaware Riverkeeper Network v. F.E.R.C.</u>, 753 F.3d

24 1304, 1313 (D.C. Cir. 2014).  At the outset, this suffers from the same fundamental flaw as the

25 CE for the 2008 Rule, ignoring the real on-the-ground impacts from the two differing regulatory

26 approaches embodied in the Rules – especially as acknowledged by the industry intervenors who

27 detailed how the two differing millsite interpretations would dramatically alter the number and

28 type of mining operations approved by the federal agencies in the West.

1    Instead of conducting any serious analysis, the EA reviewed only the minimalistic

2   impacts of "staking" additional millsite claims on the ground.  ARMIL007589.  This was

3   because the agency believed, erroneously, that the 2003 Rule's reversal of the 1997 Opinion and

4   1999 Proposed Rule would have no effect on the agency's review and approval of mining

5   projects.  "Because this rule would maintain BLM's long-standing practice regarding millsites,

6   the rule does not create any new environmental impacts.  Publishing this rule leads to the same

7   environmental impacts as the no-action alternative because BLM is not changing the existing

8   rules in any substantive way." ARMIL007590.

9    This flies in the face of what the 2003 Rule, and the 2003 Opinion, actually did: reverse

10   the 1997 Opinion (which as a Secretarial Order was binding on DOI/BLM actions in the field)

11   and allow for essentially unlimited millsites and the associated waste dumping, toxic tailings

12   impoundments, and other ancillary uses.  The EA misleadingly states that the 2003 Opinion/Rule

13   "will **continue** BLM's past practice regarding the five-acre millsite provision." ARMIL007590

14   (emphasis added).

15    Yet the 2003 Opinion, which reversed and abrogated the 1997 Opinion, acknowledged

16   that it was **returning** (i.e., not "continuing") DOI/BLM back to what it believed was agency

17   practice prior to 1997.  "Accordingly, the Department should return to its prevalent, pre-1997

18   administrative practice and interpretation." 2003 Opinion, ARMIL012037.  Further, the 1999

19   Proposed Rule (reversed by the Final Rule in 2003) stated that the 1997 Opinion reflected then-

20   current DOI policy.  "The provision allowing a maximum of 5 acres of mill site land for each

21   lode or placer mining claim is contained in 30 U.S.C. 42, and derives from the lode law of 1866

22   (14 Stat. 251).  This requirement was recently reviewed and Solicitor's Opinion M-36988

23   reaffirmed it on November 7, 1997." 64 Fed.Reg. 47028.

24    In other words, the 2003 EA's basic assumption, that nothing changed in 2003, i.e., that

25   the 2003 Rule was merely "continuing" current Interior policy and legal determinations, is flatly

26   contradicted by the agency's own Proposed Rule in 1999, as well as the 2003 Opinion's

27   acknowledgement that it was "returning" DOI/BLM back to the pre-1997 position.  Accordingly,

28   the EA contains none of the required analysis of direct, indirect, or cumulative impacts from

1   changing how mining would be regulated under the 2003 Opinion/Rule as compared to the 1997

2   Opinion and 1999 Proposed Rule. "The agency's EA must give a realistic evaluation of the total

3   impacts and cannot isolate a proposed project, viewing it in a vacuum." Grand Canyon Trust,

4   290 F.3d at 342.

5          In addition, the EA fails to comply with NEPA's mandate that the agency fully analyze

6   the impacts from all "reasonable alternatives" to the promulgated Rule.  "Nor is the failure to

7   consider reasonable alternatives without consequences. NEPA's requirement to consider

8   alternatives is an independent requirement of an EA, separate from its function to provide

9   evidence that there is no significant impact." Public Employees for Environmental Responsibility

10  v. U.S. Fish and Wildlife Service, 177 F.Supp.3d 146, 157 (D.D.C. 2016) (citations omitted).

11         The 2003 EA mentions an "Alternative Action" that it reviewed.  "An alternative action

12  would be to publish in final the rules as initially proposed, including the mill site limitation

13  described in the 1997 Opinion." ARMIL007591.  Yet in reviewing the environmental impacts

14  from keeping the 1997 Opinion, the EA states that there would be no difference in how the

15  agency would regulate mining under the different millsite Opinions.  Id.  This is based on two

16  erroneous positions.

