**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EARTHWORKS, *et al.*,                          :
                                                              :
          Plaintiffs,                                 :          Civil Action No.:        09-1972 (RC)
                                                              :
          v.                                              :          Re Document Nos.:    114, 118, 126, 129
                                                              :                                        159
U.S. DEPARTMENT OF THE INTERIOR,   :
          *et al.*,                                     :
                                                              :
          Defendants.                              :

## MEMORANDUM OPINION

### Denying Plaintiffs' Motion for Summary Judgment; Granting Defendants' Motions for Summary Judgment

## I.  INTRODUCTION

A coalition of environmental groups ("Plaintiffs") challenges two mining-related rules issued by the Bureau of Land Management ("BLM"), part of the U.S. Department of the Interior ("Interior").  Plaintiffs allege that the rules were not promulgated in compliance with various statutory authorities, including the General Mining Law of 1872 ("The Mining Law"), 30 U.S.C. §§ 22–47; the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 701–06.

Currently pending before the Court are the parties' cross-motions for summary judgment. For the reasons below, the Court denies Plaintiffs' motion and grants Defendants' motions.

## II.  BACKGROUND

### A.  Statutory Background

1.  The General Mining Law of 1872

The Mining Law allows citizens to explore unappropriated public lands and, without any prior government permission or paying any royalties, stake (or "locate") a mining claim.  30 U.S.C. § 22; *United States v. Locke*, 471 U.S. 84, 86 (1985).  After discovering a valuable mineral deposit and satisfying certain minimal procedures (including paying a location fee), claimants obtain an "unpatented" mining claim and have the exclusive right to possess the land for mining purposes.  *See* 30 U.S.C. § 26; *see also Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963).  Valid mining claims are "a unique form of property," *Best*, 371 U.S. at 335, describable as "fully recognized possessory interest[s]," *Locke*, 471 U.S. at 86.  But ultimate title to the claimed land remains with the United States unless the mining claimant takes the further step of filing for fee title, called a "patent."  *See id.*; *Best*, 371 U.S. at 336.  Claimants can obtain a patent by submitting an application to the Secretary of the Interior and complying with further requirements, including paying a nominal per-acre fee.  30 U.S.C. § 29; *Locke*, 471 U.S. at 86.[1]  "Even without a patent, claimants can maintain their mining rights indefinitely so long as they comply with federal, state, and local requirements."  *Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 699 (D.C. Cir. 2009).  These requirements include paying annual claim maintenance fees.  *See* 30 U.S.C. § 28f(a); 43 C.F.R. §§ 3834–3835.

---

[1] Effective October 1, 1994, Congress imposed a moratorium on new patent applications, and "[u]ntil the moratorium is lifted or otherwise expires, the BLM will not accept any new patent applications."  *Patents*, Bureau of Land Mgmt., https://www.blm.gov/programs/energy-and-minerals/mining-and-minerals/locatable-minerals/patents.

As implemented, the claim system tolerates a degree of uncertainty (or, at least, the language used to describe the legal status of a claim is not always precise). Formally speaking, a claim is valid against the United States only if there is a valuable mineral deposit within the limits of the claim. *See* 30 U.S.C. § 23 (providing that "no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located"); *Best*, 371 U.S. at 336 (unpatented mining claims are "valid against the United States if there has been a discovery of mineral within the limits of the claim, if the lands are still mineral, and if other statutory requirements have been met"). "*If valid*, it gives to the claimant certain exclusive possessory rights . . . . But *no right arises from an invalid claim of any kind*." *Cameron v. United States*, 252 U.S. 450, 460 (1920) (emphases added); *see also Cole v. Ralph*, 252 U.S. 286, 296 (1920) ("Location is the act or series of acts whereby the boundaries of the claim are marked . . . but it confers no right in the absence of discovery, both being essential to a valid claim.").

In practice, however, the BLM does not immediately confirm the validity of a claim but instead treats it as presumptively valid. *See W. Shoshone Def. Project*, 160 IBLA 32, 56 (2003) ("BLM generally does not determine the validity of the affected mining claims before approving a plan of operations." [2]); *see also* 4 George Cameron Coggins & Robert L. Glicksman, *Public Natural Resources Law* § 42:9 (2d ed. 2020) (reporting that "the Interior Department historically has not challenged any but the most egregious claims"); Mark Squillace, *The Enduring Vitality of the General Mining Law of 1872*, 18 Env't. L. Rep. 10,261, 10,266 (1988) (noting that the government "rarely considers the validity of an unpatented mining claim"). As a matter of both

---

[2] Approval of a "plan of operations" is generally required "before beginning operations greater than casual use," 43 C.F.R. § 3809.11, though certain smaller-scale activities require only a "notice of operations," *id.* § 3809.21.

law and practice, validity proceedings are largely discretionary. *See* 43 C.F.R. § 4.451-1 ("The

Government *may* initiate contests for any cause affecting the legality or validity of any entry or

settlement or mining claim." (emphasis added)); *see also Swanson v. Babbitt*, 3 F.3d 1348, 1350

(9th Cir. 1993) ("At any time prior to the issuance of a patent, the government may challenge the

validity of the mining claim and, if successful, the claim will be cancelled with all rights

forfeited."). Validity examinations generally take place only when a claimant applies for a

patent,[3] *see* 43 C.F.R. § 3862.1-1(a); seeks to conduct operations on lands that have since been

withdrawn from the public domain,[4] *see id.* §§ 3809.11, 3809.100; engages in obvious abuse

amounting to trespass, *see, e.g., United States v. Goldfield Deep Mines Co. of Nev.*, 644 F.2d

1307, 1308 & n.2 (9th Cir. 1981) (government challenged claim after operator cut trees, dug

roads, and used heavy equipment, all while implausibly maintaining that platinum and other

valuable minerals could be extracted using "secret methods"); or operates on land in which the

government has an interest, *see, e.g., Ickes v. Underwood*, 141 F.2d 546, 546 (D.C. Cir. 1944)

(government challenged claim as part of effort to secure land for construction of Grand Coulee

Dam).

---

[3] Of course, in light of the current congressional moratorium, these kinds of claim investigations no longer occur. But even when patenting was available, relatively few patent applications were actually filed. *See* Squillace, *supra*, at 10,266 ("The reason for this dearth of patent applications is uncertain, but it probably stems in substantial part from a healthy fear on the part of claimants that the government . . . will strictly scrutinize any claim for which a patent is sought. The patent applicant may thus wind up with a legal declaration that his claim is invalid rather than gain fee title to the land.").

[4] Land can be withdrawn—that is, reserved for nonmining purposes—in various ways. For example, the Secretary of the Interior can withdraw land under the FLPMA, *see* 43 U.S.C. § 1714, and the President can do so via a proclamation under the Antiquities Act, *see* 54 U.S.C. § 320301. "Where the Government subsequently withdraws the land from mineral entry and location, permission to prospect is thereby revoked and only claims then supported by a discovery are protected from the withdrawal." *United States v. Boucher*, 147 IBLA 236, 243 (1999) (quoting *United States v. Niece*, 77 IBLA 205, 207 (1983)).

Facing such a challenge, a claimant has certain procedural rights. *See Cameron*, 252 U.S. at 460 (noting that the government "has no power to strike down any claim arbitrarily, but so long as the legal title remains in the government it does have power, after proper notice and upon adequate hearing, to determine whether the claim is valid and, if it be found invalid, to declare it null and void"). Additionally, a claimant may have rights against rival claimants prior to discovery under the old mining doctrine of *pedis possessio*. *See Union Oil Co. of Cal. v. Smith*, 249 U.S. 337, 346–47 (1919) (explaining that "a miner may hold the place in which he may be working against all others having no better right, and while he remains in possession, diligently working towards discovery is entitled—at least for a reasonable time—to be protected against forcible, fraudulent, and clandestine intrusions upon his possession"); 5 Nancy Saint-Paul, *West's Federal Administrative Practice* § 5856 (2020) ("Even before discovering a valuable mineral deposit on federal lands, a prospector can acquire a species of inchoate property right under the mining law doctrine of *pedis possessio*, meaning 'foot possession' or actual possession."). But ultimately, "[p]rior to validity proceedings, unpatented claims amount to a potential property interest, since it is the discovery of a valuable mineral deposit and satisfaction of statutory and regulatory requirements that bestows possessory rights." *Freeman v. U.S. Dep't of Interior*, 83 F. Supp. 3d 173, 178 n.6 (D.D.C. 2015), *aff'd*, 650 F. App'x 6 (D.C. Cir. 2016) (per curiam); *see also Foster v. Seaton*, 271 F.2d 836, 838 (D.C. Cir. 1959) (per curiam) ("One who has located a claim upon the public domain has, prior to the discovery of valuable minerals, only 'taken the initial steps in seeking a gratuity from the Government.'" (quoting *Ickes*, 141 F.2d at 549)).