17         First, the EA argues that "[t]he Leshy [1997] interpretation would not diminish

18  environmental impacts because, as mentioned above, by imposing a categorical limit on the

19  number of mill sites a claimant may locate in association with each mining claim, claimants

20  would likely subdivide their maximum-sized mining claims into smaller claims to obtain the

21  number of mill sites they need." Id.  Yet, this directly contradicts the 1999 Proposed Rule (the

22  alternative the EA was considering) which specifically precluded such a "subdivide" scheme.

23  See proposed §3832.32, which only allowed "an aggregate of 5 acres of mill site land for each

24  20-acre parcel of patented or unpatented placer or lode mining claims associated with that mill

25  site land, **regardless of the number of lode or placer claims located in the 20–acre parcel**."

26  64 Fed.Reg. 47037 (emphasis added).

27         Second, the EA asserts that, even if DOI/BLM adopted the 1997 Opinion and 1999

28  Proposed Rule, "the Leshy interpretation would not necessarily diminish the environmental

impacts from mining operations." ARMIL007591.  This is because if mining companies could

not obtain rights under the Mining law to have their ancillary uses approved on the additional

millsite claims, the companies could apply to use public land under other authorities. Id.  Yet this

ignores the entire controversy over the differing Opinions and is extremely misleading.  As the

industry intervenors correctly state, if companies did not have rights under the Mining Law to

locate their ancillary facilities (waste dumps, tailings, etc.) on excess millsite claims, then getting

approval of modern mining would be under a completely discretionary regime:

> By interpreting the Mining Law to restrict the allowable acres of unmineralized land that
> can be used for waste rock and tailings disposal facilities, mineral processing facilities,
> and other reasonably incident uses, Plaintiffs seek to make development of large surface
> mines difficult and even impossible because these facilities would require discretionary
> land use authorizations derived from other statutes. NWMA and AMA members' mineral
> prospecting and exploration activities could become fruitless if the facilities necessary to
> develop a discovered deposit into a mine could not be authorized under the Mining Law.

NMWA/AMA Motion to Intervene, at 3 (Dkt. 21).  Indeed, the main reason the various mining

companies, trade associations, Alaska, and Nevada (as amicus) all joined this case was to attempt

to ensure that DOI/BLM do not have the discretionary authority and FMV requirements over

ancillary facilities proposed on lands not covered with valid and perfected claims (including

millsite claims limited by the 1997 Opinion).

Lastly, the EA was never subject to any public review, as required by NEPA and BLM

policy.  NEPA regulations require that agencies "shall to the fullest extent possible ...

[e]ncourage and facilitate public involvement in the decisions which affect the quality of the

human environment."  40 C.F.R. §1500.2(d).  "NEPA procedures must insure that environmental

information is available to public officials *and citizens* before decisions are made and before

actions are taken ... Accurate scientific analysis, expert agency comments, *and public scrutiny

are essential* to implementing NEPA." 40 C.F.R. §1500.1(b) (emphasis added).  "You must have

some form of public involvement in the preparation of all EAs." BLM H-1790-1 - NATIONAL

ENVIRONMENTAL POLICY ACT HANDBOOK, at 76.

https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_h

andbook.Par.24487.File.dat/h1790-1-2008-1.pdf (viewed 2-16-17).

DOI/BLM must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. §1506.6(a).  The agency "shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by [40 C.F.R. §] 1508.9(a)(1)." 40 C.F.R. §1501.4(b). "Section 1506.6 requires agencies to involve the public in implementing their NEPA procedures, and this includes public involvement in the preparation of EAs and FONSIs." 46 Fed. Reg. 18,026 (March 23, 1981) ("Forty Most Asked Questions Concerning CEQ's NEPA Regulations," answer to question 38).

Here, the public never had any opportunity to comment upon the analysis DOI/BLM used in the EA.  Indeed, the EA was signed just two days after the 2003 Millsite Opinion was issued, which was the agency action which changed DOI/BLM's interpretation of the Mining Law, leading to the 2003 Rule itself and the triggering of the agencies' NEPA obligations.