The Mining Law also allows the location and patent of lands for a "mill site." 30 U.S.C. § 42(a). These sites must be located on nonmineral lands and cannot be contiguous to a mine or

lode, but they can be used for mining or milling activities in connection with a claim (such as milling, chemical processing, and waste dumping).  *Id.*; *see also* 43 C.F.R. § 3832.31 (noting that a mill site can be used "for activities reasonably incident to mineral development on, or production from, the unpatented or patented lode or placer claim with which it is associated").  No mill site location "shall exceed five acres."  30 U.S.C. § 42(a).

## 2.  The Federal Land Policy and Management Act

In 1976, after a "broad[] inquiry into the proper management of the public lands in the modern era," Congress passed the FLPMA.  *Locke*, 471 U.S. at 87; *see also Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 (10th Cir. 1982) (noting that "[t]he national policy declared in the FLPMA stands in marked contrast to the many older public land statutes that provided for the wholesale disposition of the public lands").  The FLPMA supersedes or supplements the Mining Law in certain ways.  For example, it requires the Secretary, "[i]n managing the public lands," to "take any action necessary to prevent unnecessary or undue degradation," 43 U.S.C. § 1732(b), and encourages the "harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment," *id.* § 1702(c).  As relevant here, it also "declares that it is the policy of the United States that . . . the United States receive fair market value of the use of the public lands and their resources unless otherwise provided for by statute."  *Id.* § 1701(a)(9).

## 3.  National Environmental Policy Act

NEPA represents "a broad national commitment to protecting and promoting environmental quality."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331).  Among other things, it requires any federal agency proposing a "major Federal action[] significantly affecting the quality of the human environment" to prepare

"a detailed statement"—commonly referred to as an Environmental Impact Statement ("EIS")—
that analyzes the potential impacts of the proposed action and possible alternatives.  42 U.S.C.
§ 4332(C).  Sometimes, it is not clear whether a given agency action requires an EIS.  In these
circumstances (that is, "if the agency's proposed action neither is categorically excluded from the
requirement to produce an EIS nor would clearly require the production of an EIS"), an agency
can prepare "a more limited document, an Environmental Assessment."  *Dep't of Transp. v. Pub.
Citizen*, 541 U.S. 752, 757 (2004).  If, after completing an Environmental Assessment ("EA"), an
agency concludes that a full-blown EIS is not necessary, it must issue a "finding of no significant
impact," which, as the name implies, "briefly presents the reasons why the proposed agency
action will not have a significant impact on the human environment."  *Id.* at 757–58.

### 4.  APA's Notice-and-Comment Procedures

The APA, which applies to all federal agencies, provides the general procedures for
agency rulemaking.  For so-called "notice-and-comment" rulemaking, the APA requires that an
agency publish notice of a proposed rule, 5 U.S.C.§ 553(b), and give the public adequate
"opportunity to participate in the rule making" through written comments and other submissions.
*Id.* § 553(c).  Once the comment period has closed, the APA directs the agency to consider the
"relevant matter presented" and incorporate into the adopted rule a "concise general statement"
of its "basis and purpose."  *Id.*  "Given the strictures of notice-and-comment rulemaking, an
agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical
outgrowth' of the former."  *Env't Integrity Project v. E.P.A.*, 425 F.3d 992, 996 (D.C. Cir. 2005).
In other words, an agency cannot "pull a surprise switcheroo" and adopt a final rule that differs
in an unforeseeable way from the proposed one.  *Id.*

**B.  Case Background**

1.  Parties

Plaintiffs in the case are five environmental interest organizations: Earthworks, High Country Citizens' Alliance, Great Basin Resource Watch, Save the Scenic Santa Ritas, and the Western Shoshone Defense Project.  Compl. ¶ 1, ECF No. 1.  Essentially, they ask the Court to enjoin and declare invalid portions of two rules issued by the BLM and Interior.  *Id.* ¶¶ 1, 3. They name the Department of Agriculture and United States Forest Service as additional defendants (along with BLM and Interior, "Federal Defendants"), seeking to enjoin those agencies' "adoption of, and reliance upon," the allegedly invalid portions of the two rules.  *Id.* ¶ 4.  After the case was filed, additional parties successfully moved to intervene as defendants: the State of Alaska, *see* Order Granting Mot. to Intervene, ECF No. 42, and various mining companies and associations ("the Mining Defendants"), *see* Orders Granting Mots. to Intervene, ECF Nos. 22, 41.[5]

2.  Challenged rules

*a.  The 2008 Rule*

One of the rules at issue is an Interim Final Rule entitled "Mining Claims Under the General Mining Laws," 73 Fed. Reg. 73,789-02 (Dec. 4, 2008) [hereinafter 2008 Mining Claim Rule or 2008 Rule].  The BLM and Interior promulgated the 2008 Rule in direct response to the court's decision in *Mineral Policy Center v. Norton (MPC)*, 292 F. Supp. 2d 30 (D.D.C. 2003).[6]

---

[5] The Mining Defendants are: Barrick North America Holding Corporation, ABX Financeco Inc., the National Mining Association, Round Mountain Gold Corporation, Northwest Mining Association, and the Alaska Miners Association, Inc.

[6] Incidentally, two of the plaintiffs here were also plaintiffs in *MPC*.  Compl. ¶ 74.

In *MPC,* the plaintiffs challenged an earlier generation of BLM regulations governing mining claims, alleging that they violated the FLPMA and NEPA.  *MPC*, 292 F. Supp. 2d at 40–41.  As relevant here, the plaintiffs argued that the regulations failed to implement the FLPMA's mandate that the United States "receive fair market value" for the use of public lands "unless otherwise provided for by statute."  *Id.* at 49 (quoting 43 U.S.C. § 1701(a)(9)).  They recognized that the Mining Law implicated section 1701(a)(9)'s "carve out" provision (the "unless otherwise provided for by statute" language).  *See id.* at 50.  But the plaintiffs contended that "the Mining Law does not vest operators on unclaimed or invalidly claimed land with legal rights against the United States."  *Id.*  Thus, they argued, "such persons are not affected by § 1701(a)(9)'s 'carve out' provision, and *are* therefore subject to the general fair market value requirement."  *Id.* Using language disputed in this case, Judge Kennedy agreed with the plaintiffs:

> The court concludes that . . . if there is no valid claim and the claimant is doing more than engaging in initial exploration activities on lands open to location, the claimant's activity is not explicitly protected by the Mining Law or FLPMA.  Thus, the activity does not fall within the carve-out provision set forth in § 1701(a)(9).

*Id.*  As a result:

> Operations neither conducted pursuant to valid mining claims nor otherwise explicitly protected by FLPMA or the Mining Law (*i.e.*, exploration activities, ingress and egress, and limited utilization of mill sites) must be evaluated in light of Congress's expressed policy goal for the United States to 'receive fair market value of the use of the public lands and their resources.'

*Id.* at 51 (quoting 43 U.S.C. § 1701(a)(9)).  Judge Kennedy then remanded the regulations to Interior so that it could "give[] proper effect" to this goal.  *Id.*

In response, the BLM promulgated the 2008 Rule.  The rule first explained that, after seeking public comment, the BLM had concluded that "no mining operations amounting to more than initial exploration activities occur on unclaimed Federal lands under the Mining Law."  73 Fed. Reg. at 73,790.  "Consequently," the rule continued, "the BLM has determined that there is

no use of the surface of invalidly claimed or unclaimed lands for mining purposes, amounting to more than initial exploration activities, for which BLM must consider charging fair market value." *Id.* The rule also stated that "[t]he court's decision in Mineral Policy Center did not address the use of lands on which mining claims of unknown validity exist." *Id.* at 73,791 (alteration in original) (citation omitted). It acknowledged that "the BLM does not routinely undertake validity examinations for all mining claims located under the Mining Law" and mentioned the "budgetary and other practical reasons" why it does not do so. *Id.* And it reasoned that this practice was consistent with the Mining Law and the FLPMA:

> Because Congress authorizes mining claimants to locate mining claims under the Mining Law and maintain them by making annual payments to the BLM while the validity of the claims is unknown or undetermined, the BLM has concluded that it may not apply FLPMA's fair market value policy to approved mining operations that occur on mining claims of unknown validity.