Overall, DOI/BLM cannot credibly argue that the EA complies with the strict requirements of NEPA.  The agencies' contradictory and misleading justifications cannot be used to support a clearly inadequate EA and FONSI.

## D.  The 2003 Rule Violates the Public Notice and Comment Requirements of the APA

Similar to the failure to subject the EA to any public review, DOI/BLM failed to subject the 2003 Rule to the required public notice and comment procedures of the APA. The APA requires that agencies provide adequate notice of proposed rulemaking, 5 U.S.C.§553(b), and provide the public with adequate "opportunity to participate in the rule making." §553(c).  While an agency may promulgate a final rule that is somewhat different than the proposed rule, the final rule must be a "logical outgrowth" of the proposed rule. International Union, United Mine Workers of America v. Mine Safety and Health Admin., 407 F.3d 1250, 1259 (D.D.C. 2005). "Given the strictures of notice-and-comment rulemaking, an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." Environmental Integrity Project v. EPA, 425 F.3d 992, 996 (D.C. Cir. 2005).  "[I]f the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to

1   respond to the proposal." <u>Small Refiner Lead Phase-Down Task Force v. EPA</u>, 705 F.2d 546,

2   547 (D.C. Cir. 1983).  "Thus, we have refused to allow agencies to use the rulemaking process to

3   pull a surprise switcheroo" on the public in the final rule. <u>Environmental Integrity Project</u>, 425

4   F.3d at 996.

5   　　　In this case, the 2003 Millsite Rule completely reversed the then-existing DOI/BLM

6   policy and legal interpretation which limited the number of allowable millsites under the Mining

7   Law as stated in the 1999 Proposed Rule and the 1997 Millsite Opinion.  No public notice was

8   given of this "switcheroo," and the public was never given an opportunity to respond to or

9   comment on DOI/BLM's new legal interpretation and policy – in violation of the APA.  "The

10  necessary predicate [in revising proposed rules], however, is that the agency has alerted

11  interested parties to the possibility of the agency's adopting a rule different than the one

12  proposed. The adequacy of the notice depends, according to our precedent, on whether the final

13  rule is a 'logical outgrowth' of the proposed rule."  <u>Kooritsky v. Reich</u>, 17 F.3d 1509, 1513 (D.C.

14  Cir. 1994).  The court further noted that: "The Federal Register Act, 44 U.S.C. §§ 1501–1511,

15  and the regulations thereunder, require agencies to include a preamble to their notice of proposed

16  rulemaking 'which will inform the reader, who is not an expert in the subject area, of the basis

17  and purpose for the ... proposal.' 1 C.F.R. § 18.12(a)." <u>Id</u>.

18  　　　Here, the 1999 Proposed Rule said nothing that would alert the "non expert" general

19  public that the agency was considering reversing the then-existing DOI/BLM millsite policy,

20  which the 2003 Rule did without any opportunity for public review and comment on the switch.

21  　　　　　　　　　　　　　　**CONCLUSION**

22  　　　Accordingly, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion, and

23  set aside, vacate and remand the 2003 and 2008 Rules, with instructions to reinstate the 1997

24  Millsite Opinion as the proper interpretation of the Mining Law, and to conduct rulemakings

25  consistent with federal law, and this District's original Order in <u>MPC.</u>

26

27

28

Respectfully submitted this 24th day of February, 2017.

*/s/ Edward S. Scheidman*
_____
Edward S. Scheidman, DC Bar # 475128
DLA PIPER US, LLP
500 8th Street, NW
Washington, DC 20004
(202) 799-4534
Fax: (202) 799-5534
edward.scheideman@dlapiper.com


*/s/ Roger Flynn*
_____
Roger Flynn, *Pro Hac Vice*
Jeffrey C. Parsons, *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349
440 Main St., #2
Lyons, CO 80540
(303) 823-5738
Fax (303) 823-5732
wmap@igc.org


Attorneys for Earthworks, High Country Conservation Advocates, Great Basin Resource Watch, Save the Scenic Santa Ritas, and Western Shoshone Defense Project

## CERTIFICATE OF SERVICE

I, Roger Flynn, attest that on February 24, 2017, I served the foregoing, including all exhibits, by filing all documents with this Court's ECF filing system, which will electronically deliver all documents to all parties in this case.

*/s/ Roger Flynn*