*Id.* at 73,791–92. Essentially, then, the agency took no concrete action in response to the court's order in *MPC*: it concluded that there were no operations conducted on unclaimed land or invalid claims and thus no need to consider whether the United States was receiving fair market value for those activities. It simply clarified that the only payments required were the annual claim maintenance fees mandated by 30 U.S.C. § 28f(a), claim location fees, and service charges for other mining claim transactions. 73 Fed. Reg. at 73,791.

### b. The 2003 Rule

The second rule at issue is a Final Rule entitled "Locating, Recording, and Maintaining Mining Claims or Sites," 68 Fed. Reg. 61,046-01 (Oct. 24, 2003) [hereinafter 2003 Mill Site Rule, 2003 Final Rule, or 2003 Rule]. Among the provisions promulgated by the 2003 Rule was the specific regulation challenged here, 43 C.F.R. § 3832.32, which clarified the amount of land that could be included in each mill site. As mentioned above, the Mining Law allows claimants

to locate and patent nonmineral lands called "mill sites" in connection with mining claims.  30

U.S.C. § 42(a).  But there is a long-running debate on how much land can be claimed under this

provision.  The relevant section of the statute explains only that "no location . . . shall exceed

five acres"; it does not specify how many separate locations can be claimed.  *Id.*

In 1997, the Solicitor of the Department of the Interior issued an opinion clarifying that

an applicant can claim only up to five mill site acres *per mining claim*.  *See* U.S. Dep't of the

Interior, Off. of the Solicitor, M-36988, Limitations on Patenting Millsites Under the Mining

Law of 1872, at 2 (Nov. 7, 1997) [hereinafter 1997 Opinion]; *see also* 68 Fed. Reg. at 61,054.  In

1999, Interior published a corresponding Proposed Rule that sought to limit the amount of mill

site acreage that could be located per claim and prevent claimants from subdividing their claims

to obtain rights to more mill sites.  *See* Locating, Recording, and Maintaining Mining Claims or

Sites, 64 Fed. Reg. 47,023-01, 47,037 (Aug. 27, 1999) [hereinafter 1999 Proposed Rule]; *see*

*also* 68 Fed. Reg. at 61,054.

After a turnover in administrations, however, Interior changed course.  A Deputy

Solicitor issued a new opinion expressing the view that (1) the 1997 Opinion's interpretation was

inconsistent with the statutory text, which did not limit the number of mill sites that could be

located per mining claim; (2) the Supreme Court had interpreted similarly worded provisions in

the Mining Law as imposing no limit on the number of lode and placer claims a claimant could

locate and patent; (3) restricting the number of mill sites per mining claim was contrary to the

Mining Law's goal of promoting mineral development; and (4) the 1997 Opinion departed from

Interior's prior interpretation of the Mining Law, which had long treated the statute as limiting

the size of mill sites rather than the number of mill sites per mining claim.  *See* U.S. Dep't of the

Interior, Off. of the Solicitor, M-37010, Mill Site Location and Patenting Under the 1872 Mining

Law 2–4 (Oct. 7, 2003) [hereinafter 2003 Opinion]; *see also* 68 Fed. Reg. at 61,054.  The 2003

Opinion also noted that, although the statute did not cap the number of mill sites per mining

claim, it did limit the acreage a claimant could use for mill site purposes to that which is "used or

occupied . . . for mining or milling purposes."  2003 Opinion 4 (quoting 30 U.S.C. § 42).  In

other words, Interior could curb "excessive mill sites by challenging the validity of mill sites that

claimants do not actually need for mining or milling purposes."  *Id.*

Shortly afterward, Interior published the 2003 Final Rule.  It recounted the above history

and then announced that, "instead of changing the Department's past prevalent practice and

interpretation of the mill site provision, BLM has decided to withdraw the proposed amendment

to the mill site regulations and continue its prevailing practice and interpretation that the

Department followed for a half century before the 1997 Opinion."  68 Fed. Reg. at 61,054.  The

resulting regulation clarified that a claimant was not limited to a single five-acre mill site (or two

or more mill sites so long as the aggregate was no larger than five acres) but instead "may locate

more than one mill site per mining claim" if no individual mill site was larger than five acres and

the total amount of acreage was "reasonably necessary to be used or occupied for efficient and

reasonably compact mining or milling operations."  43 C.F.R. § 3832.32.

### 3.  Claims and current posture

In their complaint, Plaintiffs alleged four claims: (1) the 2008 Mining Claim Rule and

related policies violate the Mining Law and the FLPMA by improperly restricting the application

of the FLMPA's fair market valuation mandate, (2) the 2003 Mill Site Rule and related policies

violate the Mining Law by allowing excessive mill site acreage, (3) the 2003 Rule and the 2008

Rule violate NEPA by not adequately providing for review and public comment, and (4) the

2003 Mill Site Rule violates the notice-and-comment requirements of the APA by departing

radically from the 1999 Proposed Rule.  *See* Compl. ¶¶ 151–64.  Currently pending before the Court are the parties' cross-motions for summary judgment.[7]  *See* Pls.' Mot. for Summ. J. & Mem. in Supp. ("Pls.' MSJ"), ECF No. 114; Defs.' Resp. to Pls.' Mot. for Summ. J. & Cross-Mot. for Summ. J. ("Gov't's XMSJ"), ECF No. 118; Mem. in Supp. of Intervenor-Defs.' Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. ("Mining Defs.' XMSJ"), ECF No. 124; Intervenor-Def. State of Alaska's Resp. to Pls.' Mot. for Summ. J. & Cross-Mot. for Summ. J., ECF No. 126.

### III.  LEGAL STANDARD

A court must grant summary judgment when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In cases involving review of agency action under the APA, however, Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record."  *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011) (citations omitted).  In this context, summary judgment instead "serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Id.*

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).  That said, the scope of the

---

[7] Shortly after the case was reassigned to the undersigned judge, Plaintiffs filed a request for oral argument.  *See* ECF No. 159.  Because the Court can resolve the motion on the existing record (which includes a transcript of the oral argument before the previously assigned judge), that motion will be denied as a matter of the Court's discretion.  *See* Local Civ. R. 78.1.

court's review is narrow, and a court must not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Indeed, an agency's decision is presumed to be valid. *See Am. Radio Relay League, Inc. v. F.C.C.*, 617 F.2d 875, 879 (D.C. Cir. 1980).

When a plaintiff challenges an agency's formal interpretation of a statute it is charged with administering, the familiar two-step procedure of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) applies. First, the court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But if the court concludes that the statute is either silent or ambiguous, then it must proceed to the second step and determine whether the agency's interpretation is "based on a permissible construction of the statute." *Id.* at 843. In practice, "[t]he analysis of disputed agency action under *Chevron* Step Two and arbitrary and capricious review is often the same." *Pharm. Rsch. & Mfrs. of Am. v. F.T.C.*, 790 F.3d 198, 209 (D.C. Cir. 2015) (internal quotation marks and citation omitted); *see also Arent v. Shalala*, 70 F.3d 610, 616 n.6 (D.C. Cir. 1995) ("[W]hether an agency action is 'manifestly contrary to the statute' is important both under *Chevron* and under *State Farm*." (quoting *Chevron*, 467 U.S. at 844)).

Finally, when plaintiffs challenge an agency rule in the abstract, rather than a particular application of that rule, they face a "heavy burden." *Rust v. Sullivan*, 500 U.S. 173, 183 (1991). "To prevail in such a facial challenge, [a plaintiff] 'must establish that no set of circumstances exists under which the [regulation] would be valid.'" *Reno v. Flores*, 507 U.S. 292, 301 (1993) (second alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

"That is true as to both . . . constitutional challenges and . . . statutory challenge[s]." *Id.*

(citations omitted); *see also Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011). In other

words, "it is not enough for the plaintiff[] to show the [challenged regulations] could be applied

unlawfully." *Sherley*, 644 F.3d at 397.[8]

## IV. ANALYSIS

### A. Standing

Plaintiffs must establish constitutional and prudential standing for each claim they bring.

*See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006). To establish constitutional

standing, plaintiffs must show (1) that they have suffered an "injury in fact" that is "concrete and

particularized" and "actual or imminent, not conjectural or hypothetical"; (2) that the injury is

"fairly traceable to the challenged action of the defendant"; and (3) that it is "likely" rather than

just "speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of

Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up) (citations omitted). To establish prudential

standing, the interests plaintiffs seek to protect must fall within the "zone of interests to be

protected or regulated by the statute . . . in question." *Bennett v. Spear*, 520 U.S. 154, 175

(1997). Under the zone-of-interests test, courts ask "whether this particular class of persons has

---

[8] Using *Salerno*'s "no set of circumstances" test to evaluate a facial statutory challenge to
an agency regulation is arguably in tension with *Chevron*, and courts have struggled to reconcile
the standards. *See* Stuart Buck, Salerno *vs.* Chevron: *What to do About Statutory Challenges*, 55
Admin. L. Rev. 427, 429 (2003) ("*Chevron* allows the court to overturn the agency's decision if
the regulation is either 1) directly contradicted by the statute or 2) unreasonable. But the *Salerno*
standard seems to require that the agency's regulation be upheld if even one set of circumstances
existed in which the regulation was consistent with the statute."). Nevertheless, the applicability
of the *Salerno* test in these circumstances now seems relatively clear, at least in the D.C. Circuit.
*See Sherley*, 644 F.3d at 397 n.** (D.C. Cir. 2011); *see also Chamber of Commerce v. N.L.R.B.*,
118 F. Supp. 3d 171, 184 (D.D.C. 2015). *But see Sherley*, 644 F.3d at 404 n.7 (Henderson, J.,
dissenting) ("Whether *Salerno*'s 'no set of circumstances' approach is properly applied in the
absence of a constitutional challenge is not altogether settled in our Circuit.").

a right to sue under this substantive statute." *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (internal quotation marks and alteration omitted). As Judge Silberman has observed, in an APA cause of action, "[t]his particular type of prudential standing"—that is, the zone-of-interest analysis, or what is sometimes called "statutory standing"—"is thus typically tied to at least two statutes—the organic statute underlying a complaint and the APA itself." *Ass'n of Battery Recyclers, Inc. v. E.P.A.*, 716 F.3d 667, 676 (D.C. Cir. 2013) (Silberman, J., concurring). Finally, when an organization sues on behalf of its members, it must establish "representational" or "associational" standing. That requires showing that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiffs have demonstrated all the required varieties of standing—constitutional, prudential, associational—necessary for their four claims. They plausibly argue both injury and causation: they explain, with supporting declarations, that their members reside in the western United States and regularly use and enjoy the public lands that will be affected by the challenged rules, and that the challenged rules unlawfully permit excessive and environmentally harmful development of these areas. When these kinds of arguments are adequately and specifically supported, as they are here, they have long been recognized as sufficient. *See id.* at 183 ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." (internal quotation marks omitted) (citation omitted)); *Ctr.*

16

*for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 140 (D.D.C. 2012) (finding injury and causation when plaintiffs provided a "substantial discussion" of the aesthetic and recreational interests of their members and "how such interests will be impaired by the Agency's policy").

Federal Defendants nevertheless assert that Plaintiffs' injuries are traceable not to the challenged rulemakings themselves but instead to the agencies' subsequent consideration and approval of specific mining proposals and operations. Gov't's XMSJ at 10 (noting that "neither of the challenged regulations governs approval of mining proposals or otherwise authorizes any surface disturbance of federal lands"). Of course nobody is harmed by rulemaking in the abstract; Plaintiffs' claim is that they are harmed by the downstream operations permitted by the rules. The probable effects of a rule can be sufficient to establish standing. *See, e.g.*, *Ctr. for Biological Diversity v. E.P.A.*, 861 F.3d 174, 184–85 (D.C. Cir. 2017) (holding that plaintiff organization had standing to challenge EPA approval of pesticide because there was a substantial probability that the pesticide's use would harm its members' aesthetic and recreational interests).

Plaintiffs have demonstrated redressability too: as they say, "[a]n order from this Court declaring that the Rules violate the 1872 Mining Law, FLPMA, NEPA, and the APA would, as repeatedly stated by the Intervenors, result in substantial changes in how these mining operations would be regulated—resulting in less 'rights to mine.'" Pls.' Reply at 3, ECF No. 130.

Whether or not Plaintiffs have prudential standing requires more discussion. There is no doubt that Plaintiffs' NEPA claims fall within that act's protective scope. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996) (concluding that "plaintiffs whose members use [a particular area] for [recreational] purposes [such] as hiking are plainly within the zone of interests protected by NEPA"). But their claims alleging Mining Law violations present a closer question. Federal Defendants contend that, because "Congress

intended the Mining Law to protect miners who assert their mining interests," nonminers like Plaintiffs necessarily fall outside the Mining Law's zone of interests.  Gov't XMSJ at 20.  They point to a recent Ninth Circuit decision concluding that environmentalists were not within the Mining Law's zone of interests because the law meant to protect only economic interests—not environmental or historical interests.  *See* Gov't Defs.' Further Notice of Suppl. Authority, ECF No. 149 (citing *Havasupai Tribe v. Provencio*, 906 F.3d 1155 (9th Cir. 2018)).

The zone-of-interests test "is not meant to be especially demanding" because it exists against a backdrop of "Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  There is no requirement that Congress meant "to benefit the would-be plaintiff."  *Id.* (quoting *Clarke*, 479 U.S. at 399).  Instead, the interest the plaintiff asserts must merely be "arguably within the zone of interests to be protected or regulated by the statute" he claims was violated.  *Id.* at 224 (quoting *Ass'n of Data Processing Svc. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).  The word "arguably" means that "the benefit of any doubt goes to the plaintiff." *Id.* at 225.  A suit will thus fail the zone-of-interests test "only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *Id.* (quoting *Clarke*, 479 U.S. at 399).

The Court holds that Plaintiffs clear prudential standing's low bar.  To be sure, the "obvious intent" of the Mining Law "was to reward and encourage the discovery of minerals that are valuable in an economic sense."  *United States v. Coleman*, 390 U.S. 599, 602 (1968).  But the law allowed for relatively unsupervised development only if certain statutory criteria were

satisfied; violations of those criteria would "work an unlawful private appropriation in derogation of the rights of the public." *Cameron*, 252 U.S. at 460.  In other words, the Mining Law struck a balance—albeit an asymmetrical one—between miners' interest in development and "the rights of the public."  Plaintiffs are members of the public who claim harm from the government's overly generous interpretations of a statute regulating the use of public lands. Their interest is not so marginally related to the balance the Mining Law struck that one could not reasonably assume Congress wanted to permit their suit.  *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 227 ("If the Government had violated a statute specifically addressing how federal land can be used, no one would doubt that a neighboring landowner would have prudential standing to bring suit to enforce the statute's limits.").  Given the benefit of the doubt, Plaintiffs' interests fit within the Mining Law's zone of interests.  *See id.* at 224–28 (holding that landowner could challenge proposed use of neighboring land because his economic, environmental, and aesthetic interests fell within the zone of interests of a statute that had the purpose of acquiring land for Native American tribes' economic development).

Even if Plaintiffs do not fall within the ambit of the Mining Law's zone of interests, the Court finds in the alternative that they at least have prudential standing for their first claim, which is based on the FLPMA.  The *Havasupai Tribe* court dealt with environmentalists' claim that the Forest Service failed to account for several costs in determining that a mine could be operated at a profit and thereby recognizing that its owner had "valid existing rights" exempt from a withdrawal of public lands from mining claims.  906 F.3d at 1161, 1166.  The court first concluded that the plaintiffs' aesthetic and recreational interests were outside the Mining Law's zone of interests.  *Id.* at 1166.  But then, observing that the plaintiffs had also argued that the Forest Service's action violated the FLPMA, it found that the FLPMA was in fact the source of

the plaintiffs' claim.  *Id.* at 1166–67.  The court explained that the FLPMA gave Interior

authority to withdraw federal lands for certain purposes "subject to valid existing rights."  *Id.* at

1166 (citations omitted).  So although the agency looked to the Mining Act in making its valid

existing rights determination, its decision "affect[ed] whether activities on federal land can be

limited under the FLPMA."  *Id.* at 1166.  Because the plaintiffs had thus properly alleged an

FLPMA violation, and because the FLPMA encompassed aesthetic and recreational interests, the

plaintiffs had prudential standing.  *Id.* at 1167.

So too for Plaintiffs' first claim.[9]  That claim challenges the 2008 Rule for failing to

comply with the FLPMA's policy that the federal government receive fair market value for use

of public lands.  *See* Compl. ¶¶ 151–54; Pls.' MSJ at 13–21.  It requires some analysis of the

Mining Law and how that law interacts with the FLPMA, but it ultimately comes down to

whether the 2008 Rule violated the FLPMA's fair market value policy.  Plaintiffs' aesthetic and

recreational interests fall within the FLPMA's zone of interests, so they have prudential standing

for the first claim.  *See Havasupai Tribe*, 906 F.3d at 1166–67; *see also Desert Citizens Against*

*Pollution v. Bisson*, 231 F.3d 1172, 1179 (9th Cir. 2000) (holding that environmentalists'

aesthetic and recreational interests were within the FLPMA's zone of interests).[10]

---

[9] The same would not be true of Plaintiffs' second claim, which alleges only that the
2003 Rule violated the Mining Law.  *See* Compl. ¶¶ 155–57.

[10] Federal Defendants' sole challenge to Plaintiffs' associational standing is that none of
"their members' interests fall within the zone of interests of the Mining Law."  *See* Gov't XMSJ
at 13.  Having rejected that argument, the Court notes that there is little doubt Plaintiffs satisfy
the other two elements of associational standing: Plaintiffs are environmentalist organizations
with a clear interest in federal land use, and the lawsuit does not require the participation of
Plaintiffs' individual members.  *See Ctr. for Biological Diversity*, 861 F.3d at 182.

## B. Merits

The Court will consider the challenges to each rule in turn.

### 1. 2008 Rule

#### a. Is the 2008 Rule a reasonable construction of the Mining Law and the FLMPA in light of MPC?

The essential question is whether it was unreasonable for the BLM to conclude in promulgating the 2008 Rule that there were no meaningful operations on invalidly claimed or unclaimed lands and therefore no need for the BLM to seriously consider whether to charge fair market value for those activities.[11]  Of course, in resolving this question, the Court is not writing on a blank slate.  *MPC* addressed these issues, and Judge Kennedy's order was not appealed.  It therefore remains good law.  *See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) ("[I]t is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected." (citation omitted)).  But *MPC*'s terminology, which was echoed in the 2008 Rule, has caused confusion.  As discussed above, *MPC* establishes that the BLM is required to at least consider charging fair market value for operations on what it variously called "unclaimed," "invalidly claimed," and "inadequately claimed" public land.  292 F. Supp. 2d at 50.  What these terms refer to, exactly, is at the heart of the dispute.

Plaintiffs' key contention is that these references encompass lands that have been *claimed* by mining operators but have not been *perfected* or *verified* through agency validity proceedings. According to Plaintiffs, until the claims are independently confirmed as containing valuable

---

[11] To the extent that the standard of review is governed by *Salerno* rather than *Chevron*, the Court believes that framing the question this way is consistent with *Salerno*'s "no set of circumstances" test for facial challenges.  If the BLM failed to take proper account of the FLPMA's mandate in promulgating the 2008 rule, then the BLM failed to take account of the mandate in every relevant circumstance.

mineral deposits, a claim does not fall within the protective scope of the Mining Law.  As a result, Plaintiffs say, the BLM is required to at least consider charging fair market value for operations on claims where the discovery of valuable mineral deposits has not been established and confirmed.  *See* Pls.' MSJ at 18.  In other words, it is not permissible for the agency, not *knowing* if a claim is valid, to treat the claim *as if* it were valid under the Mining Law and therefore immune from the FLPMA's fair market provision.  *Id.*[12]

Interior and the BLM characterize this argument as a "novel theory that there are phases in the development of a mining claim where the Mining Law does not apply."  Gov't's XMSJ at 27 (emphasis omitted).  In their view, the Mining Law and related regulations create a "cradle to grave" framework, *id.* at 27, and that engaging in prediscovery activities like exploration is "a statutorily-granted right under the Mining Law," *id.* at 28 (citing 30 U.S.C. §§ 22, 28).  They also reject the idea that "mining operations on mining claims of unknown validity" are not subject to and governed by the Mining Law.  *Id.* at 27.  The Mining Defendants largely echo these arguments.  They emphasize "a long-established BLM practice of permitting mining operations on mining claims without requiring formal claim validity exams."  Mining Defs.' XMSJ at 23.

---

[12] In a supplementary filing, Plaintiffs also cite for support *Center for Biological Diversity v. U.S. Fish & Wildlife Service*, 409 F. Supp. 3d 738, 763 (D. Ariz. 2019).  *See* Pls.' Notice of Suppl. Authority, ECF No. 153.  The Court agrees with Defendants that the case is of limited relevance here.  *See* Gov't Defs.' Resp. to Pls.' Notice of Suppl. Authority at 2–3, ECF No. 155; Mining Defs.' Resp. to Pls.' Notice of Suppl. Authority at 4–5, ECF No. 154.  Although that case examined the Mining Law, it dealt with a site-specific application of Forest Service regulations and a statute unique to the Forest Service, the Organic Act.  *See Ctr. for Biological Diversity*, 409 F. Supp. 3d at 748–49.  It did not discuss the 2008 Rule (a regulation governing the payment of fees to the BLM) or the FLPMA (the intersection of which with the Mining Law forms the core of this dispute), nor did it address whether the Forest Service had properly promulgated the regulations at issue.  In addition, the *Center for Biological Diversity* court's footnote suggesting that the mill site provision of the Mining Act limits mill site area to five acres per mining claim is nothing more than background information—in other words, dicta.  *See* 409 F. Supp. 3d at 763 n.13.

And they question whether Congress meant to alter this practice through the FLPMA or whether Judge Kennedy intended to do so in *MPC*.  *See id.* at 22–28.

    *MPC* never referred to claims of "unknown validity."  Rather, as mentioned, the opinion focused on operations not conducted on "valid" claims, which could include operations on "unclaimed," "invalidly claimed," or "inadequately claimed" land.  *See* 292 F. Supp. 2d at 50. Its operative language relied on the valid/invalid distinction: "Operations *neither conducted pursuant to valid mining claims* nor otherwise explicitly protected by FLPMA or the Mining Law (*i.e.*, exploration activities, ingress and egress, and limited utilization of mill sites) must be evaluated in light of Congress's expressed policy goal for the United States to 'receive fair market value of the use of the public lands and their resources.'"  *Id.* at 51 (emphasis added) (quoting 43 U.S.C. § 1701(a)(9)).  Of course, as Plaintiffs stress, *MPC* also followed statements of the Supreme Court in emphasizing that a claim is invalid in the absence of discovery.  *See id.* at 47–48 (explaining that "before perfecting a valid mining claim [through discovery and fulfilling related administrative requirements], . . . [a claimant] has no property rights against the United States"); *see also Best*, 371 U.S. at 336 (unpatented mining claims are "valid against the United States if there has been a discovery of mineral within the limits of the claim"); *Cameron*, 252 U.S. at 460 (stating that "no right arises from an invalid claim of any kind").[13]

---

[13] The Supreme Court has also observed, somewhat cryptically, that "it has come to be generally recognized that while discovery is the indispensable fact and the marking and recording of the claim dependent upon it, yet the order of time in which these acts occur is not essential to the acquisition from the United States of the exclusive right of possession of the discovered minerals or the obtaining of a patent therefor."  *Union Oil Co.*, 249 U.S. at 347; *see also Creede & Cripple Creek Mining & Milling Co. v. Uinta Tunnel Mining & Transp. Co.*, 196 U.S. 337, 354 (1905) ("[I]t is not a vital fact that there was a discovery of mineral before the commencement of any of the steps required to perfect a location . . . .").  This language could be read to imply that, contra the statutory text and subsequent judicial statements, a prediscovery claim is actually "valid" against the United States in some sense.  *Cf.* 30 U.S.C. § 23 (providing that "no location of a mining claim shall be made *until* the discovery of the vein or lode within

But crucially for present purposes, *MPC* says nothing about the practical process of determining whether a claim is valid, whether the government has an affirmative obligation to do so, or when such an obligation, if it exists, might attach.  These all strike the Court as analytically distinct from the abstract question of whether a claim, in the absence of discovery, is technically valid or not.  As discussed above, the Mining Law, its implementing regulations, and related case law have never required Interior or BLM to verify the validity of a claim by independently confirming discovery.  Additionally, as the Supreme Court has also recognized, a claim of unknown or undetermined validity is not a legal nullity.  An operator on a claim of unknown validity can have rights against rival claimants under the doctrine of *pedis possessio*, and the government cannot find such a claim invalid without a degree of process.  *See Cameron*, 252 U.S. at 460 (noting that the government "does have power, after proper notice and upon adequate hearing, to determine whether the claim is valid").  That implies that while a claim may *in fact* be invalid (*e.g.*, because, after a reasonably thorough claim investigation process, it has been shown to lack a valuable discovery), it is nonetheless treated as a *de facto* valid claim until proven otherwise.  Nothing in *MPC* challenged this practice or suggested it was impermissible.

---

the limits of the claim located" (emphasis added)); *Locke*, 471 U.S. at 86 ("'Discovery' of a mineral deposit, *followed by* the minimal procedures required to formally 'locate' the deposit, gives an individual the right of exclusive possession of the land for mining purposes." (emphasis added)); *Best*, 371 U.S. at 335 ("A mining claim on public lands is a possessory interest in land that is 'mineral in character' and as respects which discovery 'within the limits of the claim' *has been* made." (emphasis added)); *Foster v. Seaton*, 271 F.2d 836, 838 (D.C. Cir. 1959) ("One who has located a claim upon the public domain has, *prior to the discovery of valuable minerals*, only 'taken the initial steps in seeking a gratuity from the Government.'" (emphasis added) (quoting *Ickes*, 141 F.2d at 549)); *Am. Colloid Co. v. Babbitt*, 145 F.3d 1152, 1156 (10th Cir. 1998) ("Before one may obtain any rights in a mining claim, one must 'locate' a valuable deposit of a mineral.").  Less radically, it could mean that a claimant need not establish (*e.g.*, in a patent application or validation proceeding) that discovery actually predated the recording of a claim.  But even on this less extreme view, *Union Oil* seemed to have recognized that a claim would not be subject to immediate validation proceedings.

Even if *MPC* meant to address, *sub silentio*, claims of unknown validity, *MPC*'s instructions to Interior on remand were narrow.  It held only that Interior, in promulgating the earlier regulations, "was not cognizant of its statutory obligation to attempt to 'receive fair market value of the use of public lands and their resources,' and did not balance its competing priorities with that obligation [in] mind."  *MPC*, 292 F. Supp. 2d at 51.  Accordingly, the regulations were "remanded to Interior, so that Congress's policy goal, as set forth in § 1701(a)(9), may be given proper effect."  *Id.*

Interior and BLM adequately discharged this obligation.  The 2008 Rule considered the various kinds of problematic operations specifically mentioned by *MPC*—those on "unclaimed," "invalidly claimed," or "inadequately claimed" land—and sought to identify how it could apply a fair market value policy to each of them.  *See* 73 Fed. Reg. at 73,791.  It explained that,  even after seeking examples via public comment, "[t]he BLM is not aware of any mining operations taking place on 'invalidly claimed' public lands (i.e., public lands where BLM has determined that the claims or sites are invalid) or unclaimed public lands (i.e., lands where there are no mining claims or mill sites)."  *Id.*  And it determined that Congress had decided how to implement the FLPMA's fair market policy mandate when it required claimants to pay annual maintenance fees.  *Id.* at 73,792.

Plaintiffs' alternative interpretation would require reading *MPC* to have quietly upended the current claim system under the Mining Law.  As the BLM recognized in its Advanced Notice of Proposed Rulemaking issued in response to *MPC*, Surface Management, 72 Fed. Reg. 8,139-01 (Feb. 23, 2007), there are over 250,000 active mining claims on public lands, and a full validity determination costs between $12,000 and $80,000.  *Id.* at 8,141.  As a result, "[c]onducting validity determinations for all 250,000 mining claims would exceed the BLM's

annual operating budget many times over." *Id.* The Court will not strain to read either *MPC* or the FLPMA as silently working such a fundamental change to longstanding practice under the Mining Law.[14]

> ### b. Did the promulgation of the 2008 Rule violate NEPA?

In promulgating the 2008 Rule, the BLM determined that the rule was

> a regulation of an administrative, financial, legal, technical, or procedural nature. Therefore, it is categorically excluded from environmental review under Section 102(2)(C) of the National Environmental Policy Act, pursuant to 516 Departmental Manual (DM), Chapter 2, Appendix 1. In addition, the interim final rule does not meet any of the 10 criteria for exceptions to categorical exclusions listed in 516 DM, Chapter 2, Appendix 2.

73 Fed. Reg. at 73,792. As a result, it concluded that neither an EIS or EA was required before publishing the rule. *Id.* at 73,792–93.

Under NEPA, agencies identify classes of actions that "normally do not have a significant effect on the human environment." 40 C.F.R. § 1501.4(a). Agency actions under these so-called "categorical exclusions" (CEs) are exempt from NEPA's requirement of preparing an EA or an EIS. *Id.* "[T]raditional arbitrary-and-capricious review is sufficient where the question is whether [an agency] properly invoked a CE." *Nat'l Tr. for Hist. Pres. in the U.S. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987). "[T]he agency's interpretation of the scope of one of its own CE's is 'given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation.'" *Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (quoting *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999)); *see also Edmonds Inst. v. Babbitt*, 42 F. Supp. 2d 1, 18 n.11 (D.D.C. 1999) (noting that NEPA does

---

[14] It should be noted that the FLPMA explains that, except for certain exceptions not relevant here, "no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress." 43 U.S.C. § 1732(b).

not require "a full-blown statement of reasons for invoking a categorical exclusion"). Nevertheless, even when an action is covered by a CE, the presence of certain "extraordinary circumstances" will require analysis under NEPA.  40 C.F.R. § 1501.4(b); 43 C.F.R. §§ 46.205(c), 46.215.

Plaintiffs largely argue that BLM's use of a CE was inappropriate here because the 2008 Rule "will undoubtedly have on-the-ground effects" since it "allows mining projects to be approved that otherwise may or would not occur, or would occur in a different manner."  Pls.' MSJ at 34.  But the 2008 Rule did not make any substantive changes to the existing practice under BLM regulations—it simply clarified, consistent with existing practice, when certain fees associated with mining claims and mill sites must be paid.  While the Court, for the purposes of standing, is required to adopt Plaintiffs' views of the merits and assume that the 2008 Rule violated the FLPMA, the BLM was not required to adopt Plaintiffs' reading of *MPC* when considering whether a CE applied.  It was not arbitrary for the BLM to conclude that the 2008 Rule worked no substantive change in any rule or requirement and likewise did not constitute extraordinary circumstances.

### 2.  2003 Rule

#### a.  Is the 2003 Rule a reasonable construction of the Mining Law?

As with the APA challenge to the 2008 Rule, this dispute reduces to whether the 2003 Mill Site Rule's determination that a claimant may locate more than one mill site per mining claim is consistent with the statute, 30 U.S.C. § 42(a).[15]  The statutory language is quite sparse: it

---

[15] To repeat, insofar as the standard of review is governed by *Salerno* rather than *Chevron*, the Court believes this framing is similarly consistent with *Salerno*'s "no set of circumstances" test for facial challenges.  If the Plaintiffs' position is correct, any allowance for multiple mill sites per claim is inconsistent with the statute.  The BLM and Interior argue that "even the 1999 proposed rule—which Plaintiffs favor—would have permitted locating more than

gives proprietors of veins and lodes the right to use and occupy lands for mining or milling purposes, clarifies that the lands must be nonmineral in character and not contiguous or adjacent to the vein or lode, and specifies that "no location made on or after May 10, 1872, of such nonadjacent land shall exceed five acres." *Id.* It is completely silent on the number of mill sites that can be located per claim. Put in *Chevron* terms: Congress has not "directly spoken to the precise question at issue." 467 U.S. at 842.

Plaintiffs disagree. They advocate a one-mill-site-per-claim rule by relying on several extra-statutory materials, most prominently a Public Land Law Review Commission Report called *One Third of the Nation's Land: A Report to the President and to the Congress by the Public Land Law Review Commission* (June 1970), which assumed such a limitation. *See* Pls.' MSJ at 23–28. They also argue that Congress, in enacting the Mining Law, was primarily concerned with the development of mineral lands so it is implausible to read the statute as allowing the extensive development of acquisition of nonmineral lands like mill sites. *Id.* at 26–28. And more generally, they suggest that Congress would not have limited the size of each mill site without also limiting the number of mill sites; beyond requiring additional administrative hurdles, two five-acre mill sites (allowed) seems equivalent to a single ten-acre site (not allowed). *See id.* at 22.

Although Plaintiffs' arguments carry some weight, they hardly establish an unambiguous congressional intent to limit the number of mill sites per mining claim. If Congress wanted to

---

one mill site per mining claim (for example, two 2.5 acre mill sites), so long as the miner did not locate more than 5 acres of mill site per 20 acres of mining claim." Gov't's XMSJ at 18. "Thus, even assuming that Plaintiffs' preferred interpretation was correct, the regulation adopted by the BLM with the 2003 Rule would still not be invalid *every* time someone located more than one mill site per mining claim." *Id.* But the Court fails to see why Plaintiffs' preference for an earlier rule would prevent them from arguing that both violate the Mining Law.

impose such a restriction, it could have said so expressly.  *See Goldring v. District of Columbia*, 416 F.3d 70, 77 (D.C. Cir. 2005) (explaining that a court's "job one" in determining Congress's intent is "to read the statute, read the statute, read the statute").  But while the statute limits the size of mill sites at five acres, it does not place a similar restriction on the number of mill sites a claimant can locate.  *See* 30 U.S.C. § 42(a).  That omission is particularly glaring in light of the fact that the Mining Law's predecessor, the Lode Law of 1866, not only capped the size of lode claims at "200 feet in length along the vein" but also limited the number of claims that a miner could locate and patent to one per lode.  *See* Ch. 262, sec. 4, 14 Stat. 251, 252 (providing that "no person may make more than one location on the same lode"); *see also* 2003 Opinion 13–19 (recounting the Mining Law's legislative history).  Indeed, the Supreme Court has held that the Mining Law's placer claim provision—which is worded similarly to the mill site provision—did not prohibit a claimant from patenting more than one such claim.  *See St. Louis Smelting & Ref. Co. v. Kemp*, 104 U.S. 636, 648, 651 (1881); *see also* 30 U.S.C. § 35 (providing that "no [placer] location shall include more than twenty acres for each individual claimant").  Consequently, the Court cannot say that Congress meant the Mining Law to include a one-mill-site-per-claim rule.

That brings the Court to *Chevron* Step Two, which provides that a court "must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute." *Christensen v. Harris County*, 529 U.S. 576, 586–87 (2000).  In other words, the Court is required to uphold the 2003 Rule if it is based on a "permissible construction" of the mill site provision.  *Chevron*, 467 U.S. at 843.

The 2003 Rule does permissibly construe the statute.  There is no language in the statute contradicting the BLM's reading.  And the BLM thoroughly justified its interpretation as consistent with the statute by drawing on the statutory text, Supreme Court precedent, its view of

the congressional policy behind the Mining Law, and longstanding BLM practice.  *See* 68 Fed. Reg. at 61,054–55; 2003 Opinion 2–4; *see also Northpoint Tech., Ltd. v. F.C.C.*, 412 F.3d 145, 151 (D.C. Cir. 2005) ("A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made.").  Faced with a statute that leaves open the question of whether the number of mill sites should be limited, it is not the Court's place to second-guess how the BLM should strike a balance between the competing policy concerns underlying the Mining Law.  *See Chevron*, 467 U.S. at 864 ("[P]olicy arguments are more properly addressed to legislators or administrators, not to judges.").  Even if the BLM's interpretation may not be the only plausible one (or, for that matter, the most natural one), this Court must defer to it because it is a permissible one.  *See id.* at 843 n.11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.").

Plaintiffs stress that the 2003 Rule represented a complete about-face from the 1997 Opinion and the 1999 Proposed Rule.[16]  *See* Pls.' MSJ at 22. But that is of no matter.  As long as an agency explains itself, it can change its view of an ambiguous statute's meaning without forfeiting *Chevron* deference.  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework.").  Indeed, "the whole point of *Chevron* is to leave

---

[16] The Court notes that, even under the 1999 Proposed Rule, multiple mill sites could be located per claim, though they were limited in aggregate size.  64 Fed. Reg. at 47,037 ("You may locate more than one mill site, so long as you do not locate more than an aggregate of 5 acres of mill site land for each 20-acre parcel of patented or unpatented placer or lode mining claims associated with that mill site land, regardless of the number of lode or placer claims located in the 20-acre parcel.").

the discretion provided by the ambiguities of a statute with the implementing agency." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996). As mentioned, the BLM carefully explained its decision to reverse course from the 1999 Proposed Rule and impose no cap on the number of mill sites a claimant could locate. *See* 68 Fed. Reg. at 61,054–55; *see also generally* 2003 Opinion. The agency's change of heart thus does not deprive it of *Chevron* deference.

### b.  Did the 2003 Rule violate NEPA?

In publishing the 2003 Rule, BLM reported: "We have conducted an environmental assessment and have concluded that this rule would not have a significant impact on the quality of the human environment under [NEPA] and therefore an Environmental Impact Statement is not required." 68 Fed. Reg. at 61,063. Keeping in mind that NEPA imposes procedural rather than substantive requirements, *see Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989), the question is whether the BLM's EA considered all the relevant factors and rationally concluded that the final 2003 Rule would not cause a significant impact warranting an EIS. That is because "a court's role in reviewing an agency's decision not to prepare an EIS is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored." *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017) (cleaned up) (quoting *Myersville Citizens for a Rural Cmty., Inc. v. F.E.R.C.*, 783 F.3d 1301, 1322 (D.C. Cir. 2015)). Plaintiffs' primary contention is that the BLM violated NEPA because its EA ignored the impacts that would result from claimants' ability to use more land for mill sites under the 2003 Rule compared to the regime articulated in the 1997 Opinion and 1999 Proposed Rule. *See* Pls.' MSJ at 35.

The problem for Plaintiffs is that the policy expressed in the 1997 Opinion and the 1999 Proposed Rule was never implemented. When the BLM issued the 2003 Opinion and Final Rule, it "ha[d] not applied the 1997 Opinion to any patent application or plan of operations."

2003 Opinion 39; *see also* 68 Fed. Reg. at 61,055.[17]  In practice and by regulation, then, the

BLM had maintained the same interpretation that it held prior to the 1997 Opinion.  *See* 68 Fed.

Reg. at 61,054–55.  The 2003 Rule merely codified the BLM's prevailing practice; it effected no

change in the status quo on the ground.[18]  *See* Bureau of Land Mgmt., Dep't of the Interior,

Environmental Assessment for the Final Rule to Revise 43 C.F.R. Parts 3710, 3730, 3810, 3820,

3830, 3840, and 3850, at 5 (2003) [hereinafter 2003 Rule EA] ("[T]his amended rule does not

change BLM's practice regarding mill site locations.").[19]  Because all the 2003 Rule did was

maintain the status quo, it was not a major federal action significantly affecting the environment.

---

[17] The BLM tried once to deny a proposed plan of operations based on the 1997 Opinion, but Congress stepped in with a pair of laws that rebuffed the BLM's attempt.  *See* 68 Fed. Reg. at 61,055.  One prohibited the BLM from relying on the 1997 Opinion to reject patent applications and plans of operations submitted prior to the law's enactment.  Pub. L. No. 106-31, § 3006, 113 Stat. 57, 90–91 (1999).  The other essentially prohibited the BLM from spending appropriated funds to deny applications based on the 1997 Opinion for fiscal years 2000 and 2001.  *See* Pub. L. No. 106-113, § 337(a), 113 Stat. 1501, 1501A-199 (1999).  It should be noted that the latter law also stated that neither statute should be "construed as an explicit or tacit adoption, ratification, endorsement, approval, rejection or disapproval" of the 1997 Opinion.  *Id.* § 337(b).

[18] That the BLM never implemented the 1997 Opinion distinguishes this case from one Plaintiffs cite in a notice of supplementary authority, *American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017).  *See* Pls.' Notice of Suppl. Authority, ECF No. 140.  In that case, the United States Forest Service had at some point inadvertently expanded the boundaries of a wild horse territory from about 236,000 acres to 258,000 acres.  *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 920–22.  The Forest Service managed the extra land for twenty years but eventually realized its mistake and proposed a return to the territory's original boundaries.  *Id.* at 921–22.  It determined an EIS was unnecessary because it was merely "correct[ing] a boundary established for administrative convenience" so its action would have "'no effect' on the ground."  *Id.* at 931 (alteration in original).  The D.C. Circuit held that the Forest Service violated NEPA.  *Id.*  It reasoned that the Forest Service did not acknowledge its "departure from past practice" and had ignored the obvious impact that the change would have on the wild horse population in the area, seeing as the Forest Service had managed the extra acreage for two decades.  *Id.* at 930–31.  Here, by contrast, the BLM recognized that it reversed the 1997 Opinion and also pointed out that it had never "applied the 1997 Opinion to any patent application or plan of operations."  2003 Opinion at 39, 41.  It thus did not silently reverse its on-the-ground practice like the Forest Service did in *American Wild Horse Preservation Campaign*.

[19] The 2003 Rule EA is available in the administrative record at MIL007585–93.

*See Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997); *Comm. for Auto Resp.*
*(C.A.R.) v. Solomon*, 603 F.2d 992, 1003 (D.C. Cir. 1979); *All. for Bio-Integrity v. Shalala*, 116
F. Supp. 2d 166, 174 (D.D.C. 2000).  It thus did not require an EIS.

Plaintiffs also argue that the BLM's EA inadequately evaluated the alternative approach
offered by the 1997 Opinion and 1999 Proposed Rule.  Pls.' MSJ at 37.  An EA must "[b]riefly
discuss" alternatives and "the environmental impacts of the proposed action and alternatives."
40 C.F.R. § 1501.5(c)(2); *accord Myersville Citizens*, 783 F.3d at 1323.  But that discussion
"need not be as rigorous as the consideration of alternatives in an EIS."  *Myersville Citizens*, 783
F.3d at 1323 (collecting cases).

The BLM's EA identified the 1997 Opinion's position as an alternative but rejected it
after a brief examination.  *See* 2003 Rule EA at 7.  In addition to reiterating the 2003 Opinion's
textual and purposive arguments against the 1997 Opinion, the EA said that the 1997 Opinion's
position would not necessarily result in a lesser environmental impact.  *Id.*  For one thing, the EA
explained, a limit on the number of mill sites per mining claim would likely lead to claimants
"subdivid[ing] their maximum-sized mining claims into many smaller claims to obtain the
number of mill sites they need."  *Id.*  For another thing, the EA also stated that the "ultimate
impacts from mining would likely not change" because mining operators could gain the use of
federal land for mill sites through other means, including "land exchanges and permits or leases."
*Id.*  It nevertheless acknowledged that "[o]btaining the necessary land might take longer."  *Id.*

Although imperfect, that discussion was sufficient to satisfy NEPA.  The EA neglected to
mention that the 1999 Proposed Rule included a provision limiting operators' ability to subdivide
their claims to acquire more mill sites.  *See* 64 Fed. Reg. at 47,028 ("This rule proposes to
prevent claimants from circumventing the limitation on the number of millsite acres a claimant

may locate . . . by limiting the millsite acreage you may locate to 5 acres per associated 20 acre parcel of lode or placer claim lands."). That provision undermines the EA's first justification for dismissing the alternative. But the EA's second justification is reasonable and can independently sustain the BLM's conclusion that the "ultimate impacts from mining would likely not change" under the alternative. Even the 1997 Opinion recognized that mining operators would still be able to get land for mill sites using land exchanges and permits or leases. *See* 1997 Opinion 2–3. And while those means (unlike mill site patent applications) are subject to the BLM's discretionary approval, *id.* at 3, it is speculative to say whether such a discretionary regime would necessarily lead to less total environmental impact, *cf. Nat'l Wildlife Fed'n v. F.E.R.C.*, 912 F.2d 1471, 1478 (D.C. Cir. 1990) (explaining that "an EIS need not delve into the possible effects of a hypothetical project, but need only focus on the impact of the particular proposal at issue and other pending or recently approved proposals that might be connected to or act cumulatively with the proposal at issue"). The Court therefore cannot conclude that the BLM's consideration of the 1997 Opinion's alternative was inadequate.

Finally, the Court rejects Plaintiffs' last argument that the BLM violated NEPA by not giving the public an opportunity to comment on the EA. *See* Pls.' MSJ at 38–39. While the BLM "must, to the extent practicable, provide for public notification and public involvement when an [EA] is being prepared," it is not required to publish a proposed EA for comment as it is when preparing an EIS. 43 C.F.R. § 46.305(a)–(b); *see also id.* § 46.435(a) (requiring public comment for a draft EIS). An agency has "significant discretion in determining when public comment is required with respect to EAs." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 519 (D.C. Cir. 2010) (quoting *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006)).

The BLM did not abuse its discretion.  Even though it did not invite comments on the EA, the public still provided feedback on the merits and drawbacks of the conflicting interpretations of the mill site statute in response to the 1999 Proposed Rule.  *See* 68 Fed. Reg. at 61,054 (mentioning that the BLM received 49 comments addressing the mill site provisions of the 1999 Proposed Rule); *see also Theodore Roosevelt Conservation P'ship*, 616 F.3d at 519–20 (holding that, despite not publishing EAs for comment, the BLM sufficiently permitted public input by posting public notice of two proposed drilling projects).  The Court finds that the BLM engaged the public as much as it needed to.

In sum, the 2003 Final Rule did not violate NEPA.

### c.  Did the promulgation of the 2003 Rule violate the APA's notice-and comment requirements?

The BLM published both the 1999 Proposed Rule and the 2003 Final Rule in the Federal Register.  *See* 64 Fed. Reg. at 47,023; 68 Fed. Reg. at 61,046.  It also accepted comment on the proposed rule.  *See* 64 Fed. Reg. at 47,023.  Nevertheless, Plaintiffs argue that the BLM did not provide interested parties sufficient notice that it would abandon its proposal to limit the acreage of mill sites permitted in connection with a mining claim.  Pls.' MSJ at 39–40.  Defendants counter that the BLM was allowed to change its mind because the public could have anticipated that it might not follow through with its proposal.  Gov't XMSJ at 37–39; Mining Defs.' XMSJ at 38–40.

An agency "is not required to adopt a final rule that is identical to the proposed rule."  *Ne. Md. Waste Disposal Auth. v. E.P.A.*, 358 F.3d 936, 951 (D.C. Cir. 2004) (per curiam).  On the contrary, "[a]gencies are free—indeed, they are encouraged—to modify proposed rules as a result of the comments they receive."  *Id.*  Public input is, after all, one of the purposes of the APA's notice-and-comment scheme.  *See Int'l Union, United Mine Workers of Am. v. Mine*

*Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).  A final rule may thus depart from an earlier proposal—and still maintain compliance with the APA's notice requirements—as long as it is a "logical outgrowth" of the proposed rule.  *Ne. Md. Waste Disposal Auth.*, 358 F.3d at 951–52.  That means that "interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period."  *Id.* (quoting *City of Waukesha v. E.P.A.*, 320 F.3d 228, 245 (D.C. Cir. 2003) (per curiam)).

The 2003 Rule easily satisfies the logical outgrowth test.  The 1999 Proposed Rule floated a shift from the BLM's longstanding interpretation of the mill site statute.  *See* 64 Fed. Reg. at 47,028 ("[T]his rule proposes to make it clear that you may not locate more than an aggregate of 5 acres of mill site land for each associated placer or lode mining claim.").  Interested parties undoubtedly could have anticipated that the agency might choose instead to maintain its prevailing practice following public comment.  *See Am. Iron & Steel Inst. v. E.P.A.*, 886 F.2d 390, 400 (D.C. Cir. 1989) ("[A] simple retreat to the status quo ante can properly be viewed as a 'logical outgrowth' of the proposed rule.").  In fact, they clearly did anticipate the possibility of the BLM staying the course: the agency received "49 adverse comments" regarding the 1999 Proposed Rule's mill site provisions.  *See* 68 Fed. Reg. at 61,048; *see also id.* at 61,055–56.

This case is similar to *Arizona Public Service Co. v. E.P.A.*, 211 F.3d 1280 (D.C. Cir. 2000).  In that case, the EPA had proposed a rule that would have treated Indian tribes like states and required them to provide for judicial review of pollution permitting decisions under the Clean Air Act.  *Id.* at 1298.  But then the EPA backtracked.  Its final rule exempted tribal permitting programs from the judicial review requirement.  *Id.*  The court rejected the plaintiffs'

logical outgrowth challenge.  It explained, "[i]n first proposing that tribes would have to meet the 'same requirements' as states, EPA effectively raised the question as to whether this made sense."  *Id.* at 1299.  In doing so, the EPA "raised a highly visible and controversial issue and elicited responses from both tribal and industry commenters."  *Id.* at 1299–300.  As a result, the court concluded, "any reasonable party should have understood that EPA might reach the opposite conclusion after considering public comments."  *Id.* at 1300.

So too with the BLM's mill site rule.  The BLM asked the public in its 1999 Proposed Rule whether adopting limits on the number of mill sites allowed per mining claim was a good idea.  Nearly fifty commenters responded in the negative.  Accordingly, the BLM pulled the mill site limit from its final rule.  That rule was not "wholly unrelated or surprisingly distant" from BLM's initial proposal.  *See id.* at 1299.  Nor was the situation one "where the proposed rule gave no indication that the agency was considering a different approach, and the final rule revealed that the agency had completely changed its position."  *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009).  Rather, any reasonable party should have foreseen the possibility that the BLM would simply decline to adopt its 1999 proposal to codify the 1997 Opinion and instead retain its previous position.  "One logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step."  *Am. Iron & Steel Inst.*, 886 F.2d at 400.

The 2003 Rule complied with the APA's notice-and-comment requirements.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied, and Defendants' motions for summary judgment are granted.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: October 26, 2020.                                    RUDOLPH CONTRERAS
                                                            United States District Judge